

**PO BOX 783, JENKS, OKLAHOMA 74037 | 918.970.4722 | 855.918.5111 (TF) | WWW.VALORFES.COM**

NOVEMBER 13, 2023

FOSHEE & YAFFE
ATTN: TERRY MCKEEVER
12231 SOUTH MAY AVENUE
OKLAHOMA CITY, OKLAHOMA 73170

SUBMITTED TO TERRY MCKEEVER VIA E-MAIL: TMM@FYLAW.COM

## RE: POST-FIRE EVALUATION: SUPPLEMENTAL LETTER: COLLINS RESIDENCE, VFES OK-04.28.2021.01: 1312 WEST 60TH STREET NORTH, MUSKOGEE, OKLAHOMA:

Mr. McKeever:

## 1.0: BACKGROUND:

As indicated in the Valor Forensic Engineering Services, LLC, Report of Findings dated May 11, 2021, for the property referenced above, the initial Scope of Work was to:

*"Determine the extent of fire damage to the dwelling as a result of a fire reported on January 11, 2021."*

## 2.0: INITIAL FINDINGS:

As indicated in the Valor Forensic Engineering Services, LLC, Report of Findings dated May 11, 2021, for the property referenced above, the Conceptual Scope of Repairs (Conclusion 1) indicated:

1. *"The conceptual scope of repairs for the subject residence as a result of the fire reported on January 11, 2021, includes:*

   a. *Removal and reconstruction of the laminate-style asphalt-composition shingle roof surfaces in their entirety. It will also be necessary to remove and replace the reflective OSB roof sheathing.*

   b. *Removal and reconstruction of the wood framing for the second-floor gable along the west side of the dwelling. This reconstruction will require the removal and replacement of the sheathing, window/vent, and the painted fiber cement siding.*

   c. *Removal and reconstruction of the kitchen cabinets due to the fire **damage** at the refrigerator cabinet. If matching cabinets are not available, it may be necessary to replace the kitchen cabinets in their entirety.*

   d. *Removal and reconstruction of the roof and second floor framing above the west (lower) roof section. The ceiling/floor 'engineered' I-beams above the garage should be completely removed and replaced. This reconstruction will necessarily require the replacement of the soffits, soffit framing, fascia, and gutters. It is recommended to remove*

 **CONFIDENTIAL DOCUMENT ©2023 VALOR FORENSIC ENGINEERING SERVICES, LLC** 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

*and replace the interior finishes along the west side of the dwelling due to removal and reconstruction of the roof and roof framing.*

e. *Removal and replacement of the vinyl window at the southwest corner of the garage and near the middle of the second-floor south elevation. The removal and replacement of the southwest window will disturb the adjoining brick if a flanged window is maintained."*

The statements in The Conceptual Scope of Repairs (Conclusion 1) remain as written with the grammatical change of 'damaged' to 'damage' in statement c (marked in bold in the above passage). Further discussions of the content of this Conceptual Scope of Repairs will be included in later sections of this Supplemental Letter.

Conclusions 2 through 7 from the May 11, 2021, Report of Findings are stated below:

2. *"The necessary removal of the soot along the south and west brick veneer sections, the necessary removal and replacement of the west window of the south garage, and the necessary removal and replacement of the soffits, soffit framing, and fascia each have the potential to expose or cause damage to the brick veneer. As such, it will be necessary to ensure that sufficient compatible and visually consistent replacement brick is available. If compatible and visually consistent replacement brick is not available to complete any necessary repairs, the complete removal and replacement of the brick veneer should be considered.*

3. *As smoke was observed to have entered into the south elevation plenum, it is recommended to remove the wall board enclosure for the south plenum of the dining room and the office in order to allow for the full assessment of the ductwork, for the assessment of the framing and for any necessary clearing/remediation.*

4. *At the time of the site evaluation, burned/charred sections of the wall board wall and ceiling surfaces remained in place along the west side of the dwelling. During the demolition process, it is possible that additional fire damage will be identified to the wall top plates and/or sheathing. Should additional fire damage be noted, it will be necessary to expand the scope of repairs.*

5. *It was also noted that the exposed sections of the electrical wiring at the northwest corner of the garage had burned/deformed plastic insulation. The electrical system should be assessed to confirm the scope of necessary repairs.*

6. *It is recommended to consult with a properly credentialed industrial hygienist to determine the scope of repairs/cleaning necessary to restore the east side of the dwelling and/or other portions of the dwelling not otherwise reconstructed.*

7. *Given the necessary and extensive scope of repair, it is recommended to conduct an economic analysis to determine the feasibility of completing necessary repairs relative to demolition and reconstruction."*

Conclusions 2 through 7, as quoted above, remain as written in the Valor Forensic Engineering Services, LLC, Report of Findings dated May 11, 2021.

 **CONFIDENTIAL DOCUMENT ©2023 VALOR FORENSIC ENGINEERING SERVICES, LLC** 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

## 3.0: REVISED SCOPE OF WORK:

Recently, Valor Forensic Engineering Services, LLC, was requested to review a 60-page letter attributed to Derek VanDorn with Berryman. This document addresses issues beyond the Valor Forensic Engineering Services, LLC Report of Findings. Issues discussed within this letter but outside of the Scope of Work for the May 11, 2021, Valor Forensic Engineering Services, LLC Scope of Work are not within the Scope of Work for the Supplement Letter. The Berryman letter references demolition and other changes at the site after the initial Valor Forensic Engineering Services, LLC site evaluation on May 4, 2021. As such, Mr. Chad T. Williams, P.E., D.F.E., M.L.E., returned to the site on October 27, 2023.

## 4.0: REVIEW AND COMMENT ON THE BERRYMAN LETTER:

Through the owner's legal counsel, Valor Forensic Engineering Services, LLC, was provided with a copy of the 60-page letter attributed to Derek VanDorn with Berryman and dated June 23, 2023. A copy of this letter is included in Attachment 6.1 (below). The discussion within this section is in response to comments offered by VanDorn about the Valor Forensic Engineering Services, LLC Report of Findings. Valor Forensic Engineering Services, LLC has refrained from further commentary on the VanDorn Report as of the issuance of this Supplemental Letter.

On Page 46 of 60, the VanDorn Report states:

*"Williams recommends to replace all the reflective (radiant barrier) sheathing including that installed over Attic 2. Based on information and belief, this recommendation was based on a tear in the radiant barrier in one location. My observations found that the nearest tear in the radiant barrier was approximately 30' from the nearest fire damage. It is not reasonable to conclude the fire caused the tear in the reflective sheet. It is more likely this tear occurred as the sheathing was being installed. Any smoke that collected on the sheathing and framing can be remediated without replacement."*

Attic 2 is identified on Page 11 of 60 of the source PDF of the VanDorn Report and represents the attic over the eastern second-story section of the dwelling. The location chosen for discussion by VanDorn is located along the west side of the east attic and was indicated by VanDorn to be 'more than 30' from the nearest fire damage'. This statement is misleading and inaccurate. Image 4.1 shows an area of damaged radiant barrier to the roof decking less than 6 feet from the west wall of the east attic. In this image, the charring of the framing for the window is apparent. Furthermore, as shown in Figures 4.1 and 4.2, sections of the adjoining radiant barrier are deformed in an area that would be directly above where the fire has damaged and consumed portions of the wall framing. The commentary from VanDorn, as quoted above, is inaccurate and misleading. As such, the VanDorn commentary, as quoted above, should be withdrawn.

Further consideration should also be given to the consequences of the radiant barrier roof decking from the removal and replacement of the laminate-style asphalt-composition shingle roof assemblies. The necessary use of nails to secure the new shingles will result in additional holes and displaced sections of the radiant barrier. This additional alteration of the wood decking would not return the residence to a pre-fire condition.

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**



**4.1: VIEW OF THE DEFORMED RADIANT BARRIER ALONG THE WEST SIDE OF THE EAST ATTIC.**



**4.2: VIEW OF FIRE-DAMAGED FRAMING ALONG THE WEST SIDE OF THE EAST ATTIC AND DIRECTLY BELOW AN AREA OF DEFORMED RADIANT BARRIER TO THE ROOF SHEATHING.**



On Page 47 of 60, VanDorn states:

*"Williams noted the fire damage around the Attic 2 gable window. However, he recommended that the entire wall be re-framed. As the damage was limited to the immediate window area, it would not be necessary to re-frame the entire wall. It is a common practice to repair fire damage within a framed section without replacing the entire section."*

Interestingly, VanDorn does not quote where this information was found in the Valor Forensic Engineering Services, LLC Report of Findings. The closest passage would have been for Conclusion 1b, as quoted below.

*"Removal and reconstruction of the wood framing for the second-floor gable along the west side of the dwelling. This reconstruction will require the removal and replacement of the sheathing, window/vent, and the painted fiber cement siding."*

The west side of attic 2 would have been located near the center of the dwelling. This passage referred to the south gable wall of the west gable, which, in other words, was the south elevation of the west-opening two-car garage.

Within the Qualification Section on Page 4 of 60 of the source PDF for the Berryman Report, it was stated:

*"I regularly interact with engineers, architects, and building code officials when determining the extent of damages and developing the proper scope of repairs. In the course of business, I have frequently interfaced with insurance professionals, and I have developed a keen understanding of the customary means, methods, and pricing for the repair of damaged real property."*

The wall framing or the south-facing gable for the west-facing two-car garage and along the west side of the east attic indicated burned wall framing and sheathing. When gable infill walls are constructed, the initial wall framing studs are erected and attached to framing above and below. Sheathing, in this case, oriented strand board (OSB), is installed from the outside. The nails that secure the sheathing are nailed from the outside, extending through the sheathing and into the studs. Moisture barriers are then installed to the outside and secured into the sheathing. When a brick or stone veneer is present, the metal ties that secure the masonry veneer are nailed through the sheathing and into the wall framing. If windows are present, the flanges of the windows are nailed through the sheathing and into the wall studs. Additional flashing is completed between the window and wall assembly. This is common construction practice and something that would be anticipated for VanDorn to understand based on his statement in his qualifications.

To reconstruct even portions of the wall, it is necessary to deconstruct from the outside, first removing the siding or veneer, then the moisture barrier, and then the damaged sections of sheathing before replacing the framing sections. This is a significant demolition that will disrupt the wall. To restore the residence to a pre-fire condition, it is recommended to reconstruct the wall. The removal of individual framing members or spraying of a coating will not restore the property to a pre-fire condition. The loss of cross-section from the reuse of charred framing or wall sheathing will reduce the overall strength of the wall compared to a pre-fire condition. VanDorn mentions that '*It is a common practice to repair fire damage within a framed section without replacing the entire section'.* Simply because something may have been done in the past

 

does not mean that it will restore the property to a pre-fire condition.  The commentary from VanDorn, as quoted above, lacks a sufficient technical basis and should be withdrawn.

On Page 48 of 60, VanDorn states:

*"He recommends "removal and reconstruction of the kitchen cabinets due to the fire damaged at the refrigerator cabinet".  He also discusses the possibility of replacing all the cabinets due to matching concerns.  As previously discussed, the kitchen cabinet damage was limited to the bulkhead and crown molding used to trim the top of the cabinet.  The bulkhead is made of plywood which can easily be matched as it has no detail.  The crown molding can likely be matched. However, State Farm estimated to replace all the crown molding across the top of the cabinets anyway.  State Farm also painted all the cabinets, inside and outside, to match the paint and address any smoke that could not be cleaned."*

Conclusion 1c from the Valor Forensic Engineering Services, LLC, Report of Findings, stated:

*"Removal and reconstruction of the kitchen cabinets due to the fire **damage** at the refrigerator cabinet.  If matching cabinets are not available, it may be necessary to replace the kitchen cabinets in their entirety."*

The intent of the passage was to indicate that any fire-damaged cabinets be removed and replaced.   If it were not possible to restore the cabinetry through matching individual replacements, then removal and replacement of the cabinets as a unit would be necessary to maintain the cohesive appearance of the kitchen cabinets.  It should also be noted that efforts to disassemble cabinetry and trim typically result in damage to remaining sections through remnant nail holes and other conditions from disassembling a system that was not designed to be taken apart.  Figure 4.3 shows the attempted restoration of the refrigerator cabinet.  Figures 4.4 and 4.5 are closer images of the repair and the degraded appearance of the cabinetry/trim.



4.3: OVERVIEW OF THE KITCHEN ON 10.27.2023.

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**



**4.4: VIEW OF THE UNEVEN SURFACE ALONG THE NORTH WALL OF THE KITCHEN CABINET: 10.27.2023.**



**4.5: VIEW OF THE POOR TRIM FINISH ABOVE THE REFRIGERATOR CABINET: 10.27.2023.**

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

On Page 48 of 60, VanDorn states:

*"Williams seems to recommend that all roof and second floor framing around the Bonus Rooms be replaced due to fire damage. At the time of his and my 2021 inspections, it was evident that this Recommendation was too broad and unnecessary. The photo on page 12 of this report documents the lack of damage is the north section of the second-floor framing and roof. Williams seems to recommend replacing this area of framing. My 2023 inspection, which occurred after the finishes had been removed from the Theater Room, shows the fire did not burn over this room."*

As with other assertions, VanDorn does not elect actually to quote from the report and instead offers his statement and then proceeds to argue against it. This represents a 'straw man' logical fallacy.

Conclusion 1d from the Valor Forensic Engineering Services, LLC, Report of Findings, states

*"Removal and reconstruction of the roof and second floor framing above the west (lower) roof section. The ceiling/floor 'engineered' I-beams above the garage should be completely removed and replaced. This reconstruction will necessarily require the replacement of the soffits, soffit framing, fascia, and gutters. It is recommended to remove and replace the interior finishes along the west side of the dwelling due to removal and reconstruction of the roof and roof framing."*

Within the text of the Valor Forensic Engineering Services, LLC, Report of Findings (Page 8 of 145) in the 'Concealed Framing' Section, it was stated:

*"At the time of the site evaluation, the interior contents had been removed but no further demolition and/or remediation post-fire was evident. The 'engineered' wood I-beam's ceiling joists which extended over the garage were observed to have burned with the loss of the vertical OSB web (vertical section in the middle of the beam) noted. The loss of the OSB web had allowed for the ceilings above the southwest garage to sag. As it was necessary to cross over the compromised area of the flooring in order to reach the northwest rooms of the second story, these areas could not be safely accessed by Valor FES. As such, we reviewed the Matterport digital model and images from this portion of the dwelling provided by the owner's Public Adjuster. These images showed that the interior wall board wall and ceiling surfaces had been compromised in the southwest roof and that heavy smoke and heat were present in the northwest room. A portion of the ceiling at the southeast corner of the second-floor northwest screening room had been removed and extensive black discoloration consistent with soot was present within the fiberglass insulation. As such, the potential for heat and/or fire to have damaged the framing in this area could not be excluded. Therefore, it is recommended to plan for the removal and replacement of the wood roof framing over approximately the western third of the dwelling. This area specifically includes the framing above the southwest garage, the west hallway, the utility room, and the west stairwell and then extending above the northwest garage."*

The reference to extending above the northwest garage does not indicate that the full framing in this area should be replaced. Rather, the intent was to indicate that the framing replacement would need to extend toward and into that area. There is no basis for the assertion made by VanDorn. The next paragraph in the 'Concealed Framing' section states:

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

*"It should be noted that the recommended scope of framing repairs is subject to further evaluation during the demolition process as portions of the framing were not accessible due to debris and or remaining wall board."*

There were no known efforts on the part of VanDorn to obtain clarification as to the intent of Conclusion 1d. His substituting an assertion and subsequent efforts to argue against his assertion represent a 'straw man' logical fallacy. VanDorn should withdraw his commentary.

The VanDorn report also only shows a single image toward the peak of the ceiling and includes a caption that reads:

*"The south sloped ceiling of the Theater Room is on the left. The fire spread from the area of the attic farther to the left of this photo. This photo shows the fire was blocked at the short wall of the Theater Room and contained within the attic space. It would not be necessary to replace all this framing and additional framing to the right of the photo as Williams seems to recommend."*

The commentary within the caption reflects the concerns expressed by Valor Forensic Engineering Services, LLC that fire damage to the wood framing had extended above the northwest garage.

The last direct comment as to the critique of the Valor Forensic Engineering Services, LLC Report of Findings by VanDorn, was listed on Page 49 of 60 and states:

*"In addition to the four (4) windows discussed earlier in this report, Williams recommended replacing a window located in Bedroom 2 of the second floor. Since this area sustained no fire damage, it is not reasonable to conclude that condensation in the window is a result of the fire loss. It is more likely the seals of the thermal window failed for other reasons, e.g., manufacturing issue."*

VanDorn asserts that there was 'no fire damage' as part of his justification for excluding fire as a cause for the failure of the east wind of the second-floor southwest bedroom. Figure 4.6 shows the condition of the window (from the exterior) on May 4, 2021. Figures 4.7, 4.8, and 4.9 show the accumulation of soot along the west and south walls of the southwest bedroom. It should also be noted that the fire was burning in the second-floor space just west of the southwest bedroom.

Figures 4.10 and 4.11 are from the October 27, 2023, site evaluation, and a dark-colored discoloration is present within the window units. Typical seal failures result in white fog or liquid moisture but do not typically have a dark brown to black appearance. The presence of darker discoloration in the window and the presence of soot within the southwest bedroom would indicate that conditions within the southwest bedroom were altered during the fire. This information contradicts the assertions made by VanDorn. VanDorn also failed to offer evidence to support his assertion that other issues were present in the window. As such, his opinion represents speculation and should not be considered reliable.




**CONFIDENTIAL DOCUMENT ©2023 VALOR FORENSIC ENGINEERING SERVICES, LLC**

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**



**4.6: EXTERIOR VIEW OF THE EAST WINDOW OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**



**4.7: SOOT DEPOSITS ALONG THE TRIM FOR THE WEST WALL OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**

 

**CONFIDENTIAL DOCUMENT ©2023 VALOR FORENSIC ENGINEERING SERVICES, LLC**

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**



**4.8: SOOT DEPOSITS ALONG THE TRIM FOR THE WEST WALL OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**



**4.9: SOOT DEPOSITS ALONG THE ELECTRICAL OUTLET FOR THE SOUTH WALL OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**



**4.10: A VIEW OF DARKER DISCOLORATION WITHIN THE EAST WINDOW OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**



**4.11: A VIEW OF DARKER DISCOLORATION WITHIN THE EAST WINDOW OF THE SECOND-FLOOR SOUTHWEST BEDROOM.**

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

After review, consideration, and discussion of the VanDorn Letter, no information was provided to change or alter the conclusions indicated in the original Valor Forensic Engineering Services, LLC, Report of Findings dated May 11, 2021. The assertions presented in the VanDorn Letter commonly did not quote or otherwise provide a technical basis to establish further discussion. As such, the VanDorn Letter lacks a sufficient technical basis and should be considered unreliable and withdrawn.

The conclusions and analysis indicated in the Report of Findings dated May 11, 2021, and this Supplemental Letter are based on information available to date and as otherwise indicated within the respective documents. Valor Forensic Engineering Services, LLC, expressly reserves the right to review, consider, analyze, and comment upon any documentation received at a later date.

## 5.0: CLOSING:

Valor Forensic Engineering Services, LLC appreciates the opportunity to offer these services to you. If you have any questions or need further assistance, I can be reached at 918.845.8442 or via email at chad.williams@valorforensics.com.

Sincerely,

> This document has been digitally signed and sealed by Chad T. Williams, P.E., D.F.E., Principal Engineer: Forensics, Valor Forensic Engineering Services, LLC on the date and time indicated below the seal.
>
> Printed Copies are not considered to be signed or sealed documents and the digital signature must be verified on electronic copies.

**VALOR FORENSIC ENGINEERING SERVICES, LLC:
OKLAHOMA PROFESSIONAL ENGINEERING FIRM CERTIFICATION OF AUTHORIZATION 8371, EXPIRATION 06.30.2025.**

## 6.0: ATTACHMENTS:

6.1:    BERRYMAN LETTER: 06.23.2023:

6.2:    RATES, TERMS, AND GENERAL CONDITIONS:

6.3:    CURRICULUM VITAE: CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.:

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

## ATTACHMENT 6.1: BERRYMAN LETTER: 06.23.2023:

The inclusion of this above-referenced documentation is for reference purposes only. The Professional Engineer signing the overall Report of Findings is not signing, sealing, or otherwise accepting any responsibility for the above-referenced document. The individuals and entities preparing the above-referenced document remain solely responsible for its content.

 **CONFIDENTIAL DOCUMENT ©2023 VALOR FORENSIC ENGINEERING SERVICES, LLC** 

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) GEORGE COLLINS and )
(2) ALRIKA COLLINS, )
                       )
        Plaintiffs, )
                       )
v. )    Case No. 22-cv-00318-RAW-JAR
                       )
(1) STATE FARM FIRE AND )
CASUALTY COMPANY, )
                       )    JURY TRIAL DEMANDED
        Defendant. )
                       )

## <u>DEFENDANT'S EXPERT REPORT</u>

Respectfully submitted,

**ATKINSON, BRITTINGHAM, GLADD,
FIASCO & EDMONDS**
A PROFESSIONAL CORPORATION

/s/ J. Andrew Brown
J. Andrew Brown, OBA #22504
1500 ParkCentre
525 South Main Street
Tulsa, OK 74103-4524
Telephone: (918) 582-8877
Facsimile: (918) 585-8096
Email: dbrown@abg-oklaw.com
*Attorney for Defendant SFF&CC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the <u>23rd</u> day of June, 2023, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

S. Alex Yaffe
Terry M. McKeever
FOSHEE & YAFFE
P.O. Box 890420
Oklahoma City, OK 73170
Email:   say@fylaw.com
Email:   tmm@fylaw.com
*Attorneys for the Plaintiffs*

/ s/ J. Andrew Brown

R:\416\416\Def Expert Report-cah.docx

2

6:22-cv-00318-RAW-JAR Document 51-7 Filed in ED/OK on 11/03/23 Page 3 of 80



# Berryman

426 N.W. 5TH
Oklahoma City, OK 73102
Off: (405) 235-4646
Fax: (405) 235-3311

June 23, 2023

Drew Brown
Atkinson, Brittingham, Gladd, Fiasco, & Edmonds, P.C.
1500 ParkCentre
525 South Main Street
Tulsa, Oklahoma 74103

**Re:     George Collins and**
**Alrika Collins,**
**Plaintiffs,**

**v.**

**State Farm Fire and**
**Casualty Company,**
**Defendant.**

**United States District Court for**
**the Eastern District of Oklahoma**
**Case #:  22-CV-00318-RAW-JAR**

Dear Mr. Brown:

The following report details to date my pertinent opinions and can be changed only in writing by the undersigned.  The following opinions are based upon my review of the documentation provided to me and the observations made during my inspections of the subject property conducted on September 8, 2021 and May 19, 2023.  In forming my opinions, I utilized my twenty-five (25) years of experience as an evaluator and estimator of property damage as well as my formal education, training, and knowledge previously acquired including but not limited to: building codes, governmental regulations, and construction standards. I reserve the right to supplement this report to address additional information made available to me.

.

1002 West Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023

Page 2

## DOCUMENTS REVIEWED

- Scheduling Order
- Claim file Bates stamped Collins CL 36-15K5-35N 0001 – 8116
- Petition
- Wagoner County Assessor Website for Account #730015478
- Google Earth
- Xactimate software program and guidelines.
- Xactimate White Paper, "Overhead and Profit," 2/5/2020, pages 1-4.
- "Pricing Research Methodology," published by Xactware Solutions, dated 2/6/18.   https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf

## QUALIFICATIONS

In my time as a general contractor, I have performed numerous restoration projects for owners whose properties have sustained damages including those caused by fire and smoke.  I have routinely examined structures for the extent and cause of damages and submitted construction proposals to the public for the restoration of the owner's property. I have regularly estimated the construction costs and outlined the scope of work that has been an integral part of the firm's offers to contract for needed property restoration. For the last twenty-five (25) years, I have utilized Xactimate, a computerized estimating program, to determine the estimated cost of property damage restoration.[1]

I regularly interact with engineers, architects, and building code officials when determining the extent of damages and developing the proper scope of repairs. In the course of business, I have frequently interfaced with insurance professionals, and I have developed a keen understanding of the customary means, methods, and pricing for the repair of damaged real property.

---

[1] Xactimate is considered to be an industry standard and is utilized by most restoration contractors and the majority of insurance carriers in the United States and Canada to estimate the anticipated cost to restore property damages, including those repairs needed to correct damages caused by storm activity.

6:22-cv-00388-RAW-JAR Document 51-7 Filed in ED/OK on 11/06/23 Page 19 of 98

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 3

## DESCRIPTION

The subject property is located at 1312 West 60th Street North in Wagoner County. It is situated on approximately 25 acres north of the city of Muskogee, Oklahoma. The structure was reportedly constructed in 2016.  It is a two-story residence with approximately 3,453 square feet (SF) of living space. The three-car garage provides an additional 937 SF to the structure.[2]

The residence was constructed with dimensional lumber set upon a cast-in-place concrete foundation and slab-on-grade. The exterior cladding is a combination of brick, stone, and painted hardboard siding.

The style of roof framing is mostly a gable design with two shed style roofs over the front and back porches. The roof is covered with a laminated, composition shingle installed over wood sheet decking with a radiant barrier backing. The pitch of the roof ranges from 5/12 at the sheds and main two-story to 12/12 over the garage end of the house.  The property faces the south.



Front of the subject residence.

---

[2] Wagoner County Assessor. Account #: 730015478

6:22-cv-00388-RAW-JAR Document 51-7 Filed in ED/OK on 11/03/23 Page 20 of 98

Muskogee, Oklahoma     COLLINS v. STATE FARM

1407 West 63rd Street North     June 23, 2023

    Page 4



An aerial view of the courtesy of Google Earth

       The master bedroom is located on the main level and includes a bathroom, as well as, his and her closets. The main level also includes a kitchen with breakfast, laundry room, living room, formal dining room, office, and a powder bathroom. The main stairs lead to three additional bedrooms and two full bathrooms. A back stairway leads to a separate second-floor area which includes two bonus rooms and another half-bathroom. These rooms are situated above the garage bays. The bonus rooms were reportedly used as an Exercise Room and Theater Room.

6:22-cv-00389-RAW-JAR Document 51-7 Filed in ED/OK on 11/06/23 Page 21 of 98

1301 West 2023 Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 5



**Main Level**

Page 22 of 98
VFES OK-04.28.2024

6:22-cv-00388-RAW-JAR   Document 51-7   Filed in ED/OK on 11/06/23   Page 22 of 98

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 6



**Level 2**

## **BACKGROUND**

According to the Wagoner County Assessor, George L. and Alrika B. Collins (Collins) have been the sole owners of the residence located at 1312 West 60th Street North near Muskogee, Oklahoma. Collins obtained a Farm/Ranch insurance policy through State Farm Fire and Casualty Company (State Farm). The policy was assigned #36-B3-L971-9. On or about January 12, 2021, Collins submitted a claim to State Farm for fire damage at the property. The claim was assigned #36-15K5-35N. The date of loss was reportedly January 11, 2021. Other pertinent information to the matter includes:

1. The claim was assigned to State Farm claim representative, Heather Stanley (Stanley). Stanley inspected the subject property on January 14, 2021.

6:22-cv-00388-RAW-JAR Document 51-7 Filed in ED/OK on 06/23/23 Page 23 of 98

2. Stanley completed a damage estimate on or about February 17, 2021. The first estimate to repair the damage attributed to the fire totaled $249,269.80.[3]

3. State Farm received a notice of representation by a public adjuster, Ian Rupert (Rupert) of Ian's Enterprise LLC (Ian's) on or about March 29, 2021. The Letter of Representation was signed by Collins and Ian's on February 21, 2021.[4]

4. State Farm revised its estimate on June 28, 2021. The total of the revised estimate was $276,513.57.[5]

5. On or about August 2, 2021, State Farm received from Rupert a package of documents. Contained within the documents included amongst other items:

   • A report by Chad T. Williams, P.E. (Williams) of Valor Forensic Engineering Services.[6] The report, which was dated May 11, 2021, states the scope of work was to "Determine the extent of fire damage to the dwelling as a result of a fire reported on January 11, 2021".
   • A safety review report from Kevin Dandridge (Dandridge) of 1 Life Safety LLC.[7] The report was dated July 26, 2021.
   • A smoke evaluation report from Luke Hibbs (Hibbs) of The Mold Consultant LLC. [8] The report is dated June 11, 2021.
   • An Xactimate estimate prepared on Ian's letterhead and dated July 16, 2021. The estimate total for the Dwelling and Other Structures was $505,376.76.[9]

6. I was retained by State Farm to inspect the subject property and to prepare an estimate to repair the damage sustained by the fire on the date of loss. I inspected the subject property on September 8, 2021. An estimate totaling $317,328.20 was finalized on September 28, 2021.[10]

7. The State Farm subsequently revised its estimate increasing the total to $322,065.42.[11] The print date of this estimate was October 11, 2021.

---

[3] COLLINS CL 36-15K5-35N 2944 - 3029
[4] COLLINS CL 36-15K5-35N 1054
[5] COLLINS CL 36-15K5-35N 3252 - 3352
[6] COLLINS CL 36-15K5-35N 1427 - 1470
[7] COLLINS CL 36-15K5-35N 1573 - 1630
[8] COLLINS CL 36-15K5-35N 1631 - 1685
[9] COLLINS CL 36-15K5-35N 1689 - 1782
[10] COLLINS CL 36-15K5-35N 7374 - 7430
[11] COLLINS CL 36-15K5-35N 3761 - 3857



Muskogee, Oklahoma COLLINS v. STATE FARM Page 8

8. A lawsuit was filed by Collins on January 11, 2022.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DISCUSSION

Real property is often damaged by a multitude of incidents, e.g., fires, high wind events, hail, etc., and the size and nature of the losses can extend from small, relatively simple damage such as a vandalized door or window, to larger, more complex losses, such as fire and smoke damage. A property repair estimate should be viewed only as a reasonable approximation of the probable costs to accomplish the work and its formulation is not an exact science. The initial reconstruction estimate is a useful tool to advance the process of property restoration.

The initial estimate should be viewed as the starting point for the restoration process because it is common in the reconstruction industry for additional damages or construction needs to be identified and/or considered as the process progresses. For large losses, an exchange of multiple estimates between an insurance carrier and an owner's representative is common. In most cases the owner is represented by their selected contractor. The contractor typically begins restoration project as soon as an agreed scope of work and price is reached. It is typically understood that the agreed scope of work includes items that may change as the repairs are being made, e.g., a bathtub believed cleanable must instead be replaced after the attempt to clean has been made and was unsuccessful. Revised estimates are then created as supplements to the original agreed scope of work and price.[12] As a restoration contractor, I have participated in this process on hundreds of occasions.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INSPECTION OBSERVATIONS

The following were observations made at the subject property during the initial inspection on September 8, 2021.

## ATTICS:

1. The design of the subject structure resulted in different and separate attic spaces. Those attic spaces can be labeled as Attic 1 and Attic 2.

---

[12] Necessary supplements rarely exceed a small percentage of the initial agreed scope of work and price.

6:22-cv-00084-RAW-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 25 of 98

1304 West Broadway Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 9



> There is not attic access to the shed roofs over the porch areas.

> Attic 2 is below the main second-story of the residence.

> Attic 1 is built around the Bonus Rooms and above the first-story at the west end. See diagram below for additional details.

2. The design of each of the bonus rooms and these room's framing resulted in sloped ceilings. Behind the short walls of each room, heat and air equipment, including ductwork, had been installed. Although some areas of these attic spaces were somewhat separated from each other, they can still generally be considered one roof and attic space. The space of Attic 1 is within the red box below but outside the walls of the interior rooms depicted with the dark grey lines. The attic space is limited to the areas above first-floor rooms.

Page 26 of 98
VFES OK-04.28.2021
6:22-cv-00384-JAR Document 51-39 Filed in ED/OK on 10/02/23 Page 26 of 98
1502 West 33rd Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 10



3. The follow diagram of the roof line identifies the locations within the roof's framing the fire damage was largely contained. The yellow lines represent the locations where stud wall (covered with sheetrock) and roof framing members aided in containing the fire and preventing the fire spreading to other sections of the roof and attic framing.

6:22-cv-00184-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 27 of 60
VFES OK-04.28.2024



4. The following photographs demonstrate some of the framing damage in the second-floor bonus rooms and adjacent Attic 1 space.

6:22-cv-00184-JAR-JAR   Document 51-39   Filed in ED/OK on 10/23/23   Page 28 of 98



The west wall and sloped ceiling of the exercise room with the attic space just beyond the vertical stud wall framing members. This is near the reported fire origin.



The south wall of the movie room with the fire being contained behind the sheetrock and within the attic cavity.

Page 29 of 98
VFES OK-04.28.2021
6:22-cv-00184-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 29 of 98
1902 W. Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 13



The walk-in attic to the east of the theater room. This area suffered no fire damage.
Minimal smoke residue was evident.

5. The traditional two-story construction above the eastern sides of the
   house resulted in an attic space (Attic 2) which is almost entirely
   separated from Attic 1.



Attic 2. Except for a small area at the gable wall, the fire did not reach this space.

6:22-cv-00318-RAW-JAR   Document 51-39   Filed in ED/OK on 10/23/23   Page 30 of 60

312 West 83rd Street North                    June 23, 2023
Muskogee, Oklahoma          COLLINS v. STATE FARM         Page 14



The exercise room is located just beyond and partially below the window at the upper part of this photo. The fire burned through the triangular opening at the bottom and up to and around the window. This was the limit to the fire damage in Attic 2.

## ELECTRICAL:

1. Two electrical breaker panels were situated in the one-car garage at the west end of the residence. The electrical home run[13] ran up the wall of the garage and were distributed in varying directions in route to their dedicated circuit. Many of these wires were in the general area of the origin of the fire. It would reasonably be anticipated that many of these wires would be replaced due to exposure to the heat. However, it would not be necessary to replace all the wiring on that circuit. The wire could be replaced to a point where the wiring was no longer exposed to the fire and joined together within a junction box. This is a common practice in the fire restoration industry.

## SECOND FLOOR INTERIOR ROOMS:

1. Both bonus rooms and the adjacent half-bathrooms sustained fire and smoke damage to the extent these rooms required the replacement of all finishes and some of the stud wall framing. The stairway which opened

---

[13] An electrical home run is a line of wiring which leads from the breaker panel to the first fixture on a circuit.

6:22-cv-00084-JAR-JAR Document 51-7 Filed in ED/OK on 10/23/23 Page 31 of 98

into the exercise room also sustained fire damage to much of the finishes as well as to stud wall framing which was in the immediate area of the fire's origin.

2. The separated bedroom areas of the second-floor sustained far less damage. The three bedrooms, two bathrooms and closets exhibited minimal signs of smoke on the surface of the finishes. Carpeted areas likely needed replacement while the painted surfaces could be remediated with cleaning and painting. Other surfaces, e.g., fixtures, countertops, etc., could be cleaned. The west wall of Bedroom 2 was the closet to the fire damage in Bonus Room 1. Some smoke was present at the base of the wall and the fire department appeared to have inadvertently punctured a hole in the wall.



Upstairs Bedroom 1 had minimal soot settlement on the walls, doors, trim, lights, etc.

6:22-cv-00384-JAR-JAR Document 51-39 Filed in ED/OK on 10/27/23 Page 32 of 98
2104 West 69 Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 16



Bedroom 1 Closet with minimal soot present. A piece of the carpet and pad was removed to send to a third-party to determine the reasonable cost to replace the items.



The west wall of Bedroom 2. The hole in the wall appears to have been caused by the fire department when engaging the fire in Bonus Room 1 nearly on the other side of the wall.

6:22-cv-00184-JAR Document 51-739 Filed in ED/OK on 10/27/23 Page 31 of 60
1302 West 32nd Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 17



The vanity of Bathroom 2 with minimal soot accumulation on the countertop and fixture.
This condition was similar in the other upstairs bathroom.

## MAIN LEVEL INTERIOR:

1. The fire had burned downward from the origin at the top of the stairs in the Bonus Room area. The fire damaged the finishes of the Garage Hallway and Laundry Room. Each of these rooms required the full replacement of the finishes including but not limited to: drywall, trim, cabinetry, floor tile, and light fixtures.

6:22-cv-00314-JAR-JFJ Document 51-39 Filed in ED/OK on 10/23/23 Page 34 of 98
1302 West 63rd Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 18



The approximate origin of the fire in the attic space above these rooms.

The fire burned through the wall of the stairs causing fire damage in these rooms.

2. The ceiling of the two-car garage had been pulled down, likely by the fire department, which provided viewable access to the framing. It was found that the floor/ceiling I-beams above the garage and below Bonus Room 1 had begun to sag.

6:22-cv-00184-JAR-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 35 of 98



An overview of the garage looking from the entry door into the garage hall.



The joists which are sagging in the vicinity of the understood location of the fire's origin.

1201 West Street North
Muskogee, Oklahoma     COLLINS v. STATE FARM     Page 20

3. The finishes of the single-car garage suffered no visible fire damage. Smoke from the fire was present. However, framing above the south end of this room, in the attic space, was damaged by the fire.



4. The fire just breached the cased opening leading from the Garage Hallway into the Kitchen. Fire damage was observed to the sheetrock and trim around this opening. Fire did char a portion of the refrigerator bulkhead and the crown molding attached at the top. No other fire damage was observed in this room. Smoke was present on the finishes including but not limited to: appliances, countertops, cabinets, drywall, trim, and windows.

6:22-cv-00314-JAR-JAR   Document 51-39   Filed in ED/OK on 10/27/23   Page 37 of 60



Fire damage to the wall and the top of the refrigerator bulkhead.



The top of the cabinet above the refrigerator with no damage. The other cabinets within the kitchen were in this same undamaged (by fire) condition.

Page 38 of 98
VFES OK-04.28.2021
6:22-cv-00184-JAR Document 51-39 Filed in ED/OK on 10/6/23 Page 32 of 60
512 West Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 22

5. Holes had been punched in the Dining Room drywall at the ceiling and within a furr down used to run ductwork. The insides of the cavities were inspected. No smoke or soot was found to be present.



Holes in the ceiling and wall of the Dining Room.

6:22-cv-00314-JAR-JAR Document 51-739 Filed in ED/OK on 10/23/23 Page 39 of 98

1302 West 82nd Street North                    June 23, 2023
Muskogee, Oklahoma            COLLINS v. STATE FARM            Page 23



The inside of one of the cavities showing it to be clean of smoke damage.

6.  The remaining rooms including the Master Bedroom, Master Bathroom, Master Closets, Living Room, Powder Bath, Entry Closets, and Office all sustained soot/smoke damage. No fire damage was present. All finishes of these rooms can be remediated by cleaning and painting. The exception being the carpet and pad of the Master Bedroom and Closets. The tile floor covering ran continuously from the Garage Hallway and therefore replacement of this flooring was included in the proposed scope of work. The floor tile of the Master Bathroom and Guest Bath, as well as the white, cultured marble countertop of the Master Bathroom, were test cleaned. It was found these building components were cleanable and did not require replacement.

6:22-cv-00384-JAR-JFJ Document 51-739 Filed in ED/OK on 10/23/23 Page 40 of 60
1502 West Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 24



Master Bedroom



Master Closet



Master Bathroom



The Living Room looking towards the Kitchen and Entry

Page 42 of 98
VFES OK-04.28.2021
Muskogee, Oklahoma
2104 West Street North
COLLINS v. STATE FARM
June 23, 2023
Page 26

6:22-cv-00084-RAW-JAR    Document 51-39 Filed in ED/OK on 10/27/23    Page 42 of 60



The upper sections of the Living Room.



A sconce light installed at the stairwell to the second-floor bedrooms. Cleaning of this light fixture will address the minimal soot accumulation.

6:22-cv-00384-JAR-JFJ   Document 61-39   Filed in ED/OK on 10/23/23   Page 43 of 60

1512 West Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 27



Location of the Guest Bath test clean before cleaning. A floor mat had protected the tile from smoke and soot.



The same area after the test clean. The soot has been fully removed from the tested area.

6:22-cv-00314-JAR-JAR Document 51-39 Filed in ED/OK on 10/62/23 Page 44 of 960
1012 West Broadway Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

## EXTERIOR:

1. A tarp had been placed over the west facing elevation of the two-car garage.

2. Three upper-level windows had been covered with particle board sheathing. The window locations included: window in the south wall of Bonus Room 1 (Exercise Room); west wall of Bonus Room 2 (Theater Room); and a decorative (faux) window in the west gable of the attic space above the second-floor bedrooms. A fourth window, located in the garage, showed evidence of condensation. Other causes possibly caused the condensation build-up, but the window was in the general area of the fire.



The tarp installed over the double garage with the partially boarded window of the Theater Room.

3. Exterior light fixtures were undamaged by the fire and had no soot collection.

Page 45 of 98
VFES OK-04.28.2021
6:22-cv-00034-RAW-JAR Document 51-39 Filed in ED/OK on 10/07/23 Page 45 of 98
1212 West Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 29



4.  The brick, hardboard, and stone cladding at the front elevation were undamaged. However, the fire appeared to have damaged the gable wall framing which caused the need to remove and replace/reset some of this cladding as it is attached to the framing.



The framing behind these gables were fire damaged. Otherwise, the cladding was undamaged.

5.  The gutter across the front of the porch appeared to have been damaged by the fire fighters accessing the roof. Otherwise, the remainder of the front elevation was undamaged.

6:22-cv-00318-RAW-JAR    Document 51-9    Filed in ED/OK on 10/23/23    Page 46 of 98

1312 West 23rd Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 30



6.  The east elevation of the residence was undamaged.



7.  The back elevation was also undamaged.

6:22-cv-00284-JAR Document 51-39 Filed in ED/OK on 10/27/23 Page 47 of 98



1312 West 81 Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 31





6:22-cv-00184-JAR-JAR Document 51-39 Filed in ED/OK on 10/6/23 Page 48 of 50
1202 West Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 32

8. The entry doors, storm doors, and windows were all inspected for fire/smoke damage. Other than the windows previously discussed, all were free of damage and could be restored with cleaning and/or painting.

**Roof:**

1. The shingles of the roof were found to be a 30-year laminated, composition shingle. Due to the fire damage to the framing in the Attic 1/Bonus Rooms area, much of the roof required replacement.

2. The west facing gable of the Attic 2 area exhibited smoke damage where the fire had burned through the previously discussed window.



*********************************************************************************

The following were observations made at the subject property during the second inspection on May 19, 2023. At that inspection, it was observed that the Plaintiffs in this matter and moved back into the subject residence.

6:22-cv-00318-RAW-JAR   Document 51-739   Filed in ED/OK on 10/27/23   Page 935 of 960

## ATTICS:

1. Much of the debris in the bonus room had been removed. The sagging floor I-beams had been cut back with a temporary wall placed below the remaining I-beams. The roof decking and some of the rafters had been replaced.



This photo is nearly the same perspective of that include at the top of page 11 of this report.



6:22-cv-00184-JAR-JAR Document 61-39 Filed in ED/OK on 10/23/23 Page 50 of 60

The roofs decking has been replaced but partially charred rafters remain.



This area, above the origin of the fire, shows new decking and new rafters attached against the fire damaged rafters. An odor sealer has been applied to the old framing members.



6:22-cv-00184-JAR-JAR Document 51-39 Filed in ED/OK on 10/27/23 Page 51 of 60

1304 West Broadway Street North                        June 23, 2023
Muskogee, Oklahoma                    COLLINS v. STATE FARM                        Page 35

A fire damaged rafter with a new sister rafter. Both have been sealed.



The south wall of the Theater Room. The finishes have been removed but the framing
was not replaced despite a new roof being installed above this section of the house.

2. All three of the previously discussed fire damaged windows in the second
   floor had been replaced. No other windows were new. The window in the
   Attic 2 gable had been partially reframed. However, other fire damaged
   framing had been left in place.

6:22-cv-00184-JAR-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 52 of 98



Some new framing below the Attic 2 window. Other fire damaged framing was left in place.



The exterior side of the new window in the Attic 2 gable. The siding was not replaced.

Page 53 of 98
VFES OK-04.28.2021
2304 West Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 37

6:22-cv-00184-WPJ-JAR   Document 51-39   Filed in ED/OK on 10/02/23   Page 53 of 98

## ELECTRICAL:

1. There was not any evidence that any electrical wiring had been replaced including the wiring running through and/or near the fire damaged areas of the home.

2. Nearly all lighting was tested for operation and all were found to be working at the time.

## SECOND FLOOR INTERIOR:

1. The Bonus Rooms and Bathroom had been demolished of their finishes. The framing repairs had been partially completed.

2. The Bedrooms and adjacent rooms appeared to be largely unchanged since the previous inspection except the rooms were now occupied. It appeared the rooms had been cleaned. If the walls, doors, and trim had been painted, they were painted the same colors. The carpeting appeared to have not been replaced. There was no evidence of visible smoke nor a detectable smoke odor.



The carpeting in the closet of Bedroom 1 with the same home hole from the carpet sample extraction as seen on page 15 of this report.

6:22-cv-00318-JWB-JAR Document 51-739 Filed in ED/OK on 06/23/23 Page 54 of 98

## MAIN LEVEL INTERIOR:

1. The fire damaged garage hallway had been partially repaired. New sheetrock, a new door to the Bonus Room Stairs, and a new door from the Garage had been installed. The room had not been painted and trim had not been installed. The flooring appeared to be the same and was not new.



6:22-cv-00184-JAR-JFJ   Document 51-39   Filed in ED/OK on 10/27/23   Page 55 of 98



2. The Laundry Room was entirely finished indicating the finishes had not been replaced in this room. What appeared to be the original drywall, cabinets, baseboard, floor tile, and hot water heater were all still in place.



6:22-cv-00384-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 56 of 60
1502 West 23rd Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 40





The original hot water heater located in the laundry room. The installation and inspection stickers are dated January 2016.

6:22-cv-00184-JAR-JFJ  Document 61-39 Filed in ED/OK on 10/27/23  Page 57 of 98
112 West 23rd Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 41

3. The stairs to the Bonus Room have largely been unrepaired except for the application of an odor control sealer.



4. The fire damage to the Kitchen door casing, drywall, and cabinet bulkhead had been repaired/replaced and repainted. Kitchen fixtures had been cleaned but appeared to be the same units, including the appliances.



The kitchen from nearly the same perspective as that provided on page 20 of this report.

6:22-cv-00304-RAW-JAR   Document 51-7   Filed in ED/OK on 10/23/23   Page 59 of 60

5.  Drywall repairs of the holes had been made in the Dining Room and the room had been painted.



6.  The remaining rooms of the Main Level had been cleaned and perhaps re-painted. All the flooring appeared to be the original flooring.



The Master Bathroom from nearly the same perspective as the photo on page 24 above.

2102 West Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 43

## EXTERIOR:

1. No repairs to the exterior elevations had been completed except for the above-mentioned replacement of three windows.

## ROOF:

1. The roof over the two-car garage and part of the single-car garage had been replaced. The rest appeared to be original.



The section of the roof which had been re-roofed.

6:22-cv-00081-RAW-JAR Document 51-739 Filed in ED/OK on 10/13/23 Page 60 of 98

102 West 2nd Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 44



The interior of the box is the approximate area of the roof which was re-shingled.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #1:*** *Chad Williams (Williams) of Valor Forensic Engineering Services provided a report dated May 11, 2021. The report offers a conceptual scope of repairs based on the inspection made by Williams on May 4, 2021. The scope of repairs offered and damages discussed by Williams are mostly the same as those I observed and were included in the final State Farm estimate. A few recommendations were not consistent with my observations. I believe this went beyond the work necessary to remediate and repair the damages.*

1. Williams recommends to replace all the reflective (radiant barrier) sheathing including that installed over Attic 2. Based on information and belief, this recommendation was based on a tear in the radiant barrier in one location. My observations found that the nearest tear in the radiant barrier was approximately 30' from the nearest fire damage. It is not reasonable to conclude the fire caused the tear in the reflective sheet. It is more likely this tear occurred as the sheathing was being installed. Any smoke that collected on the sheathing and framing can be remediated without replacement.

VFES OK-04.28.2021



2. Williams noted the fire damage around the Attic 2 gable window. However, he recommended that the entire wall be re-framed. As the damage was limited to the immediate window area, it would not be necessary to re-frame the entire wall. It is a common practice to repair fire damage within a framed section without replacing the entire section.



The fire damage is limited to the window framing and the portions of the studwall just below the window. It would not be necessary to replace the entire wall, measuring approximately 32' wide, to repair this damage.

6:22-cv-00318-RAW-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 62 of 98

3. He recommends "removal and reconstruction of the kitchen cabinets due to the fire damaged at the refrigerator cabinet". He also discusses the possibility of replacing all the cabinets due to matching concerns. As previously discussed, the kitchen cabinet damage was limited to the bulkhead and crown molding used to trim the top of the cabinet. The bulkhead is made of plywood which can easily be matched as it has no detail. The crown molding can likely be matched. However, State Farm estimated to replace all the crown molding across the top of the cabinets anyway. State Farm also painted all the cabinets, inside and outside, to match the paint and address any smoke that could not be cleaned.

4. Williams seems to recommend that all roof and second floor framing around the Bonus Rooms be replaced due to fire damage. At the time of his and my 2021 inspections, it was evident that this recommendation was too broad and unnecessary. The photo on page 12 of this report documents the lack of damage is the north section of the second-floor framing and roof. Williams seems to recommend replacing this area of framing. My 2023 inspection, which occurred after the finishes had been removed from the Theater Room, shows the fire did not burn over this room.



The south sloped ceiling of the Theater Room is on the left. The fire spread from the area of the attic farther to the left of this photo. This photo shows the fire was blocked at the short wall of the Theater Room and contained within the attic space. It would not be necessary to replace all this framing and additional framing to the right of the photo as Williams seems to recommend.

Page 63 of 98
VFES OK-04.28.2021
6:22-cv-00081-RAW-JAR  Document 51-39  Filed in ED/OK on 10/27/23  Page 64 of 96
302 West 33rd Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 47

5. In addition to the four (4) windows discussed earlier in this report, Williams recommended to replace a window located in Bedroom 2 of the second floor. Since this area sustained no fire damage, it is not reasonable to conclude that condensation in the window is a result of the fire loss. It is more likely the seals of the thermal window failed for other reasons, e.g., manufacturing issue.

6. Other recommendations offered by Williams appear to have been included in the final State Farm estimate dated October 11, 2021.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #2:*** *Luke Hibbs (Hibbs) of The Mold Consultant offered a report with recommendations as to repairs due to fire and smoke. The recommendations offered by Hibbs appears to have been almost entirely addressed within the State Farm estimate dated October 11, 2021.*

1. Hibbs recommended fully replacing the drywall finishes in the "areas directly affected by the fire". His directly affected rooms include: Laundry Room, Garage, Kitchen, Hallway from Garage, and Upstairs Bonus Rooms. All these rooms are included in the State Farm estimate except for the Kitchen which was only directly affected just inside the cased opening from the Garage Hallway. It is not necessary to demolish an entire room when only a small portion of the room was directly affected. To demolish all the finishes of the kitchen to repair the limited damage, as seen on page 20 of this report, would be unnecessary causing delays in the period of restoration and greatly inflating the cost of the repairs.

2. Hibbs recommended "cleaning, resealing, repainting, and deodorization" of the rooms. The State Farm estimate includes these recommended repairs.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #3:*** *A report, dated July 26, 2021, was submitted as prepared by Kevin Dandridge (Dandridge) of 1 Life Safety LLC. The report and attached estimate are unreliable as they include proposed work and charges that do not apply to the repairs necessary at the subject property. Proposed unit quantities and unit costs are inflated and do not reflect realistic charges if the charges were necessary. The $186,236.00 estimate grossly overstates the true cost to completed the exaggerated scope of work proposed by Dandridge. The report and estimate should be disregarded.*

1. Dandridge acknowledges having not visited the subject property. Instead, he relied on documents provided to him including photographs.

6:22-cv-00314-JAR-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 50 of 98
104 West 3rd Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 48

2. Much of the written portions of the report appear to be general language as much of the discussion involves details that are not part of the subject residence's design or construction. Therefore, these sections are not applicable.

3. Dandridge states "all safety protocols set by the CDC will be enforced until the restrictions are released". It is unclear what CDC protocols Dandridge is referring to as he does not cite them. By July 2021, requirements to wear masks indoors had been lifted. Even recommendations or advise by the CDC had been reduced regarding masks. Hand washing stations were not required nor expected. Breathing masks were not required to be always worn as stated by Dandridge.

4. He states "All work that will have to be done in the fire affected areas will need to be done with gloves and masks to make sure that the employees are not coming into contact with dangerous carcinogens". Gloves and masks, during debris removal, are standard equipment used by contractors in the same way that framing contractors use hammers and saws to complete the framer's tasks. It should be noted, the debris removal of debris which may have carcinogens from the fire would anticipate to be completed in 1-2 weeks.

5. Dandridge seems to not understand the subject residence is located on an acreage in the rural area of the county, as he states several charges are necessary to include: flagmen to prevent people from walking into constructions zones; fencing because of public access to the property; and ground-level scaffolding to cover walkways. These precautions may occasionally be needed on large projects in areas where the public does have access. They do not apply to this matter.

6. He states "A daily FOD, Foreign Object Debris, walk will have to be done at the end of each day to make sure that there is no material trash or debris left in walkways or access points of the building". This is a common practice that is expected of every contractor working on a project. Each Xactimate line item includes labor assumptions which include the cost to travel to the job site, set up for the day's work, keep the job site clean, etc. In other words, each of the line items in any of the Xactimate estimates already includes a factor contributing to the charge of maintaining a clean and safe jobsite. Inclusion of any additional charges only serves to inflate the estimate.

7. Dandridge includes 500-hours of "safety monitoring systems". Even based on the overstated scope of work, supervising the work is not necessary. Safety is a priority on every project, no matter the size. Each contractor has an awareness as to their safety needs and requirements and is expected to follow them. The General Contractor also has a role in

Page 65 of 98

VFES OK-04.28.2021 1104 West 23rd Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 49

assuring the contractors executing the work are doing so with the appropriate safety requirements in mind. Charging the customer of a fire reconstruction project an additional $47,500 to oversee work which others are expected to execute safely only serves to inflate the estimate.

8. Dandridge includes a charge for three (3) portable toilets/handwash stations for 25-weeks. One temporary toilet, which typically includes hand sanitization, would be expected during the duration of the anticipated 6-month project. The rate of a temporary toilet is approximately $150/month. By charging for 3-units at $200/week (approximately $800/month), Dandridge has inflated the estimate over $14,000 or 1,500%.

9. The estimate includes a charge for N-95 Masks. As previously discussed, masks are part of contractors' equipment. Trim carpenters oftentimes where them daily in the same way they use their saw daily. The mask charge is not necessary. Still, Dandridge charges a unit cost of $42.50 per mask. N-95 masks can be purchased in bulk for $0.60/each. Research found that they could be purchased for about $1.00/each in November of 2021.[14] Even if it were necessary to charge a customer for a contractor to use expected equipment, the mark-up of 4,250% or nearly $6,000 offered by Dandridge is unreasonable. If Dandridge's estimate represents a cost of $42.50 per box of masks, then the calculation can be broken down to each of his proposed 20 workers will use 40 masks per week. Both quantities are significantly inflated and out of line.

10. Dandridge estimates that the job will require the use of 1,250 pairs of leather/cut proof gloves. It appears he anticipates each worker utilizing 2.5 pairs of leather gloves per day. Leather gloves are reusable and when maintained each pair last for months or longer. Further, leather gloves are standard equipment used by contractors. The entire $9,000 charge entered by Dandridge is unreasonable.

11. Goggles are also standard equipment and taken from job-to-job by contractors. However, Dandridge estimates that the workers will require 25-pair of goggles for a duration of 65-weeks. The period-of-restoration is reasonably expected to be six-months. Dandridge seems to agree with this in other areas of the estimate where he estimates a 25-week duration, e.g., line item for safety monitory system. In this case, the unnecessary charge for goggles is inflated in price, number of units, and duration. The entire $20,312.56 charge for goggles is unreasonable and unnecessary.

12. A similar overstatement occurs with the cost for earplugs. They are standard equipment and Dandridge estimates the charge for this

---

[14] N95, KN95, or Cloth Masks? Prices Surge As CDC Weighs New Recommendations - Bloomberg (bingj.com)

6:22-cv-00318-RAW-JAR  Document 51-739 Filed in ED/OK on 10/03/23  Page 66 of 98
June 23, 2023

1404 West Broadway Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 50

equipment should last for 52-weeks. The $6,240 charge for earplugs is unreasonable.

13. Head protection is also standard equipment. Contractors own their own hardhats and take them from job-to-job.

14. Dandridge includes a charge for a portable fire extinguisher because it is required "within 75 feet of each pump, dispenser, underground pipe opening, and lubrication or refueling service area". None of these exist in this residential fire reconstruction.

15. He estimates a charge of $30,000 for a flagman to be onsite 40-hours a week for 25-weeks. Again, it seems Dandridge seems to be unclear as to the job surroundings and the reasonable scope of work necessary to remediate and repair the subject residence.

16. A charge of $60,000 is entered for what appears to be the preparation and maintenance of the electrical system during the repairs. Again, it appears Dandridge does not understand the existing electrical system, the damage it sustained, or the electrical requirements which will be needed or allowed during the period-of-restoration. As is customary in the restoration industry, the existing electrical system would be disconnected and a temporary power system put in place with limited power usage. All of which would be done with the oversite of the local building inspection department. The costs associated with these charges are properly accounted for in the final State Farm estimate.

17. Dandridge charges $3,925 for a debris chute or hopper and hardware. It is unclear where this chute would be assembled and utilized. It is not necessary for this project.

18. A 40-hour/week charge is included for a laborer to manage the storage of materials. Materials will be delivered on an as-needed-basis and will not require a full-time employee to assure the materials are "stored in tiers and meet safe load limits of floors".

19. Fall protection, such as harnesses, are standard equipment for roofers and framers. An additional charge is not necessary.

20. For this project, a telehandler would not be utilized. The framing is constructed with stick framed, nominal lumber. Lifting of trusses is not necessary. Roofing items would be loaded when delivered. The 25-week duration offered by Dandridge is unreasonable. Even if a forklift were necessary, it would only be on site in the early stages of the project. The entire $11,250.00 charge is unnecessary.

21. The Dandridge estimate is so unreliable that the public adjuster who solicited the estimate, Ian Rupert, seems to have largely disregarded it.

*********************************************************************************

***Opinion #4:***  *The Plaintiffs' Public Adjuster, Ian Rupert, submitted an estimate dated July 16, 2021. The total for the Dwelling and Other Structures sections of the estimate was $505,376.76. The estimate contains many inaccuracies. It cannot be relied upon to determine the true cost to repair the damage sustained by the fire loss on January 11, 2021.*

1. The paragraphs below include some of the more significant overestimations included in the Rupert estimate. To provide an exhaustive list of the items found in the 81-page estimate is beyond the scope of this report.

2. The estimate was provided to State Farm in August of 2021 approximately six-months after Rupert was retained by Collins.

3. Many of the safety items included in the Rupert estimate are unreasonable and unnecessary charges. Some of these items have been previously discussed.

   • Roof anchors and safety harnesses are standard equipment and are not typically charged as an add-on by contractors.
   • It would not be necessary to construct a fence around the residence in this setting. Construction materials can be maintained within the secured facility. The public does not have access to the property.
   • For the same reason, warning signs and additional barricade system set-up is not necessary. Even if it were, a charge for 10 signs at a daily rate for 180 days (calculated to 1,800 days) for a total of $6,829.20 is unreasonable.
   • For this job, the line-item for personal equipment is not necessary. The necessary equipment are standard items and expected to be taken from job-to-job. The quantity entered by Rupert is unreasonable. For the scope of work necessary, it is not expected that there will be 20-workers on the job site in any one day. To estimate that 20-workers will be on the job site everyday of work for 6-months is unreasonable.
   • For reasons previously discussed, safety monitoring is not necessary.

4. Rupert used several line items to account for the demolition or debris removal of the fire damaged property. On line 22 of the estimate, he adds a rounded 120 hours of debris removal to account for debris to include "All except Roofing, Framing, and Above Lines". As Xactimate provides several ways to estimate debris removal more accurately, like the methods utilized by Rupert for "Roofing Framing and Above Lines", it is

unclear why Rupert found it necessary to add these undocumented hours. It is likely the line-item entry has inflated the estimate.

5. Rupert manually manipulated the pricing of many of the line items in the estimate. One example is found at Line #36 on Page 7 of the estimate. The standard Xactimate unit price to *Remove Laminated – comp. shingle rfg. – w/felt* (as provided by the June 2021 Xactimate pricing database used by Rupert) is $47.32/Square[15](SQ). Rupert manipulated this price to $103.28/SQ. This type of manipulation appears to have been repeated on the demolition of all roof and roof related items in the estimate. This is contrary to roofing industry standards and served to inflate the estimate. Rupert's opinion seems to be that the removal of the shingles and other roofing items should be estimated using the roofing labor rates of the most skilled workers instead of Xactimate's researched labor rate. This is incorrect for the following reasons:

a. It is contrary to how Xactimate develops and characterizes its unit prices. Xactimate queries the marketplace, e.g., vendors, materialmen, supply houses, etc. for its pricing data points; hence, the $47.32/SQ price is the data driven, researched price rather than the $103.28/SQ which Rupert utilized. If roofing contractors, providing competitive bids, reported their pricing in the amount Rupert suggests, those reported unit prices would be the data analyzed and reported by Xactimate as the current market unit price. Instead, the $47.32/SQ price serves as the market driven price.

b. It is contrary to common practices. Every roofing crew has members with varying skills, responsibilities, and pay rates. His assertion that the applicable labor rate for all tasks needed to remove/replace a roof should always be the highest Xactimate roofing rate. This suggests that only the most skilled roofers on the crew will complete all the tasks associated with replacing a roof, including the roof shingle tear-off. This is not the case in the roofing marketplace. In reality, a roofing crew splits the responsibilities with: the lesser skilled workers tearing-off the shingles, hauling the shingles to the onsite trash container, and cleaning up around the job site, etc.; and the more skilled workers installing the shingles and other roofing components that require greater knowledge, skill, and experience. This is further supported by Xactimate's differentiation of roofing tasks/skills and commensurate rates: skilled roofer, $92.34/hour; roofing general labor, $32.41/hour.[16]

---

[15] Xactimate estimating software pricing database for Muskogee, OK, OKMU8X_JUN21
[16] Xactimate estimating software pricing database for Muskogee, OK, OKMU8X_JUN21.

Page 69 of 98
VFES OK-04.28.2021
Case 6:22-cv-00014-RAW-JAR   Document 51-9   Filed in ED/OK on 11/16/23   Page 55 of 60
1302 West Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 53

6. The manipulation of unit pricing in Rupert's estimate runs counter to the highly researched unit pricing found within the Xactimate software system. When assembling the price databases, Xactimate obtains routine feedback from a wide variety of data sources and uses a proprietary cluster analysis algorithm to develop a "range of cost" for a particular item.[17]  The unit price is the best representation of an identified "range of cost". Xactimate acknowledges some of its collected market pricing data may be higher or lower than its published unit price; however, this in and of itself is not justification for arbitrarily increasing the unit pricing. The Xactimate published price is the *most representative price*. Rupert arbitrarily changed the most representative price without the basis outlined by Xactimate.

7. Rupert replaced all the structure's roof decking when the decking attached to the roof above Attic 2 was undamaged.

8. The estimate includes the replacement of ten windows which is greater than the four documented to be damaged. Rupert ignores the recommendation of the engineer he solicited, Williams, who recommended the replacement of five windows.

9. When the addition of General Contractor Overhead and Profit (GCOP) is expected, as it is in this case, the common markup rate is 10% for overhead and 10% for profit which is applied to the Xactimate estimate's subtotal. This is the industry standard. Rupert chose to excessively markup each at a rate of 20%. Rupert's cumulative markup of 40% is not a common practice. His assigned markup only serves to inflate the estimate as it would cause the estimate to be uncompetitive in the reconstruction marketplace.

*************************************************************************************************

**<u>Opinion #5</u>:** *The estimates prepared by State Farm reasonably addressed the documented fire-caused damages to the subject property. The State Farm representative appears to have followed industry standard methods, common in the damage evaluation industries, when inspecting the property for damages. The estimates prepared by State Farm was prepared in ways common to what is typical when estimating fire damages. The final State Farm estimate reasonably includes the necessary costs to return the subject property to a pre-loss condition.*

---

[17] "Pricing Research Methodology," published by Xactware Solutions, dated 2/6/18, available at https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf.

Page 70 of 98
VFES OK-04.28.2021
6:22-cv-00184-RAW-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 55 of 60
1302 West Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 54

1. State Farm utilized the Xactimate estimating software to prepare the estimate to repair fire-related damages.

2. The final pricing database selected by State Farm, OKMU28_OCT21, accurately matches the month the estimate was prepared and the geographic locale of the subject residence.

3. The estimated scope of work and quantities itemized within the estimate appears to match the repairs needed to return the property to its pre-loss condition. The final estimate total reasonably represents the true cost to repair the fire-related damages.

4. Even within the initial estimate, which served as the starting point, the quantities and dimension used to prepare the estimate closely matched those which I observed.

5. The initial State Farm estimate was prepared within weeks of initially visiting the property. This is common when estimating for large losses.

6. State Farm did not receive another estimate from the owners' representative until Rupert submitted his report approximately six-months after being retained. State Farm promptly reached out to Berryman Enterprises to inspect the property and prepare another bid for comparison.

7. Upon receiving the Berryman bid, State Farm promptly revised its estimate by largely adopting Berryman's bid.

8. The initial estimate served as a reasonable starting point to work toward an agreed scope and price. The final State Farm estimate reasonably addresses the necessary costs to return the property to its pre-loss condition.

I understand that discovery is in progress and I reserve the right to supplement this report to address additional information made available to me. Any document contained or referred to in this report may be used as an exhibit to illustrate my testimony. Please find attached as a part of this report my current Curriculum Vitae which list all cases in which I have given testimony, both at deposition and trial over the last four (4) years. It establishes my qualifications and my compensation.

Sincerely,

Derek VanDorn
BERRYMAN ENTERPRISES, INC.

6:22-cv-00084-RAW-JAR Document 51-39 Filed in ED/OK on 10/23/23 Page 71 of 98

COLLINS v. STATE FARM

# CURRICULUM VITAE

**Name:**    Derek VanDorn
**Born:**    April 15, 1974
    Shattuck, Oklahoma

**Occupation:**    Construction Consultant
    Berryman Enterprises, Inc.
    General Contractor / Consultant
    426 N.W. 5th Street
    Oklahoma City, Oklahoma 73102

**Education:**    M.B.A., Cameron University, 2004
    Business Administration

    B.S., Oklahoma State University, 1998
    Finance

**Experience:**    General Contractor/Consultant, Berryman Enterprises 2017-Present

    General Contractor, Phoenix Construction, 2015-2017

    General Manager, Steve Breed Construction, 2007-2015

    Claim Specialist, State Farm Insurance, 1998-2007

**Certifications:** Oklahoma Commercial Roofing Endorsement

**Compensation Structure:**

Expert services and review, study, estimation, and written opinions shall be billed at a rate of $345/hour.

Expert services at deposition and trial shall be billed at $525.00/hour.

Page 72 of 98
VFES OK-04.28.2021
1302 West Broadway Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 56

**Previous Depositions and Court Appearances (Four Years):**

1) Lisa West and Stormy Hopson, individually
   and as class representatives, v.
   ABC Oil Company, Inc., et. al.
   In the United States District Court
   For the Western District of Oklahoma
   Case # CIV-16-264-F
   Deposition Date: June 5, 2020

2) William and Rachel Marchant,
   v. Magnum Contemporary Housing,
   Inc., and Palm Harbor Homes, Inc.
   And Palm Harbor Village, Inc.
   In Private Arbitration
   Arbitration Date: July 28, 2020

3) Jody and Jerry Bryant,
   v. North Star Mutual Insurance
   Company and Dome Insurance
   Agency, LLC,
   District Court of Oklahoma County, Oklahoma
   Case # CJ-2020-70
   Deposition Date: October 28, 2021

4) L. Duane Wilson and Helen L. Wilson
   v. State Farm Fire & Casualty Company
   For the Northern District
   Of Oklahoma
   Case #: 21-CV-00062
   Deposition Date: December 15, 2021

5) Eric and Micah Proe,
   v. Glenn Dennis Emery, Mike
   Emery, dba Diamond Homes
   District Court of Hughes County, Oklahoma
   Case # CJ-2019-63
   Deposition Date: May 31, 2022

6) Johnnie L. Greer
   v. State Farm Fire and Casualty
   Company, and Robert W. Kawero
   District Court of Canadian County, Oklahoma
   Case # CJ-2019-151
   Deposition Date: June 7, 2022

COLLINS v. STATE FARM

7) Thomas H. Bates
   v. State Farm Fire and Casualty
   Company
   For the Western District
   Of Oklahoma
   Case # CIV-21-705-JD
   Deposition Date: June 28, 2022

8) First Presbyterian Church of
   Arkansas City
   v. Brotherhood Mutual Insurance
   For the District of Kansas
   Case # 21-CV-01201-KHV-JPO
   Deposition Date: August 31, 2022

9) Kevin W. and Rebecca Hoog
   v. Dometic Corporation
   For the Western District
   Of Oklahoma
   Case # CIV-20-00272-JD
   Deposition Date: September 30, 2022

10) Eric and Micah Proe,
    v. Glenn Dennis Emery, Mike
    Emery, dba Diamond Homes
    District Court of Hughes County, Oklahoma
    Case # CJ-2019-63
    Trial Testimony: October 28, 2022

11) Thomas H. Bates
    v. State Farm Fire and Casualty
    Company
    For the Western District
    Of Oklahoma
    Case # CIV-21-705-JD
    Trial Testimony: November 7, 2022

12) Garrett and Ashley Foster
    v. United Built Homes
    In Private Arbitration
    Deposition Date: November 16, 2022

COLLINS v. STATE FARM

13) AC Owen Construction, LLC,
v. Jeremy W. Cramer, D.V.M.,
P.L.L.C. d/b/a Lakeview
Pet Hospital,
In Private Arbitration
Deposition Date: January 11, 2023

14) Jonathan and Jessica Plasencia
v. Asher Homes, LLC
In Private Arbitration
Case # 01-22-0003-2957
Hearing Date: January 23, 2023

15) AC Owen Construction, LLC,
v. Jeremy W. Cramer, D.V.M.,
P.L.L.C. d/b/a Lakeview
Pet Hospital,
In Private Arbitration
Hearing Date: February 3, 2023

16) Mike Hazlip, et al., v White Star
Petroleum, LLC. et al.,
District Court of Payne County,
Oklahoma
Case # CJ-2018-87
Deposition Date: February 16, 2023

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

## ATTACHMENT 6.2: RATES, TERMS, AND GENERAL CONDITIONS:






**PO BOX 783, JENKS, OKLAHOMA 74037 | 918.970.4722 | 855.918.5111 (TF) | WWW.VALORFES.COM**

## RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023:

### 1.0: GENERAL INFORMATION:

Valor Forensic Engineering Services, LLC is a Professional Engineering Firm that provides forensic engineering consulting services to adjusters, appraisers, attorneys, contractors, property owners, and other parties directly involved with a subject matter. Valor Forensic Engineering Services, LLC does not perform or provide engineering design services. Any necessary design services should be obtained from licensed design professionals in accordance with the rules, laws, and/or local codes within the subject jurisdictions. **The use of any report or document prepared by Valor Forensic Engineering Services, LLC represents acceptance and agreement with the Rates, Terms, and General Conditions as indicated herein and with any provisions as indicated within the documents**.

### 2.0: PROFESSIONAL SERVICE FEES AND COSTS:

Valor Forensic Engineering Services, LLC provides professional services on either a 'fixed fee' basis or a 'time and cost' basis derived from a defined scope of work. **Fees for services are due based on the scope of work performed and cannot be contingent on the outcome of any specific matter.** Valor Forensic Engineering Services, LLC requires the receipt of a retainer payment before the start of work. The value of the required retainer payment will depend on the specific parameters of the subject matter. Evaluations on a 'fixed fee' basis are subject to revised (increased or decreased) budgets based on revised scopes of work.

### 2.1: 'FIXED FEE' BILLING:

At its sole discretion, Valor Forensic Engineering Services, LLC may offer professional services for a 'fixed fee' based on a defined Scope of Work. The expenses associated with a 'fixed fee' evaluation are subject to change based on changes to the Scope of Work.

### 2.2: 'TIME AND COST' BILLING RATES:

Professional Engineering services ('Time and Cost' basis) and Engineering Technician services are offered at the following base billing rates:

Engineer IV (Principal, P.E., D.F.E): $275/Hour (Legal $320/Hour/Testimony $550/Hour)
Engineer III (Senior P.E.): $245/Hour (Legal $280/Hour/Testimony $490/Hour)
Engineer II (P.E.) $220/Hour (Legal $250/House/Testimony $440/Hour)
Engineering Technician: $135/Hour (Legal $150/Hour/Testimony $295/Hour)
Administration: $85/Hour
Vehicle Mileage: Current IRS Mileage Rate plus $.20/Mile (based on distance driven relative to the subject matter)
Tolls, Parking, and Other Expenses: Cost plus 10 percent.

NOTE: Testimony is billed in 4-hour blocks with a minimum first 4-hour block.

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

Billing will occur on a quarter-hour basis unless otherwise indicated elsewhere in this document (specifically testimony). Site evaluations will be subject to a minimum one-hour charge. The rates listed above may reflect the routine costs for third-party contractors that assist with the performance of our work. Due to variations in staffing, staff qualified at a given rate may not be available at a particular time. Valor Forensic Engineering Services, LLC retains the right to offer professional services at other rates at its sole discretion. When third-party contractors are engaged, billing will also be subject to the respective firm's billing policies and rates. Mileage rates allow for the use of larger vehicles necessary to carry equipment commonly utilized during site evaluations.

Depending on staffing, scheduling, and logistics, emergency services may be available from Valor Forensic Engineering Services, LLC. Emergency services are for files where same-day or next-day site evaluations are required to protect the health, welfare, and safety of the public or, where necessary, to safeguard property. Due to the heightened costs associated with short-notice logistics and associated rescheduling, it may be necessary for Valor Forensic Engineering Services, LLC to increase its rates above standard 'Time and Cost' billing rates. Rates for services required to occur at night, over weekends, or during established company holidays are considered to be 'after-hours' requests and are also subject to billing rates above those listed in the 'Time and Cost' billing rates. When emergency or after-hours billing rates apply, the retaining client will be notified at the time of engagement.

As some matters will continue for extended periods of time, Valor Forensic Engineering Services, LLC retains the right to adjust professional services rates to then-current market rates. Rates accepted at the start of a matter will be honored for 180 days and then transition to current rates.

## 2.3: APPRAISAL UMPIRE SERVICES:

Billing for Valor Forensic Engineering Services, LLC staff acting as Umpire in an appraisal may be based on a 'time and cost' basis. Valor Forensic Engineering Services, LLC reserves the right to decline to engage in any specific appraisal process at its sole discretion. A full cost retainer, based on estimated costs/time and divided among the involved parties as defined by relevant policy or law, may be required by Valor Forensic Engineering Services, LLC before performing any work related to Appraisal Umpire services.

Should it become necessary for Valor Forensic Engineering Services, LLC to seek or engage the professional services of other entities or legal counsel as part of an appraisal, the costs for such professional services will be apportioned to the involved parties on the same basis as any other costs related to the performance of the duties of the umpire. Any costs associated with testimony or subpoenas resulting from the involvement in a given matter as an appraisal umpire will similarly be apportioned to the involved parties and subject to the legal and testimony rates and terms listed with these Rates, Terms, and General Conditions.

## 2.4: LEGAL SUPPORT SERVICES/BILLING RATES:

Legal rates are applicable for matters where legal counsel retained Valor Forensic Engineering Services, LLC or when matters in which Valor Forensic Engineering Services, LLC was otherwise retained, and the owner then elects to engage attorneys/legal counsel. In matters involving legal counsel's incidental engagement, Valor Forensic Engineering Services, LLC may elect, at its sole

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

discretion, to continue to bill for services at standard rates.  Litigation does not need to have been filed for legal rates to apply.

## 3.0: PAYMENT TERMS:

**As an independent third party providing professional consulting services, the payment of professional fees cannot be contingent upon any specific outcome(s) relative to a given matter.**

Valor Forensic Engineering Services, LLC requires the payment of a retainer equal to half of the 'fixed fee' billing or 'time and cost' budget in addition to any known third-party costs.  **Full and final payment must be received before releasing the final signed and sealed Report of Findings or other documentation.**  For larger matters or matters anticipated to take more than 30 days to complete, Valor Forensic Engineering Services, LLC may implement billing based on completing certain phases of work.

At its sole discretion, Valor Forensic Engineering Services, LLC may elect to offer professional services to clients without the previous payment of a retainer or under alternative financial arrangements (specifically excluding any form of contingency).

For matters completed without a retainer or payment before the release of the Report of Findings or other documents, full payment is due within 30 days of the invoice.  Late fees of 1.5% per month for any balance remaining unpaid after 30 days will be assessed.  Invoices extending beyond 60 days are subject to collections processes, and any costs associated with such collection efforts will be added to the existing invoices and accumulated late fees.  **Valor Forensic Engineering Services reserves the right to suspend work due to invoices that are more than 60 days past due or to decline further work for clients with delinquent balances.**

Valor Forensic Engineering Services, LLC, and their representatives may, for reasonable business purposes, exchange positive and negative payment history and any other pertinent information with, including by way of example but without limitation, any credit bureau, background service provider, collection agency, attorney, or financial institution.

## 4.0: CONFIDENTIALITY:

**Unless otherwise agreed to and/or required by law, Valor Forensic Engineering Services, LLC considers all forensic engineering matters confidential.  If records, specific information or observations, images, documents, etc., are requested by a party other than a retaining client and/or another party previously approved by the retaining client, Valor Forensic Engineering Services, LLC will notify the retaining client before the release of the requested data to allow the retaining parties to protect applicable information.**

Valor Forensic Engineering Services, LLC retains the right to discuss general observations and experiences from past work as part of its research, educational, training, and other business operations while not identifying the specific site, address, involved parties, or location beyond a general geographical area.  Requests for specific information related to past work will be treated as confidential, as indicated in the paragraph above.

## 5.0: RETENTION OF RECORDS:

Valor Forensic Engineering Services, LLC will maintain a digital record of documents provided to, obtained during, or otherwise developed during the evaluation or subsequent processes.  Reports

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

of Findings of other prepared documents by Valor Forensic Engineering Services, LLC, will be maintained as a PDF file.  These PDF documents are maintained in digitally signed or locked digital files.

## 6.0: SUBPOENA OF RECORDS:

While Valor Forensic Engineering Services, LLC intends to cooperate with involved parties to ensure that the information requested is made available as smoothly and cooperatively as feasible, it must be understood that submitting a subpoena to the firm or staff members represents a demand for professional services.  As such, it has become necessary for Valor Forensic Engineering Services, LLC to adopt policies as indicated within this section.  Unless otherwise agreed to in advance, all subpoenas shall be submitted directly to our legal counsel as listed below:

**DAVID KEESLING | SENIOR PARTNER | FEDERAL PRACTICE GROUP**
**T: (918) 936-3420 | EMAIL: DKEESLING@FEDPRACTICE.COM**
**401 SOUTH BOSTON AVENUE, SUITE 2300 | TULSA, OK 74103**

Please note that Federal Practice Group is the Registered Agent for Valor Forensic Engineering Services, LLC, within the State of Oklahoma.  Valor Forensic Engineering Services, LLC reserves the right to take any actions necessary to prevent and/or stop abusive, harassing, or other unprofessional behavior by any party presenting a subpoena.  Valor Forensic Engineering Services, LLC further reserves the right to the financial recovery of any professional, legal, or other expenses incurred due to abusive, harassing, or otherwise unprofessional behavior related to any subpoena.

The time necessary to review, research, gather, and provide relevant documentation to the requesting party requires significant (and non-trivial) efforts and draws our professional and administrative staff away from other professional obligations and previously planned corporate operations.  As a third party (non-involved party in the litigation), it is necessary for Valor Forensic Engineering Services, LLC, to invoice the party submitting a subpoena for its reasonable costs related to the party presenting the subpoena, the research, and gathering of documentation, and for the transmission of any found documentation.  **As subpoenas often represent complex legal documents, there should be no expectation that the research, gathering, and review of documentation in response to a subpoena will be an administrative process or completed solely by administrative staff.  As such, parties submitting a subpoena will be billed for the time of involved professional staff and administrative staff as shown in Section 2.2: 'Time and Cost' File Billing Rates: of this document.'**

**<u>Upon receiving a subpoena, an invoice will be prepared based on the time necessary to review the subpoena, conduct the necessary research, gather documentation, and transmit the documentation to the requesting party.  Full payment of the invoice to Valor Forensic Engineering Services, LLC will be required before any gathered documentation is released.</u>**  As there may be agreements among/between the involved attorneys relative to the payment of professional service fees, the involved attorneys must ensure that any invoices resulting from subpoenas are paid promptly.  Any attorney presenting a subpoena is encouraged to involve the counsel that has engaged Valor Forensic Engineering Services, LLC, or is acting on the client's behalf.

 

## RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023

When the invoice for the necessary services in response to a subpoena is paid in full, the requested documents will be released via a file folder in Microsoft® SharePoint® or to retaining counsel for further distribution. The Microsoft® SharePoint® link will be maintained for seven days from the initial issuance unless additional time to maintain the link is requested in writing or by email to our office. Should the file be closed after the initial 7-day period and additional access is needed, the file folder can be reopened for a charge of $50. The obligations of Valor Forensic Engineering Services, LLC will be deemed to have been met when the file folder is made available to the requesting party via SharePoint. The requesting party will remain obligated to download the produced documentation into their systems. Valor Forensic Engineering Services, LLC cannot be responsible for any issues created by email or other digital filtering systems that may delay or otherwise block the transmission of the digital link to the file folder. **Once the Microsoft® SharePoint® link is sent to the proper email address, any further processes from the requesting party to ensure their proper handling of the provided information is beyond the responsibilities of Valor Forensic Engineering Services, LLC.**

If it is necessary to produce documents in response to a subpoena in another format, the party requesting such production will remain financially liable for the significant increases in billable time and costs associated with such production.

**Due to the demand for professional services represented by submitting a subpoena, the time and effort necessary to comply with a subpoena, and the need for payment for compliance with a subpoena, all subpoenas must provide at least 45 days to produce requested documentation.** Subpoenas presented with less than 45 days to respond are excessively burdensome and disruptive to the operation of the firm. Should any legal costs be incurred in responding to a subpoena, those costs will remain the financial responsibility and liability of the person presenting the subpoena. The incursion of legal expenses will be related primarily, but not exclusively, to short (subpoenas received with less than 45 days to respond) or late subpoenas and subpoenas that are overly broad, burdensome, harassing, or otherwise improper.

**If a subpoena is overly broad, burdensome, or seeks proprietary information, Valor Forensic Engineering Services, LLC retains the right to seek legal counsel and take steps necessary to constrain such subpoena overreach and/or abuse. Valor Forensic Engineering Services, LLC reserves the right to collect legal and professional fees from any party presenting an overly broad, burdensome subpoena or seeking proprietary or irrelevant information.**

## 7.0: TESTIMONY RATES AND TERMS:

While Valor Forensic Engineering Services, LLC intends to cooperate with involved parties to ensure the requested testimony is made available as smoothly and cooperatively as feasible, it must be understood that the request for deposition or testimony represents a demand for professional services. As such, it has become necessary for Valor Forensic Engineering Services, LLC to adopt policies as indicated within this section. Testimony in depositions, trials, or other processes requires significant time and resources to draw professional staff away from other business operations. Furthermore, coordinating such testimony also requires considerable time, effort, and work on the part of the firm. As such, it is necessary for Valor Forensic Engineering Services, LLC, to charge rates commensurate to that work level.

 

## RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023

Unless otherwise agreed to in advance, all requests/subpoenas for deposition or testimony shall be submitted directly to our legal counsel at:

**DAVID KEESLING | SENIOR PARTNER | FEDERAL PRACTICE GROUP**
**T: (918) 936-3420 | EMAIL: DKEESLING@FEDPRACTICE.COM**
**401 SOUTH BOSTON AVENUE, SUITE 2300 | TULSA, OK 74103**

**Please note that Federal Practice Group is the Registered Agent for Valor Forensic Engineering Services, LLC, within the State of Oklahoma. Any party requesting deposition or testimony is specifically instructed to present any such request through the counsel of the party retaining Valor Forensic Engineering Services, LLC. Efforts to contact the firm or individuals outside of retaining legal counsel will be considered to represent harassment. As such, Valor Forensic Engineering Services, LLC reserves the right to engage legal counsel in response to such acts. Any costs associated with the engagement of legal counsel in response to such behavior will remain the financial liability of the party engaging in such harassing acts. Valor Forensic Engineering Services, LLC also reserves the right to engage law enforcement officials in cases of egregious harassment, misrepresentation, or other noxious behavior.**

Valor Forensic Engineering Services, LLC may not have information about the specific financial obligations or agreements between/among the involved parties. As such, it remains the obligation of the involved attorneys to ensure that full payment of retainers related to preparation and deposition is received promptly. In the absence of information to the contrary and our concurrence, the party requesting testimony is understood to be responsible for payment of any testimony-related invoices.

**Testimony is billed in 4-hour increments based upon the hourly rates listed in Section 2.2 'Time and Cost' File Billings Rates. If testimony is agreed to beyond the Tulsa, Oklahoma, metropolitan area, the minimum billing increment for testimony will be an 8-hour increment in addition to any costs associated with the time for travel and direct costs related to such travel.**

Upon receiving a request for testimony, Valor Forensic Engineering Services, LLC, will provide invoices to the retaining client for testimony preparation and to the party requesting the deposition for the initial four-hour block of testimony. It is the obligation of the party requesting testimony to notify Valor Forensic Engineering Services, LLC, if testimony of more than four hours is anticipated so that an invoice for this second testimony billing increment can be presented. The time included within the testimony billing increment includes the time present for the testimony and is not the time 'on the record.' **Full payment of this testimony invoice is required before finalizing the scheduling of any testimony. Testimony will immediately cease when the time included in the paid retainer has been exhausted. The retainer paid for testimony becomes non-refundable if the testimony is canceled with less than 10 calendar days of notice, as significant efforts will have been undertaken in the scheduling and preparation for testimony. It should be noted that Valor Forensic Engineering Services, LLC, reserves the right to require any unpaid invoices associated with an involved individual, firm, or other parties to be paid in full before any testimony is scheduled.**

**Valor Forensic Engineering Services, LLC will commonly have work schedules planned out for weeks to months in advance and will commonly be working to coordinate**

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

**simultaneous requests from multiple parties. When working to coordinate the schedules to honor as many external requests as possible, it may not be possible to confirm scheduling or availability immediately. As such, requests for testimony should be filed with our legal counsel with as much notice as possible (at least 60 days) so that the required retainer can be billed and received before determining a mutually agreeable date, time, and neutral location. Requests received with less than a 60-day notice represent an unnecessary and undue burden on the firm and professional staff. Given scheduling obligations and commitments, it may not be possible for professional staff to agree to testimony schedules received with less than a 60-day notice. If Valor Forensic Engineering Services, LLC must engage legal counsel related to any scheduling, deposition, or testimony matter, the party requesting said deposition/testimony shall be solely responsible and liable for those legal expenses. Attorneys requesting deposition are encouraged to engage counsel for the retaining client as early as possible. Dates for deposition or testimony are not to be set without the concurrence of Valor Forensic Engineering Services, LLC.**

**Please also note that Valor Forensic Engineering Services, LLC will require that any testimony outside of a courtroom occurs at our legal counsel's office, at an agreed neutral site (costs for renting the site will be the responsibility of the party requesting the deposition), or via online video conference. Under no circumstances shall testimony occur at the offices of the party requesting the deposition.** Valor Forensic Engineering Services, LLC, expressly reserves the right to have legal counsel present and involved in any legal testimony process. Should coordination among the involved parties and our legal counsel be necessary as part of any testimony, the costs related to this legal counsel coordination will remain the financial responsibility of the party requesting the testimony. Furthermore, please note that Valor Forensic Engineering Services, LLC reserves the right to take any necessary actions to prevent and/or stop abusive, harassing, misleading, or other unprofessional behavior by any party before and during any testimony or scheduling process. Valor Forensic Engineering Services, LLC also specifically requires that copies of any video or other footage and written transcripts from any testimony be provided to the firm at no charge. Valor Forensic Engineering Services, LLC also specifically requires that the attorney conducting the deposition be recorded (at their expense) when a video deposition is requested.

**If a request for deposition also includes a subpoena for records that were not previously received, it will be necessary for Valor Forensic Engineering Services, LLC to consider this subpoena to represent a second separate request for professional services. The presentation of a subpoena for records and a subpoena for deposition represents an additional and unnecessary burden on the firm and professionals preparing for testimony.** Any requests for documents at the time of deposition will be subject to the terms and conditions articulated in Section 5.0: Subpoena of Records. Requests for records at the time of deposition represent additional financial and time burdens to the firm. As such, the time necessary for complying will be billed to the requesting party in accordance with Section 5.0: Subpoena of Records.

**It is further requested that any exhibits presented or discussed within any testimony be provided to Valor Forensic Engineering Services, LLC, at least 30 days before any scheduled testimony. Should exhibits or other documents that have not been previously**

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

produced be presented as part of any testimony, Valor Forensic Engineering Services, LLC reserves the right to decline to comment on said documents until sufficient time has been provided to review and consider such documents/exhibits any impacts that they may have upon our work and/or testimony. The time necessary to review and consider documents and any consequences they may have upon our work or testimony cannot reasonably be completed during short breaks. It may require the suspension and rescheduling of the testimony. If it is necessary to suspend and reschedule testimony, the party requesting such testimony will be financially liable for all costs related to the original deposition and the reoccurrence of the expenses associated with the continuation of the suspended deposition.

Valor Forensic Engineering Services, LLC will review and correct as necessary any deposition transcripts following depositions. The party requesting the deposition will be charged for reviewing the documents and obtaining a notary signature as required. The costs of reviewing and revising any deposition transcripts will be billed at the base rates indicated in Section 2.2. If any fees must be paid to the court reporter to receive a copy of the transcript, those charges will remain solely the responsibility of the party requesting the deposition. Under no circumstances shall Valor Forensic Engineering Services, LLC, be denied access to or required to pay any fees to view and retain copies of any depositions for its staff.

## 8.0: MOTIONS TO EXCLUDE OR RESTRICT EXPERTS OR REPORTS:

Retaining clients and their legal counsels/attorneys will ensure that Valor Forensic Engineering Services, LLC, and our legal counsel are immediately notified of any attempt to restrict or otherwise exclude reports or testimony by any party employed, contracted to, or otherwise engaged with Valor Forensic Engineering Services, LLC. Furthermore, Valor Forensic Engineering Services, LLC reserves the right to independently engage its legal counsel to respond to any attempts to challenge, restrict, or exclude any reports or testimony.

## 9.0: PRODUCTION OF OPPOSING EXPERT REPORTS AND RESPONSE:

Retaining clients and their legal counsels/attorneys will ensure that Valor Forensic Engineering Services, LLC, is provided with copies of any reports or other documents from opposing experts that comment on, respond to, or otherwise critique any statements, reports, or other documents prepared by or on behalf of Valor Forensic Engineering Services, LLC or affiliates referenced within its Reports or other documents. Valor Forensic Engineering Services, LLC reserves the right to review such documentation, consider the information contained, and develop responses as appropriate. Valor Forensic Engineering Services, LLC specifically reserves the right to independently engage its legal counsel on such matters, if necessary.

## 10.0: THIRD-PARTY SERVICES:

Professional engineering and associated services may include the engagement of third-party providers for field assessments/testing, developing weather data/resources, and obtaining technical references and/or other necessary data. Any third-party data included within the work of Valor Forensic Engineering Services, LLC will remain subject to the terms and limitations imposed by the specific data provider.

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

Expenses related to third-party services will be billed to the retaining client at incurred cost plus ten percent. The costs of third-party services will be included in the initial evaluation budget accepted by the client or approved in writing before being incurred. At the discretion of Valor Forensic Engineering Services, LLC, third-party services may be separately billed from other professional engineering and associated services when incurred and due within 15 days.

## 11.0: OUT-OF-REGION TRAVEL:

Out-of-region travel is defined as a matter that requires more than 6 hours of roundtrip travel (by car) from the primary office or matters that necessitate hotel stays due to multi-day evaluations. Costs of out-of-region travel may include airfare, rental cars, hotels, per diem, and other necessary expenses. Meal costs are billed based on current GSA per diem rates when feasible. Hotels, flights, and other expenses are billed at the incurred cost plus ten percent unless otherwise agreed to in advance.

Due to the inherent variability of evaluation schedules, Valor Forensic Engineering Services, LLC will book necessary airfare that is financially prudent considering all costs involved and in accordance with scheduling limitations.

## 12.0: GENERAL CONDITIONS:

The professional engineering and other services provided by Valor Forensic Engineering Services, LLC will be performed with a degree of skill and care consistent with the practices of the forensic engineering profession in the area where the subject building was located and at the time of the site evaluation. Findings and Conclusions, as stated within Reports of Findings, are determined within a reasonable degree of engineering certainty based on the conditions present at the site at the time of the site evaluation(s), based on the review of applicable and available data, and based on the education, training, and experience of the professional engineering and other assigned staff. **No warranty, suitability for use, or guarantee of outcome is expressed and/or implied.**

**The financial liability of Valor Forensic Engineering Services, LLC, resulting from the performance of its services, shall be limited to the cost of the services billed/performed during the initial field assessment phase of the matter only or $5,000 (whichever is less). Valor Forensic Engineering Services, LLC shall not be liable for any particular outcome of any matter. All work is subject to the limitations listed in the Report of Findings or other issued documents.**

Valor Forensic Engineering Services, LLC reserves the right to review any additional data, conditions, and/or information that becomes available following the issuance of the Report of Findings or other documents. Valor Forensic Engineering Services, LLC reserves the right to review and/or update findings and/or conclusions based upon new information.

Mold assessments and air quality assessments are beyond the Scope of Work performed by Valor Forensic Engineering Services, LLC. As reports of findings have a defined scope, it is not intended to identify all conditions present at or within a given building/site.

Due to professional obligations, perceived or actual conflicts of interest, workload, limitations in areas of expertise, and other factors, Valor Forensic Engineering Services, LLC retains the right to decline to accept or to decline to remain engaged with a specific evaluation or matter. The decision to decline to accept or to decline to stay engaged in a matter is a decision that will be

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

solely at the firm's discretion. If Valor Forensic Engineering Services, LLC determines that it is necessary to withdraw from any matter, this action will be taken in writing to the retaining client.

**As a professional engineering firm, Valor Forensic Engineering Services, LLC is obligated to protect the health, welfare, and safety of the general public and safeguard property. To honor this engineering principle and to meet the legal and ethical responsibilities therein contained, Valor Forensic Engineering Services, LLC reserves the right to release information to jurisdictional regulatory authorities, including Building Officials, Fire Marshalls, Law Enforcement, or others, if necessary, to protect the health, welfare, or safety of the public or as necessary to safeguard property. Valor Forensic Engineering Services, LLC shall not be liable for any consequences from the necessary release of information to protect the health, welfare, or safety of the public or as necessary to safeguard property. Valor Forensic Engineering Services, LLC will notify the client as soon as practical if it has become necessary to release information to jurisdictional authorities to protect the health, welfare, and safety of the general public or to safeguard property.**

Valor Forensic Engineering Services, LLC shall not be responsible or liable for Acts of God, governmental action, or acts outside our control. In the event of a disruption to operations, regardless of the cause, Valor Forensic Engineering Services, LLC will notify the engaging client of the circumstances and work to develop a plan to complete any pending work or testimony when feasible.

## 13.0: REPORT FORMATS AND DELIVERY METHODS:

Valor Forensic Engineering Services, LLC will provide a signed and sealed digital (PDF) copy of prepared reports to the retaining client (or their designated representative) via a file transfer website such as Microsoft® SharePoint® unless otherwise required by law. Given the size of report files, it may be necessary to separate reports into multiple sections should a client request to receive a file via e-mail. If requested or required by state or local rules/laws, a printed copy of the report can be provided to the retaining client. As indicated in Section 4, Reports of Findings and other documents are confidential and will not be released to any other parties without the approval of the retaining client unless otherwise required by law. Valor Forensic Engineering Services, LLC disclaims any contractual relationship, duty, or obligation to any party other than the retaining client.

## 14.0: RETENTION AND USE OF IMAGES AND OTHER DATA:

Valor Forensic Engineering Services, LLC, and our professional staff routinely participate in professional education/training efforts and technical research. While protecting specific site information, Valor Forensic Engineering Services, LLC reserves the right to utilize general observations, non-obvious/redacted images, meteorological data, knowledge, and experiences within marketing, education efforts, and technical research.

## 15.0: RETAINAGE AND STORAGE OF EVIDENCE:

Specific evaluations require collecting, storing, and transferring evidence collected during site evaluations. Evidence storage fees are incurred when obtained evidence is not immediately sent to a lab or other party. The costs of securing and transferring evidence to a lab will be billable to the client. Storage fees are incurred monthly and typically billed to the client every quarter. The

 

## RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023

time that evidence is considered to be stored begins with the date of collection until the client provides written consent to dispose of or transfer the evidence.

### 15.1: STORAGE RATES:

Initial Intake Fee:                       $25/each item
Small Items (Less than four cubic feet):   $30/month
Items larger than four cubic feet:       Quoted

### 15.2: ALTERNATIVE STORAGE/EVIDENCE TRANSFER:

Valor Forensic Engineering Services, LLC maintains a limited evidence storage capacity and may need to transfer storage to a contract provider or affiliated company. Storage rates and terms for evidence transferred from Valor Forensic Engineering Services, LLC to a third party will occur by their established rates, terms, conditions, and/or policies.

### 15.3: DISPOSAL OF EVIDENCE:

Terminating storage and disposal of evidence will require the written approval of the client sent through email, US Mail, or hand delivery. Evidence relevant to multiple parties will require the approval of all parties before the disposal of the evidence. The disposal of large or hazardous evidence may incur a disposal fee. Any evidence released by the retaining client for disposal will become the property of Valor Forensic Engineering Services, LLC (excluding hazardous materials) and may be retained at no further expense to the client for research purposes.

### 16.0: INTELLECTUAL PROPERTY, DOCUMENT TEMPLATES, FORMATS, AND GRAPHICS:

All reports, letters, or other document templates, formats, contents, or other intellectual property ©2023 Valor Forensic Engineering Services, LLC. **Transmission, reproduction, and/or distribution of ANY document by any party other than the retaining client without the expressed written permission of Valor Forensic Engineering Services, LLC (unless required by law) is expressly prohibited**. Clients and their designated representatives retain the right to transmit Reports of Findings and other documents as necessary for processes related to the subject matter.

Logos, graphics, reports formats, templates, contents, intellectual property, and other documents ©2023 Valor Forensic Engineering Services LLC unless otherwise indicated. Digital mining, decompiling, or otherwise obtaining graphics, logos, or other content for any purpose without the expressed written permission of the respective owners is expressly forbidden. Valor Forensic Engineering Services, LLC reserves the right to engage legal counsel to protect its intellectual property represented by its documents.

### 17.0: INDEMNIFICATION:

To the maximum extent permitted by law, Client agrees to indemnify, defend, and hold Valor Forensic Engineering Services, LLC, its owners, and their representatives harmless against all claims of injury, liability, loss, or damage (punitive or otherwise) pursued by Client and Client's representatives, relatives, and invitees. To the maximum extent permitted by law, Valor Forensic Engineering Services, LLC, its owners, and their representatives shall not be responsible or liable to Client for any injury, liability, loss, or damage (punitive or otherwise) directly or indirectly caused by, arising out of, or resulting from the acts or omissions of any other person or acts of God. It is

 

**RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023**

understood and agreed that the Valor Forensic Engineering Services, LLC, its owners, will not be liable to the Client, or any agent or associate of the Client, for any mistake or error in judgment or for any act or omission done in good faith and believed to be within the scope of authority conferred or implied by this Document.

### 18.0: SEVERABILITY:

If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, then such provision or the application thereof shall be amended to reflect the parties' intent. Invalidation of any provision(s) in this Agreement by judgment or court order shall in no way affect any of the other provisions in this Agreement which shall remain in full force and effect.

### 19.0: MODIFICATION:

The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified or amended in any way except through a written amendment signed by all of the parties hereto.

### 20.0: DISPUTE RESOLUTION, BINDING ARBITRATION, CHOICE OF COURT AND LAW:

### 20.1: DISPUTE RESOLUTION:

Upon written demand for Alternative Dispute Resolution by any party to this Agreement, Disputes shall be processed through mandatory Alternative Dispute Resolution as a prerequisite to further litigation or Binding Arbitration proceedings. Alternative Dispute Resolution will cease as a prerequisite to further litigation or Binding Arbitration proceedings as to the party demanding Alternative Dispute Resolution in the event a respondent party fails to respond and comply with an Alternative Dispute Resolution demand within 15 days. Subsequent demands for Alternative Dispute Resolution are permitted once per 15 days. Alternative Dispute Resolution will cease as a prerequisite to further litigation or Binding Arbitration proceedings as to all parties once 30 days have passed since the most recent Alternative Dispute Resolution proceeding with no subsequent Alternative Dispute Resolution demands pending, 60 days have passed since the first Alternative Dispute Resolution proceeding, or 360 days have passed since the first written demand for Alternative Dispute Resolution was submitted, whichever comes first. The party demanding Alternative Dispute Resolution shall pay the costs necessary to commence proceedings.

### 20.2: BINDING ARBITRATION:

Upon written demand for Binding Arbitration by any party to this Agreement, Disputes shall be settled through Binding Arbitration. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Binding Arbitration shall be administered in accordance with and governed by net-ARB.com and its rules of arbitration. Binding Arbitration may also be commenced through the American Arbitration Association (AAA) or an alternate forum, and upon commencement, shall be administered in accordance with and governed by the rules of arbitration promulgated by the chosen forum. If the parties disagree as to the arbitration forum or rules of arbitration, Binding Arbitration shall be administered in accordance with and governed by the net-ARB.com forum and their rules of arbitration. The party demanding Binding Arbitration shall pay the costs required by the forum to commence and maintain proceedings. The arbitrator shall award the prevailing party their expenses incurred to commence or maintain

 

## RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023

Binding Arbitration and Alternative Dispute Resolution (ADR) proceedings. The award of the arbitrator(s) shall be accompanied by a reasoned opinion. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. Failure by any party to this Agreement to participate in Binding **Arbitration** within 30 days of written demand shall entitle the participating parties to an award by default.

### 20.3: CHOICE OF COURT:

**Disputes** shall be filed and litigated or arbitrated exclusively in Tulsa County in the State of Oklahoma.

### 20.4: GOVERNING LAW:

This **Agreement** and **Disputes** shall be construed in accordance with and governed by the laws of the State of Oklahoma. This provision shall not be construed or interpreted to limit the authority of arbitrators.

### 20.5: ATTORNEY EXPENSES:

In any litigation, arbitration, or other proceeding by which one party either seeks to enforce its rights under this **Agreement** (whether in contract, tort, or both) or seeks a declaration of any rights or obligations under this **Agreement**, the prevailing party shall be entitled to reasonable attorneys' fees, in addition to other costs of pursuit. In no event shall any attorney fee recovery exceed $1,000, regardless of the amount actually expended by the prevailing party. This attorney fee limitation is included in the liability limitation for completing fieldwork referenced in Section 12 and does not increase liability.

## END OF RATES, TERMS, AND GENERAL CONDITIONS: OCTOBER 15, 2023.

 

**OK-04.28.2021.01 | COLLINS SUPPLEMENTAL LETTER | NOVEMBER 13, 2023**

## ATTACHMENT 6.3: CURRICULUM VITAE:
## CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.:




**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

## PROFESSIONAL ENGINEERING EXPERIENCE:

Mr. Williams is a Licensed Professional Engineer with more than 21 years of engineering experience, including more than 15 years of forensic engineering and maintenance/operations engineering. Primary practice areas include evaluating residential, commercial, industrial, and institutional facilities to determine the causes and extent of damage related to improper design, construction defects, and damage due to weather events and other causes. In addition, Mr. Williams has experience in facilities and asset management through maintenance and operations engineering. Mr. Williams is also involved in the executive leadership of professional engineering firms and not-for-profit engineering service organizations.

## PRACTICE AND EXPERIENCE: FORENSIC ENGINEERING:

- The evaluation of commercial, industrial, institutional, and residential roofing systems to determine the cause and extent of damage resulting from construction and/or installation defects, fire, hail, wind, tornadoes, and other conditions/causes of damage. Roofing systems evaluated include built-up roofing systems (modified-bitumen cap sheet, gravel ballasted, and non-ballasted systems), ceramic and concrete roofing tiles, asphalt-composition shingles of various types, metal roof panels of various types, various types of single-ply roof membranes (EPDM, PVC, TPO, and others), Spray Polyurethane Roofing (SPF) and conventional and alternative installation slate roofing systems.

- The assessment of roof surfaces to determine the feasibility and practicality of completing durable and sustainable repairs while considering existing site and material conditions.

- The evaluation of commercial, industrial, institutional, and residential buildings to determine the cause and extent of damage resulting from design errors/omissions and construction defects. This includes reviewing engineering documents and records from the original project design.

- The evaluation of exterior building veneers, including brick, EIFS, stone, stucco, and other external building wall systems.

- The evaluation of residential, commercial, industrial, and institutional facilities to determine the cause and extent of foundation failures resulting from plumbing failures, soil movement, and other reasons.

- The evaluation of residential and commercial facilities to determine the extent of damage resulting from seismic activity within Arkansas, Kansas, and Oklahoma.

- The evaluation of residential and other buildings to determine the extent of damage from tree and tree limb impacts.

- The evaluation of residential and commercial buildings for damage due to natural gas and other explosions.

- The evaluation of residential and commercial buildings to determine the extent of damage resulting from flooding events and/or surface rainfall runoff due to the construction of roadways and/or other land development projects.

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

- The evaluation of airfield and airport facilities to determine the cause and extent of damage to pavements, pavement markings, and buildings.

- The evaluation and condition assessment of concrete and asphalt pavements for roadways, sidewalks, parking lots, and other pavements to determine the cause and extent of failure.

- The design of commercial, institutional, and industrial site grading and drainage plans.

- The design of accessible routes and systems in accordance with ADA.

- The design and analysis of utility systems, including:
  - Potable water distribution,
  - Sanitary sewers, and
  - Stormwater drainage and management systems.

- The evaluation of residential, commercial, industrial, and institutional facilities to determine the extent of damage as a result of winds and the direct or indirect passage of tornadoes, including:
  - Moore, Oklahoma (May 20, 2013),
  - El Reno, Oklahoma (May 31, 2013),
  - Tulsa, Oklahoma (August 6, 2017),
  - Seminole, Oklahoma (May 4, 2022),
  - Idabel, Oklahoma (November 6, 2022),
  - Norman, Oklahoma (February 26, 2023),
  - Jacksonville, Arkansas (March 31, 2023),
  - Shawnee, Oklahoma (April 19, 2023), and others.

- The evaluation of residential, commercial, and industrial facilities to determine the extent of damage resulting from the passage of hurricanes, including:
  - Hurricane Michael: Florida Panhandle: 2018,
  - Hurricane Laura: Southwest Louisiana: 2020,
  - Hurricane Delta: Southwest and Central Louisiana: 2020,
  - Hurricane Sally: Florida Panhandle: 2020,
  - Hurricane Ida: Eastern Louisiana: 2021, and
  - Hurricane Ian: Western Florida: 2022.

- The evaluation of vehicle impact damage to residential and commercial buildings.

- Developed training processes and procedures for new hire administration, engineering technicians, and professional engineering staff.

- Developed operational processes for administration staff, engineering technicians, and professional engineering staff.

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

- Peer and technical review of internal and external forensic engineering reports prepared by others.

## PRACTICE AND EXPERIENCE: OPERATIONS AND MAINTENANCE ENGINEERING:

- The assessment of commercial, residential, industrial, and institutional facilities to determine overall condition and assist in developing future maintenance and modernization programs.

- The evaluation of airfield and airport facilities to determine the cause and extent of damage to pavements, pavement markings, and buildings and to obtain the information necessary to develop future maintenance/sustainment plans.

- The evaluation and condition assessment of concrete and asphalt pavements for roadways, sidewalks, parking lots, and other pavements to determine the cause and extent of the failure and to obtain the information necessary to develop future maintenance/sustainment plans.

## PROFESSIONAL ENGINEERING LICENSURE AND CERTIFICATIONS:

- Licensed Professional Engineer (P.E.): Alabama, Arkansas, Colorado, Florida, Indiana, Iowa, Kansas, Kentucky, New Mexico, Louisiana, Mississippi, Missouri, Nebraska, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wyoming.

- National Council of Examiners for Engineering and Surveying (NCEES) Model Law Engineer (M.L.E.): ID 17-139-42.

- Board Certified Diplomate in Forensic Engineering (D.F.E.): National Academy of Forensic Engineers under the prerequisite accreditation of the Council on Engineering & Scientific Specialty Boards (CESB).

- Tile Roofing Industry Alliance Manual Certification Program: Concrete and Clay Roof Tile Installation Manual: October 2022.

- Tile Roofing Industry Alliance Manual Certification Program: Florida High Wind Manual Certification Program: December 2022.

## PROFESSIONAL ENGINEERING EDUCATION:

- Bachelor of Science in Civil Engineering, July 2001, The University of Oklahoma.  Primary areas of study: Civil Engineering, Geotechnical Engineering, and Structural Engineering.

- EFI/Vale Advanced Roofing Certification (EVS/R$^{TM}$ 100013), July 2016.

## ENGINEERING EMPLOYMENT HISTORY:

- Valor Forensic Engineering Services, LLC: President and Principal Engineer/Designated Agent (Multiple States), 2019 to Present (Forensic and Facilities Engineering).

- Insight Forensics, Inc.: Principal Engineer/Designated Agent (Oklahoma), 2019 (Forensic Engineering).

- EFI Global, Inc.: Senior Engineer/Engineer of Record (Oklahoma), 2016-2019 (Forensic Engineering).

- PTC|LWG: Senior Engineer, 2015-2016 (Forensic Engineering).

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

- Rimkus Consulting Group, Inc.: Consultant, Senior Consultant/Engineer of Record (Oklahoma), 2011-2015 (Forensic Engineering).

- Parsons (Maintenance Engineering): Senior Engineer/Lead Civil Engineer, 2008-2011 (Operations, Maintenance, and Forensic Engineering).

- SMC Consulting Engineers, P.C.: Project Manager, 2006-2008 (Land Development /Utilities).

- BKL, Inc.: Project Manager/Civil Engineer, 2005-2006 (Transportation/Utilities).

- Sack and Associates, Inc.: Project Manager, 2004-2005 (Land Development/Utilities).

- Kellogg Engineering, Inc: Civil Engineer, 2003-2004 (Land Development/Utilities).

- City of Owasso, Oklahoma: Civil Engineer 2002-2003 (Land Development/Operations).

## PROFESSIONAL ENGINEERING/TECHNICAL AFFILIATIONS:

- American Society of Civil Engineers (ASCE), Member (2004 to Present), Committee on Forensic Engineering Practice (2022 to Present).

- ASTM: Committee E58 on Forensic Engineering (2020 to Present).

- National Academy of Forensic Engineers (NAFE), Associate Member (2017 to 2022), Member (2022 to Present).

- National Roofing Contractors Association (NRCA), Engineer Consultant (2020 to Present).

- National Society of Professional Engineers (NSPE), Member (2014 to Present):

  o Financial Technology Task Force Member (2016),

  o Business Model Task Force II Member (2017-2018).

- Oklahoma Society of Professional Engineers (OSPE), Member (2014 to Present):

  o Member, Board of Directors (2015 to 2025),

  o Vice President for Membership (2015 - 2016), Board Member,

  o House of Delegates Member for Oklahoma (2016-2019), Board Member,

  o President-Elect (2019 to 2021), Board Member,

  o President (2021 to 2023), Board Member,

  o Immediate Past President (2023 to 2025), Board Member.

## PROFESSIONAL TECHNICAL PUBLICATIONS:

- Use of the Repairability Assessment Method for Evaluating Asphalt-Composition Shingle Roof Repairs. *Journal of the National Academy of Forensic Engineers, 37(1)*: December 2020.

## CONTINUING EDUCATION COURSES PREPARED AND PRESENTED:

- *Challenges in Forensic Engineering* (CE seminar: Oklahoma Engineering Conference, June 2019).

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

- *Determining the Repairability of Asphalt Composition Shingles* (CE Seminar: National Academy of Forensic Engineers (NAFE) Winter Meeting, January 2020), (CE Seminar: Oklahoma Engineering Conference (Virtual) 2020).

- *Differentiating Earthquake Movement from Other Structural Movements* (CE seminar: Multiple Dates and Locations).

- *Factors to Consider in Developing Conceptual Scopes of Repairs for Common Low-sloped Roofing Assemblies as Part of a Forensic Engineering Evaluation* (CE Seminar: National Academy of Forensic Engineers (NAFE) Winter Meeting, January 2022).

- *Forensic Engineering* (CE Seminar: Oklahoma Engineering Conference, June 2016).

- *Forensic Recovery from Hurricanes Laura and Delta* (CE Seminar: Oklahoma Engineering Conference, June 2021).

- *Light Residential and Commercial Earthquake Evaluations* (CE Seminar: National Academy of Forensic Engineers (NAFE) Summer Meeting, July 2018).

- *Lightning Strikes to Residential Buildings: Impacts Beyond the Electrical System* (CE Seminar: National Tornado Summit, February 2019).

- *Repairability Factors to Consider when Developing Scopes of Repairs for Asphalt-Composition Shingles:* (CE Seminar: National Association of Public Insurance Adjusters (NAPIA) Annual Conference, June 2022), (CE Seminar: Texas Association of Public Insurance Adjusters Annual Conference: October 2022).

- *Shawnee Public Schools: Stucker Complex Tornado Shelter: Post-Tornado Assessment* (CE Seminar: Oklahoma Engineering Conference, June 2023).

- *Thermal Imaging: Applications in Investigations* (CE Seminar: Multiple Dates and Locations).

- *Understanding the Limitations and Proper Use of NCEI SED and SPC Storm Report Data Sets* (CE Seminar: National Association of Public Insurance Adjusters (NAPIA) Mid-year Conference/First Party Claim Conference, December 2022).

- *Understanding the Applicability and Proper Use of Commonly Available Weather Sources Used in Forensic Engineering (*CE Seminar: National Academy of Forensic Engineers (NAFE) Summer Meeting, July 2023).

- *Wind and Hail Damage to Commercial Roofing* (CE Seminar: National Tornado Summit, February 2018).

- *Wind, Wave or Something Else: The Forensics of Boat Dock Evaluations* (CE seminar: National Tornado Summit, February 2019).

## CONTINUING EDUCATION COURSES ATTENDED (2015 TO PRESENT):

- 2015 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Oklahoma City, Oklahoma: June 18-19, 2015.

- Principles of Seismic Design: Halfmoon Education, Inc: Arlington, Texas: July 30, 2015.

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
**PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS**
**(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM**



PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

- 2016 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Tulsa, Oklahoma: June 9-10, 2016.

- EFI/Vale Specialist Training Program: Vale Training Solutions: Dallas, Texas; July 18-22, 2016.

- A Conversation about Engineering Expert Witnesses and Litigation: National Society of Professional Engineers, Online, December 29, 2016.

- 2017 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Moore, Oklahoma, June 15-16, 2017.

- Winter 2017 Meeting: National Academy of Forensic Engineers: New Orleans, Louisiana, January 14-15, 2017.

- Summer 2017 Meeting: Forensic Engineering and Analytic Techniques: National Academy of Forensic Engineers: Atlanta, Georgia, July 23, 2017.

- 2018 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Owasso, Oklahoma, June 7-8, 2018.

- Summer 2018 Meeting: National Academy of Forensic Engineers: Buffalo, New York, July 28-29, 2018.

- 2019 Oklahoma Engineering Conference, Oklahoma Society of Professional Engineers: Moore, Oklahoma, June 20-21, 2019.

- Winter 2019 Meeting: National Academy of Forensic Engineers: Denver, Colorado, July 27-28, 2019.

- Engineering Ethics: The PE as an Expert Witness: On-Line, December 21, 2019.

- Winter 2020 Meeting: National Academy of Forensic Engineers: La Jolla, California, January 11-12, 2020.

- 2020 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: On-line (Virtual Conference due to the ongoing COVID-19 Pandemic), June 18-19, 2020.

- 2021 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: On-Line (Virtual Conference due to the ongoing COVID-19 Pandemic), June 17-18, 2021.

- Winter 2022: National Academy of Forensic Engineers: Tucson, Arizona, January 8-9, 2022

- 2022 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Oklahoma City, Oklahoma: June 16-17, 2022.

- 2022 Forensic Engineering Congress: American Society of Civil Engineers, Denver, Colorado: November 2022.

- 2023 Oklahoma Engineering Conference: Oklahoma Society of Professional Engineers: Owasso, Oklahoma: June 15-16, 2023.

- Summer 2023 Meeting: National Academy of Forensic Engineers: Kansas City, Missouri, July 15-16, 2023.

 



**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM

**PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM**

The list above represents the continuing education seminars and training events attended since January 1, 2015.  This list is not exhaustive and does not include routine rules, laws, or ethics training required to renew Professional Engineering licenses in various states.  This list of representative continuing education also does not include individual personal research and study areas.

## PRIOR EXPERT WITNESS TESTIMONY:

Since January 1, 2018, testimony has occurred in the following matters (the attorney listed is the individual conducting the deposition):

- January 23, 2018: (In-Person Deposition): District Court of Muskogee County, State of Oklahoma: Advanced Urology and Advanced Wellness Center Muskogee, LLC V. Gulf Harbors Construction, New Ground Resources, Inc., New Ground International, Inc., and Massey-Mann, LLC; CJ-2013-281: Bruce A. Spence; Spence Law Office; Construction Defect regarding site work and drainage.

- March 28, 2018: (In-Person Deposition) United States District Court for Western Oklahoma: Southern Nazarene University V. Federal Insurance Company; Case Number 5:17-CV-00558-M; R. Ryan Deligans; Durbin Larimore & Bialick; Evaluation of reported seismic damage to an academic building.

- July 2, 2020: (In-Person Deposition): United State District Court for the Northern District of Texas: Amarillo Division: Nicholas Albracht V. Indemnity Insurance Company of North America; Civil Action 2:19-CV-00072-D, Jennifer Martin; Wilson Elser Moskowitz Edelman & Dicker, LLP; Review of an engineering report performed by others.

- June 21, 2021: (In-Person Deposition): United States District Court for the Western District of Oklahoma: Tracy Moore V. State Farm Fire and Casualty Company; Case Number 20-CV-410-R; J Andrew Brown; Atkinson, Brittingham, Gladd, Fiasco, Edmonds, and Annis; Repairability of an asphalt-composition shingle roof surface.

- July 7, 2021: (Remote/Video Deposition): United States District Court for the Northern District of Texas: Fort Worth Division: SLTA Real Estate Investments V. Nationwide: Civil Action Number 4:20-CV-00955-Y; Robert Wall; Segal McCambridge Singer and Mahoney; Evaluation of hail damage to a low sloped roof surface.

- September 29, 2021: (Remote/Video Deposition): Continued to October 8, 2021: United States District Court for the Western District of Arkansas: Fayetteville Division: Southgate Shopping Center, Inc. V. Cincinnati Casualty Company: No. 5:21-CV-05042-PKH, Scott M Straus, Barber Law Firm, LLC; Evaluation of damage and scope of repair for a series of three coated spray polyurethane foam (SPF) roof surfaces.

- October 28, 2021: (Courtroom In-Person Testimony): Tulsa County Case Number:  CS-2021-9495: Gibbs V. Bomanite of Tulsa: Defective construction for a concrete driveway.

- January 13, 2022: (In-Person) Circuit Court of Stone County, Missouri: Randall K Kirby V. American Family Mutual Insurance Company, S.I., Case No. 20SN-CC0129, Rob Trowbridge, American Family Mutual Insurance Company (Staff Counsel); Evaluation of damage to concrete tile roof surfaces of a dwelling.

 

**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM



**PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM**

- March 15, 2022: (Remote/Video Deposition): United States District Court: Western District of Arkansas: FS Southbrook v. Nationwide General Insurance Company: Fort Smith Division: Case Number: 2:21-CV-2120: Kyler Wilson, Wright Lindsey, and Jennings LLP; Evaluation of wind Damage to exterior mansard roof surfaces of an apartment complex.

- March 19, 2022: (Remote/Video Deposition): United States District Court of Missouri: Southern Division: University Heights Baptist Church V. Brotherhood Mutual Insurance Company, Civil Action Number: 6:21-CV-03064: WM. Clayton Crawford, Foland, Wickens, Roper, Hofer, and Crawford, PC; Evaluation of storm damage to clay tile roof surfaces of an institutional (religious) building.

- May 17, 2022: (Courtroom In-Person Testimony): United States District Court: Western District of Arkansas: Fort Smith Division: FS Southbrook V. Nationwide General Insurance Company: Case Number: 2:21-CV-2120: Wind Damage to exterior mansard roof surfaces.

- September 12, 2022: (Remote/Video Deposition): 162nd Judicial District, Dallas County, Texas: Cause Number DC-19-20125: BNLL&G and Rialto Porcelanato, Inc. V. ATRS Properties 1, LLC, Jonathan C. Allen, Resnick, and Louis, P.C. Evaluation of foundation damage to a commercial warehouse building related to a plumbing break during a tornado event.

- December 29, 2022: (Remote/Video Deposition): United States District Court: Western District of Arkansas: Fort Smith Division: First Baptist Church V. Zurich American Insurance Company, Case Number: 2:22-CV-02066-PKH: David Donovan, Watts, Donovon, Tulley & Carson, P.A. Evaluation of hail damage to roofing systems of a series of institutional (religious) buildings.

- January 3, 2023: (Remote/Video Deposition): United State District Court for the Northern District of Texas: Amarillo Division: Creekwood Real Estate, LLC V. Mount Vernon Fire Insurance Company: Civil Action No. 2:21-CV-188-M-BR: Daniel P. Buechler: Thompson, Coe, Cousins, and Irons, L.L.P. Evaluation of hail damage to the roof surfaces of a commercial retail building.

- January 17, 2023: (In-Person Deposition): State of Kansas: District Court of Montgomery County: Stephen Jeffery Graham and Judy Graham V. Farm Bureau Property and Casualty Insurance Company, an Iowa Corporation, and Heath Higbie: Case No. MGC-2021-CV-37: Mark Molner, Esq: Evans and Mullinix, P.A. and Bradley J LaForge: Hite, Fanning, Honeyman, L.L.P. Wind damage to the roof surfaces of a commercial building and subsequent water intrusion.

- March 6, 2023: (In-Person Deposition): State of Oklahoma: District Court of Creek County: Paul E. Slaton, Jasson Brook and Erin Brook V. Bios Real Estate Company, LLC: Case No. CJ-2021-133: Keri D. Palacios, Esq: Creek County Law, PLLC. Damage assessment of vinyl fencing.

- May 17, 2023: (Courtroom In-Person Testimony): 162nd Judicial District, Dallas County, Texas: Cause Number DC-19-20125: BNLL&G and Rialto Porcelanato, Inc. V. ATRS Properties 1, LLC, Jonathan C. Allen, Resnick, and Louis, P.C. Evaluation of foundation

 



**CHAD T. WILLIAMS, P.E., D.F.E., M.L.E.**
PRESIDENT AND PRINCIPAL ENGINEER: FORENSICS
(C) 918.845.8442 (E) CHAD.WILLIAMS@VALORFORENSICS.COM

PO BOX 783, JENKS, OKLAHOMA 74037 | 855.918.5111(TF) | 918.970.4720 (O) | WWW.VALORFORENSICS.COM

damage to a commercial warehouse building related to a plumbing break during a tornado event.

- June 26, 2023: (Remote/Video Deposition): United States District Court: Middle District of North Carolina: LifeBrite Hospital of Stokes, LLC V. Travelers Property Casualty Company of America, Civil Action 1:22CV849: John S. Buford, Hancock, Daniel & Johnson, P.C. Evaluation of hail damage to the roof surfaces of an institutional (medical) building.

- June 30, 2023: (Remote/Video Deposition): United States District Court: Western District of Missouri: Center Division: Burton Kirsten V. Cape Royale at Ski Harbor Condominium Owners Assoc., Inc., Case No. 2:22-cv-04109-MDH, John A. MacKenzie, Maddin, Hauser, Roth, & Heller, P.C.  Assessment of modifications to a floating boat dock.

- July 24, 2023: (Remote/Video Deposition): United States District Court: Northern District of Oklahoma: Lutheran Church of the Good Shephard V. Brotherhood Mutual Insurance Company: Case No. 220CV-00223-CVE-SH: Michael Brewer, Hiltgen & Brewer, P.C. Assessment of the Scope of Repairs for a church steeple due to hail damage.

- October 11, 2023: (Remote/Video Deposition): United States District Court: Western District of Oklahoma: Brillant Holdings, LLC V. Covington Specialty Insurance Company: Case No.: CIV-22-808-R: Madison A Botizan, Goolsby | Proctor.   Assessment of Hail Damage to Metal Panel Roof Assemblies for an Industrial Building.

