**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) GEORGE COLLINS and | ) | |
| (2) ALRIKA COLLINS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-00318-JAR |
| | ) | |
| (1) STATE FARM FIRE AND | ) | |
| CASUALTY COMPANY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

**DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS AND BRIEF IN SUPPORT**

Respectfully submitted,

**ATKINSON, BRITTINGHAM,
GLADD, FIASCO & EDMONDS**
A PROFESSIONAL CORPORATION

J. Andrew Brown, OBA #22504
Andrew G. Wakeman, OBA #21393
1500 ParkCentre
525 South Main Street
Tulsa, OK 74103-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096
Email:  dbrown@abg-oklaw.com
*Attorneys for Defendant SFF&CC*

February 16, 2024

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

**TABLE OF AUTHORITIES** ............................................................................................. ii

I.  **STATEMENT OF UNDISPUTED MATERIAL FACTS** ..................................... 1

    A.  The Policy ............................................................................................... 1

    B.  Claim Handling Pre-Litigation ................................................................ 3

    C.  The Filing of This Lawsuit and Discovery .............................................. 22

          i.  Deposition of Plaintiff George Collins ..................................... 22

          ii.  Deposition of Plaintiffs' Public Adjuster Ian Rupert .................. 24

          iii.  Deposition of Kevin Dandridge .................................................. 25

          iv.  Expert Report of Derek VanDorn ............................................... 26

II.  **ARGUMENTS AND AUTHORITIES** .............................................................. 28

    A.  Summary Judgment Standard ................................................................... 28

    B.  State Farm is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim ............................................................................................ 29

          i.  Coverage A ................................................................................. 29

          ii.  Coverage B .................................................................................. 30

          iii.  Coverage C .................................................................................. 31

    C.  State Farm is Entitled to Summary Judgment on Plaintiffs' Breach of the Duty of Good Faith and Fair Dealing Claim .................................... 32

    D.  Plaintiffs' Claim for Punitive Damages Similarly Fails ......................... 36

III.  **CONCLUSION** ............................................................................................... 37

i

## TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

*19 Solid Waste Dep't Mech. v. City of Albuquerque*, 156 F.3d 1068, 1071 (10th Cir. 1998) ...... 28

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) ........................................... 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ...................................................... 28

*Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005) ......................................... 33

*Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009) .................................................... 34, 36

*Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 175 (Okla. 2000) .............................. 36

*Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991) ................................................ 34

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ................................................................. 28

*Christian v. American Home Assurance Co.,* 577 P.2d 899, 904-05 (Okla. 1977) ............... 33, 34

*Claborn v. Wash. Nat'l Ins. Co.*, 910 P.2d 1046, 1051 (Okla. 1996) .......................................... 33

*Davis v. GHS Health Maint. Org., Inc.*, 22 P.3d 1204, 1210 (Okla. 2001) .................................. 32

*Davis-Travis v. State Farm Fire & Cas. Co.*, 336 Fed. App'x 770, 774 (10th Cir. 2009) ........... 32

*Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 377(Okla. 1991) ....................................................... 29

*Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 137-38 (Okla. Civ. App. 2006) ........... 33

*Expertise, Inc. v. Aetna Fin. Co.,* 810 F.2d 968, 972 (10th Cir. 1987) .................................... 32-33

*Garnett v. Gov't Emps. Ins. Co.*, 186 P.3d 935, 944. (Okla. 2008) ............................................. 34

*Gillogly v. Gen. Elec. Capital Assurance Co.,* 430 F.3d 1284 (10th Cir. 2005) ......................... 32

*Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 683 (10th Cir. 2007) ........................................... 29

*Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 761 (Okla. 1984) .............................................. 33

*McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981)........................................ 34

*McLaughlin v. Nat'l Benefit Life Ins. Co.*, 772 P.2d 383, 385, 387, 389 (Okla. 1988) ............... 36

*Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998) ................................... 28

*Newport v. USAA*, 11 P.3d 191, 195 (Okla. 2000) .......................................................... 34

*Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993) ................................. 35

*Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006) ..................................... 32, 34

*Timberlake Constr. Co. v. U.S.F. & G. Co.*, 71 F.3d 335, 345 (10th Cir. 1995) .................... 34-35

*Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974) ................................................. 29

## STATUTES

23 O.S. § 9.1(B)(2) ................................................................................. 37

## OTHER AUTHORITIES

Oklahoma Uniform Jury Instruction-Civil, Instruction No. 23.21 ................................ 29

## RULES

Fed. R. Civ. P. 1 ................................................................................. 28

Fed. R. Civ. P. 56 ................................................................................ 1

Fed. R. Civ. P. 56(a) ............................................................................. 28

**COMES NOW** Defendant State Farm Fire and Casualty Company ("State Farm"), by and through its attorneys of record, J. Andrew Brown and Andrew G. Wakeman, of the law firm of Atkinson, Brittingham, Gladd, Fiasco & Edmonds of Tulsa, Oklahoma and pursuant to Fed. R. Civ. P. 56, hereby submits its Motion for Summary Judgment on Plaintiffs' Claims and Brief in Support.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    *The Policy*

1.    Plaintiffs were insured under a homeowners' policy issued by State Farm (Homeowners' Policy No. 36-B3-L971-9) on the date of the fire loss and claim arising therefrom. (Plaintiffs' Homeowners' Policy, attached herein as Exhibit "1").

2.    This Policy provided Dwelling Coverage with a Policy Limit of $404,100.00, subject to the terms, conditions, limitations, and exclusions in the Policy. (Ex. 1, No. 0003).

3.    The Dwelling Coverage portion of the Policy stated as follows:

**SECTION I – PROPERTY COVERAGES**

**Coverage A – Dwelling**
1.    **Dwelling**. *We* cover the ***dwelling*** and materials and supplies located on or adjacent to the ***residence*** premises for use in the construction, alteration, or repair of the dwelling or other structures on the ***residence premises***.

(Ex. 1, No. 0016).

4.    Plaintiffs' Policy also provided coverage for loss of Personal Property with a Policy Limit of $303,075.00. (Exhibit 1, Bates No. 0003). The Personal Property portion of the Policy provided, "[w]e cover personal property owned or used by an ***insured*** while it is anywhere in the world." (Ex. 1, No. 0016).

1

5.      The Personal Property coverage applies "for accidental direct physical loss to the property described in Coverage B caused by the following perils . . . fire or lightning …, smoke." (Ex. 1, No. 0023).

6.      As to the settlement of losses under the Personal Property coverage, the Policy provides as follows:

**COVERAGE B – PERSONAL PROPERTY**

**1.  B1 – Limited Replacement Cost Loss Settlement**
    a.  ***We*** will pay the cost to repair or replace property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE B – PERSONAL PROPERTY**, except for property listed in item b. below, subject to the following:
        (1) until repair or replacement is completed, ***we*** will pay only the ***actual cash value*** of the damaged property;
        (2) after repair or replacement is completed, we will pay the difference between the ***actual cash value*** and the cost ***you*** have actually and necessarily spent to repair or replace the property;
        (3) if property is not repaired or replaced within two years of the date of the loss, ***we*** will pay only the ***actual cash value***.

(Ex. 1, No. 0030).

7.      The Policy contained conditions for coverage specific to personal property. The Policy Conditions state, in pertinent part:

**Section I – Conditions**

2.      **Your Duties After Loss**. After a loss to which this insurance may apply, you must cooperate with us in the investigation of the claim and also see that the following duties are performed:

    b.      protect the property from further damage or loss and also:
        (1) make reasonable and necessary temporary repairs required to protect the property; and
        (2) keep an accurate record of repair expenses;

    c.      prepare an inventory of damaged or stolen personal property:
        (1) showing in detail the quantity, description, age, replacement cost, and amount of loss; and

>(2) attaching all bills, receipts, and related documents that substantiate the figures in the inventory;
>
>d.   as often as *we* reasonably require:
>(1) exhibit the damaged property;
>(2) provide *us* with any requested records and documents and allow us to make copies.

(Ex. 1, No. 0031).

8.      Plaintiffs' Policy provided Loss of Use Coverage with a Policy Limit of $121,230.00. (Ex. 1, No. 0003). The Loss of Use portion of the Policy stated in part:

**SECTION I – PROPERTY COVERAGES**

**Coverage C – Loss of Use**

>1.      **Additional Living Expense**
>When a ***loss insured*** causes the ***residence premises*** to become uninhabitable, *we* will pay the reasonable and necessary increase in cost incurred by an ***insured*** to maintain their normal standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: a) the time required to repair or replace the premises; b) the time required for *your* household to settle elsewhere; or c) 24 months.

(Ex. 1, No. 0019).

9.      Plaintiffs' Coverages were subject to a $4,041.00 deductible. Under the terms of the Policy, State Farm would only pay for the part of the total loss that exceeded the deductible. (Ex. 1, No. 0003).

**B.      *Claim Handling Pre-Litigation***

10.      On January 11, 2021, a fire occurred in the attic of Plaintiffs' residence located at 1312 W. 60th St N in Muskogee, Oklahoma. (Claim File No. 36-15K5-35N, Bates No. 0001, attached as Exhibit "2").

11.      The following day, on January 12, 2021, Plaintiffs notified State Farm of the Loss. (Ex. 2, No. 0075).

12.     On January 12, 2021, State Farm Claim Representative Michael Grover ("CR Grover") contacted Plaintiff George Collins to collect additional facts about the loss. (Ex. 2, No. 0074).

13.     Mr. Collins reported no one was home at the time the fire started and Mrs. Collins returned home at about 6:30 p.m. and discovered smoke in the house. She called Mr. Collins, who came home, looked around, and did not initially see any fire, only smoke. Mr. Collins then went upstairs and discovered a fire in the theater room. Plaintiffs called 911 and about ten (10) or fifteen (15) minutes later, the Porter Volunteer Fire Department arrived. Plaintiffs reported damage to the upstairs rooms (theater and exercise room) the attic, and roof structure. Plaintiffs also reported smoke and water damage throughout the rest of the home. Plaintiffs and their eighteen (18) year-old son initially stayed the night at their daughter's apartment in Muskogee, Oklahoma, and indicated they would either check into a hotel or were considering a 5th wheel trailer to park at the property during repairs. (Ex. 2, No. 0074-0075).

14.     On the same day, CR Grover hired Mark Milstead with Integrity Fire Investigations as an Origin and Cause Investigator to inspect the loss. (Ex. 2, No. 0074).

15.     On January 12, 2021, State Farm Claim Specialist Heather Stanley ("CS Stanley") scheduled an inspection of the loss with Plaintiffs for January 14, 2021. The Origin and Cause inspection was scheduled for the same date. (Ex. 2, No. 0073).

16.     On January 14, 2021, Ms. Stanley presented to Plaintiffs' home for inspection and found the following damages:

> The framing damage is to the roof over the media/exercise area, ceiling joists of the garage and walls of the media/exercise/powder bath as well as back staircase. All the roof decking will need to be replaced due to soot on reflective sheathing can't be sealed. It appears the brick can be cleaned but stone on front will need replaced due to reframing of that gable end. The interior will be gutted to the studs. Most windows/cabs/fixtures are cleanable on the first floor as well as bedrooms/baths

upstairs. The slab appears undamaged. The estimate will be written utilizing the Restoration/Remodel Labor Efficiency.

(Ex. 2, No. 0073).

17.     Based on the damage, CS Stanley estimated the time to complete repairs to be six (6) to eight (8) months depending on contractor availability. (Ex. 2, No. 0073).

18.     On January 14, 2021, Origin and Cause Investigator, Mr. Milstead advised that he had sent samples to the lab. (Ex. 2, No. 0073).

19.     On January 14, 2021, the claim was reassigned to State Farm Claim Specialist Karla Tillberg ("CS Tillberg"). (Ex. 2, No. 0073).

20.     On January 15, 2021, CS Tillberg called Plaintiffs to discuss living arrangements. Plaintiffs stated they wanted a hotel to start and would discuss long-term housing at a later date. A hotel was set up through ALE Solutions ("ALE") for two (2) adults and one (1) adult child and a dog (bully breed). CS Tillberg initially approved two (2) weeks with ALE for the hotel. (Ex. 2, No. 0072).

21.     On January 18, 2021, CS Tillberg issued a $1,000.00 advance for food expenses and emergency items, authorized a second hotel room for Plaintiffs' adult son, and directed ALE to begin searching for long-term housing. (Ex. 2, No. 0070).

22.     On January 20, 2021, CS Tillberg received an initial contents inventory from Plaintiffs. (Ex. 2, No. 0070).

23.     On January 22, 2021, CS Stanley called Mr. Milton and was informed the furnace had been eliminated as the source of the fire. Mr. Milton also advised several mouse traps were found in the attic and additional samples had been collected. (Ex. 2, No. 0069).

24.     On January 26, 2021, State Farm received the lab results for the January 15, 2021, samples, which were negative for ignitable liquids. (Ex. 2, No. 0068).

25.     On the same day, CS Tillberg returned a call to Mr. Collins. CS Tillberg informed Mr. Collins she had received the initial content inventory. He advised he was taking receipts for food to his agent's office and CS Tillberg reminded him to keep any food receipts separate from any receipts for any Coverage B replacements. (Ex. 2, No. 0067).

26.     On January 27, 2021, CS Tillberg received a call from ALE stating it was continuing its search for a rental that would accept Plaintiffs' dog. (Ex. 2, No. 0067).

27.     On January 28, 2021, CS Tillberg received a rental housing option from ALE that was not in line with the current rental market and she instructed ALE Solutions to continue its search for housing. (Ex. 2, No. 0067).

28.     On January 29, 2021, CS Stanley received the Origin and Cause Report which found the origin of the fire to be undetermined after a fire scene examination with an engineer and multiple negative samples. However, a factual cause determination could not be established and all competent ignition sources could not be eliminated. (Ex. 2, No. 0067).

29.     On January 29, 2021, CS Stanley noted Plaintiffs had a claim history of fires. Specifically, four (4) fires in five (5) years. CS Stanley also noted financial problems as Plaintiffs had requested a housing option that did not require a credit check. Further, Plaintiffs' State Farm Agent had reported Mr. Collins was a previous employee in 2016 and then attempted to collect unemployment in 2020 although he had not worked there since 2016. CS Stanley also noted the subject property had previously been for sale in the spring of 2020 with a pending offer that fell through. (Ex. 2, No. 0067).

30.     On the same day, Plaintiffs' claim was reassigned to Claim Specialist Ed Young ("CS Young"). CS Young reviewed the file and called Mr. Collins to advise him the claim had been reassigned. (Ex. 2, No. 0066).

31.     On February 1, 2021, CS Young reviewed the EMI Electrical Report. The Report noted the fire started in the attic. Examination of the electrical system and furnace found evidence of electrical shorting in the furnace. The electrical circuit to the furnace shorted and the electric circuitry adjacent to the furnace revealed the evidence of the fire origin. The remains of two dead mice were found adjacent to the electric furnace in the attic. The Report found, "therefore…it is believed an electric short in the attic adjacent to the electric furnace was the cause of the fire and most likely due to mice nesting." There was no evidence of furnace failure. (Ex. 2, No. 0065).

32.     On February 2, 2021, CS Young reviewed the claim file and found there was no evidence to suggest Plaintiffs or anyone else set the fire as all samples came back negative for ignitable liquids. Although the Origin and Cause Investigation could not rule out all competent ignition sources and a factual cause was not established, the EMI Electrical Report found an electrical short in the attic adjacent to the furnace was the cause of the fire and most likely due to mice nesting. CS Young recommended the claim be returned to the prior claim handler for settlement and the claim should be considered in full. (Ex. 2, No. 0062).

33.     On February 8, 2021, ALE contacted CS Tillberg to inform her Plaintiffs had decided against the second housing option. Mr. Collins stated they needed a dedicated space or additional room for a workout/home gym. ALE stated it would keep looking for additional long-term housing options. (Ex. 2, No. 0061).

34.     Also on February 8, 2021, Team Manager Carmen Richwine ("TM Richwine") reviewed the file. TM Richwine noted an initial contents list had been submitted and ServPro was handling the pack-out and cleaning. Reserves were established: Coverage A at $249,000.00, Coverage B at $75,000.00, and Coverage C at $5,720.00. (Ex. 2, No. 0060).

35.     On February 9, 2021, ServPro advised the pack out was complete and mitigation and tear out could begin. (Ex. 2, No. 0060).

36.     Also on February 9, 2021, CS Tillberg contacted Mr. Collins and explained all receipts would be reviewed as soon as possible and ALE was still searching for a property. (Ex. 2, Bates No. 0060).

37.     On February 10, 2021, CS Tillberg received an e-mail from ALE Solutions stating it was still searching for additional rental options that would accept Plaintiff's dog. (Ex. 2, No. 0060).

38.     On February 12, 2021, ALE contacted CS Tillberg with an additional housing option. However, CS Tillberg requested review from TM Richwine as the housing fees were higher than normal. (Ex. 2, Bates No. 0059). Later that day, TM Richwine reviewed the housing option, found the fees reasonable, and instructed CS Tillberg to proceed with the housing option. (Ex. 2, No. 0058-0059).

39.     CS Tillberg e-mailed ALE and authorized the presentation of the housing option to Plaintiffs. (Ex. 2, No. 0058).

40.     On February 17, 2021, State Farm issued a payment of $217,170.90 under Coverage A – Dwelling to Plaintiffs with an estimated time to repair of six (6) to eight (8) months. (Ex. 2, No. 0799-0801).

41.     On February 18, 2021, CS Tillberg called and spoke with Mr. Collins regarding the weekly amount of money typically spent on food by his family. He indicated it was normal to spend $80.00 per week on groceries and $120.00 per week at restaurants. CS Tillberg explained she was still in the process of reviewing the housing contents and would follow up shortly. Mr.

Collins also indicated he had no objection to expanding the range of the long-term housing search. (Ex. 2, No. 0056).

42.     On February 19, 2021, CS Tillberg issued an additional $389.99 payment for food expenses to date. (Ex. 2, No. 0056, 0807-0808).

43.     On February 25, 2021, ALE presented a housing option to Plaintiffs. CS Tillberg called Mr. Collins regarding the housing option and he advised he was traveling for the next few weeks, but Mrs. Collins would view the property and touch base. (Ex. 2, Bates No. 0055).

44.     On March 3, 2021, CS Tillberg again reached out and left a voicemail for Mr. Collins regarding long-term housing and to inquire whether they had viewed the property presented by ALE. (Ex. 2, No. 0055).

45.     On March 8, 2021, CS Tillberg e-mailed ALE requesting an update on long-term housing. (Ex. 2, No. 0055).

46.     On March 10, 2021, CS Tillberg called and left a voice mail for Mr. Collins regarding long-term housing search and contents questions. (Ex. "2", No. 0054).

47.     Mr. Collins returned CS Tillberg's call and he indicated they may be able to move into an apartment by May 5, 2021. CS Tillberg explained that he needed to move forward immediately with a rental versus the hotel as ALE had already presented several options. (Ex. 2, No. 0054).

48.     On March 11, 2021, CS Tillberg received a call from ALE stating Plaintiffs would like to cash out their Coverage C versus proceeding with a rental. CS Tillberg explained a cash out for Coverage C is not available. (Ex. 2, No. 0054).

49.     On March 15, 2021, CS Tillberg sent an e-mail to ALE asking if it could follow up with Plaintiffs and try to arrange a flexible time to show the current property, such as an evening

or a Saturday. CS Tillberg explained it was necessary to get them in a more comfortable, long-term solution as opposed to the hotel. (Ex. 2, No. 0054).

50.     Also on March 15, 2021, TM Richwine requested CS Tillberg request the names of contractors from whom Mr. Collins was obtaining bids to repair the property and when he might expect to receive the bids. (Ex. 2, No. 0053-0054).

51.     On March 22, 2021, CS Tillberg received an e-mail update from ALE stating it was still waiting on Plaintiffs to view the property that had been located. (Ex. 2, No. 0053).

52.     On March 23, 2021, CS Tillberg called ALE for an update on housing and to ask if Plaintiffs had viewed the property. (Ex. 2, No. 0053).

53.     On March 24, 2021, CS Tillberg called Mr. Collins and left a voicemail regarding the contents of the home and additional living expenses. (Ex. 2, No. 0053).

54.     On March 26, 2021, CS Tillberg issued Plaintiffs an EFT payment for contents under Coverage B for $19,336.37 and emailed a Contents Payment Letter to Plaintiffs. (Ex. 2, No. 0053, 0834).

55.     On March 29, 2021, CS Tillberg requested TM Richwine review the file as it appeared Plaintiffs had hired Public Adjuster, Ian Rupert, of Ian's Enterprise, LLC ("PA Rupert") to represent them in the claim and was requesting documents. (Ex. 2, No. 0053, 1056-1057).

56.     CS Tillberg sent Plaintiffs a letter advising of the receipt of PA Rupert's information. (Ex. 2, No. 0052).

57.     On April 5, 2021, the claim file was updated to reflect Replacement Cost Benefits under Coverage B. The estimated total was $29,457.11 less Replacement Cost Benefits available for a subtotal of $24,136.81. After the deductible of $4,041.00 and a previous payment to Plaintiffs for $19,336.37, Plaintiffs were owed an additional $759.44. (Ex. 2, No. 0051-0052).

58.     CS Tillberg called and left a voicemail for PA Rupert regarding Replacement Cost Benefits under Coverage B and pending documents. (Ex. 2, No. 0051).

59.     Additionally, on April 5, 2021, CS Tillberg received an e-mail from ALE stating it was still searching for a six (6) month rental option for Plaintiffs. (Ex. 2, No. 0051).

60.     On April 8, 2021, CS Tillberg spoke with PA Rupert and discussed the pending settlement under Coverage B. He advised payment should be made directly to Plaintiffs and stated he had asked ServPro to stop cleaning the remaining contents of the home as he wanted to evaluate. Coverage C was also discussed and PA Rupert stated Plaintiffs wanted a cash out based on comparable housing or an RV. CS Tillberg explained a cash out was not an option as Coverage C is only available for incurred expenses, but she would review any housing options he submitted. However, a one (1) year lease would not be approved and documentation that Plaintiffs were moving forward with repairs to the property was needed. (Ex. 2, No. 0051, 0851).

61.     On April 12, 2021, State Farm issued a supplement payment for $4,280.34 under Coverage B. A letter was sent to PA Rupert summarizing the coverages and addressing long-term ALE housing. The letter requested a status on the repair bids for the property by April 16, 2021. (Exhibit 2, No. 0050-0051, 0860-0861).

62.     On April 22, 2021, ALE provided an update to CS Tillberg stating it was still diligently searching for housing options in Plaintiffs' preferred area that allowed for a six (6) month lease. (Ex. 2, No. 0050).

63.     On April 26, 2021, CS Tillberg e-mailed PA Rupert regarding outstanding CRDN billing for textile and electronic cleaning and additional steps to move forward with long-term housing. CS Tillberg also stated she had received an additional contents list from Plaintiffs and would review it and follow up. (Ex. 2, No. 0050, 0875).

64.    On April 27, 2021, ALE again e-mailed stating it was diligently searching for housing options for Plaintiffs. (Ex. 2, No. 0049).

65.    On May 5, 2021, ALE e-mailed CS Tillberg stating Plaintiffs had been unresponsive to many attempts to contact them regarding the long-term housing search. The e-mail stated Plaintiffs were still in Home 2 Suites with two rooms totaling $239.90 per night and neither room offered a full kitchen. ALE asked if assistance was still needed for housing and if a hotel check-out date should be set. (Ex. 2, No. 0049).

66.    On May 6, 2021, CS Tillberg responded to ALE stating the housing search should continue as well as any hotels with the option of kitchen facilities. CS Tillberg also explained PA Rupert was on file and that any housing options should be presented as soon as possible. (Ex. 2, No. 0049).

67.    CS Tillberg also called Plaintiffs' State Farm Agent, DJ Witty, and asked if he could assist with the long-term housing search. He provided a possible rental in the area and CS Tillberg sent the information to ALE. (Ex. 2, No. 0049).

68.    On May 12, 2021, CS Tillberg called PA Rupert to discuss the status of the claim. He advised he had received her e-mails but did not see a need to respond. CS Tillberg asked for the status of the rebuild. He advised he would be submitting a report and had also re-evaluated the contents and would be submitting additional information on that as well. CS Tillberg explained there was a possible long-term housing option and ALE had been reaching out with the option. PA Rupert argued it must be the same square footage as Plaintiffs' home. She explained the current hotel was nowhere near the same square footage. He again demanded a cash out or for State Farm to bring a mobile home and furniture to the site. CS Tillberg explained she would review any

housing option he presented. Finally, he also advised payment could be made to CRDN. (Ex. 2, No. 0048-0049).

69.     On May 13, 2021, ALE stated it had attempted to call the landlord of the rental recommended by Agent Witty on three (3) separate occasions, but he had already rented it to other applicants once he called back. ALE stated it would continue the housing search. (Ex. 2, No. 0048).

70.     On May 19, 2021, CS Tillberg called ALE and directed the search area should be expanded and any options should be presented to Plaintiffs and/or PA Rupert. (Ex. 2, No. 0048).

71.     On May 26, 2021, ALE found another housing option for Plaintiffs and requested the authority to present it to Plaintiffs. (Ex. 2, No. 0048).

72.     On May 27, 2021, ALE was authorized to present the property to Plaintiffs. (Ex. 2, No. 0047-0048).

73.     On June 2, 2021, CS Tillberg received notice from ALE that it had attempted to contact PA Rupert with no response. (Ex. 2, No. 0047).

74.     On June 11, 2021, ALE provided an update that it was still unable to find housing for Plaintiffs. TM Richwine directed CS Tillberg to communicate the housing search needed to continue weekly and to employ a second company to look for housing. (Ex. 2, No. 0046).

75.     On June 14, 2021, CS Tillberg contacted Temporary Accommodations and created an assignment for it to start searching for housing options for Plaintiffs. She also provided PA Rupert's information. She then contacted ALE and requested a weekly search as State Farm wanted Plaintiffs in a home as opposed to a hotel. ALE responded it would continue its search. (Ex. 2, No. 0045-0046).

76.     On June 16, 2021, ALE contacted CS Tillberg with a property for rent, which was sent to TM Richwine for review. CS Tillberg also noted no information had been received from

13

PA Rupert and Temporary Accommodations had not yet provided a housing option. (Ex. 2, No. 0045-0046).

77.     TM Richwine expressed concerns with presenting Plaintiffs with a six (6) month housing lease as no additional information had been provided by PA Rupert and five (5) months had passed since the fire with no updates on whether Plaintiffs intended to rebuild or settle elsewhere and the time to rebuild was set to expire on August 31, 2021. (Ex. 2, No. 0045, 0800-0801).

78.     On June 22, 2021, CS Tillberg received an e-mail from PA Rupert indicating a packet of information was forthcoming and should be received by June 28, 2021. (Ex. 2, No. 0045).

79.     On June 28, 2021, Coverage A was updated to reflect an estimate of $276,513.57. This was emailed to PA on June 28, 2021. (Ex. "2", No. 0044, 0915-0919).

80.     On June 28, 2021, the claim was reassigned to Claim Specialist Cheryl Penisten-Wilbur ("CS Penisten-Wilbur"). (Ex. 2, No. 0044).

81.     On July 1, 2021, Temporary Accommodations informed CS Penisten-Wilbur that a rental property had been located with a sixty (60) night lease available. (Ex. 2, No. 0043-0044).

82.     On July 7, 2021, CS Penisten-Wilbur received a request for documents from PA Rupert. CS Penisten-Wilber sent a copy of the letter and documents that were previously e-mailed on June 28, 2021, to PA Rupert. (Ex. 2, No. 0043, 0915-0919).

83.     On July 15, 2021, TM Richwine noted the last contact with PA Rupert was on June 28, 2021, which was an updated price list and a request for a status on the estimates and/or repairs to the home. ALE had been extended through August 31, 2021, and State Farm had outlined it would not be extended further unless further information was provided to explain what had transpired since the Actual Cash Value payment was issued. (Ex. 2, No. 0043).

84.     On July 20, 2021, CS Penisten-Wilbur received an e-mail from PA Rupert with a 792-page Proof of Loss which would not open. CS Penisten-Wilbur sent a return e-mail to PA Rupert notifying him the document would not open. (Ex. 2, No. 0043).

85.     On July 27, 2021, the Proof of Loss was received from PA Rupert and reviewed by TM Richwine. (Ex. 2, No. 0043).

86.     On July 28, 2021, CS Stanley noted that PA Rupert's Proof of Loss contained the following: (1) an estimate for Safety Protocols totaling $166,236.00, which included $47,500.00 in safety monitor labor and $15,000.00 in sanitation stations; (2) a Structure Estimate totaling $500,584.69; (3) an estimate for "Other Structures" totaling $4,792.07; (4) a request for Loss of Use totaling $61,616.00 based on eight (8) months of an Airbnb rental; and (5) pet boarding for $4,320.00. (Ex. 2, No. 0042-0043).

87.     On August 2, 2021, Derek VanDorn of Berryman Enterprises, Inc. ("Berryman") agreed to review both PA Rupert's Proof of Loss and State Farm's estimate to confirm the scope of work needed to repair Plaintiffs' home. Mr. VanDorn agreed to contact PA Rupert regarding access to Plaintiffs' home. (Ex. 2, No. 0042).

88.     On August 6, 2021, PA Rubert e-mailed CS Penisten-Wilber and Mr. VanDorn. Before allowing access to Plaintiffs' home, PA Rupert demanded Mr. VanDorn confirm whether he was a licensed Oklahoma adjuster and requested he bring a licensed State Farm adjuster with sufficient authority to approve the claim with him during his re-inspection. PA Rupert also noted Plaintiffs had been forced to remain in a hotel and demanded State Farm immediately remit his Loss of Use estimate or approve comparable housing. He defined comparable housing to mean similar in size and quality and nearby Plaintiffs' home. (Ex. 2, No. 0042).

89.     That same day, CS Stanley e-mailed PA Rupert a letter in response to his August 6, 2021, e-mail. (Ex. 2, No. 0041, 0929-0932).

90.     On August 11, 2021, CS Penisten-Wilbur spoke with ALE regarding the search for long-term housing. ALE stated Plaintiffs had been offered eight (8) different housing options and none chosen for various reasons, but would continue the search. (Ex. 2, No. 0041).

91.     On August 18, 2021, ALE e-mailed CS Penisten-Wilbur stating Plaintiffs had found a home to rent with a move-in date of August 20, 2021. However, because furniture could not be delivered until August 23, 2021, Plaintiffs asked to remain in the hotel until furniture could be delivered. (Ex. 2, No. 0039-0041).

92.     Later that same day, ALE e-mailed CS Penisten-Wilbur stating Plaintiffs had asked to cancel the move-in and either remain in the hotel for the duration of repairs or discuss a possible cash out of Coverage C. (Ex. 2, No. 0040).

93.     On August 24, 2021, ALE reported Plaintiffs had found and arranged the last rental themselves and then refused it because they had been told to do so by PA Rupert. (Ex. 2, No. 0037).

94.     On August 27, 2021, CS Stanley received a certified letter from PA Rupert requesting State Farm pay the constructive total in his Proof of Loss and a cash out on Coverage C. (Ex. 2, No. 0037).

95.     On September 8, 2021, CS Stanley and Mr. VanDorn met PA Rupert at Plaintiffs' property for Mr. VanDorn to inspect the home and write an estimate. While Mr. VanDorn was inspecting the property, CS Stanley attempted to take pictures of the remaining contents in the home, but PA Rupert became confrontational each time she exited her vehicle and accused her of being non-responsive. (Ex. 2, No. 0036-0037).

96.     PA Rupert also questioned CS Stanley regarding temporary housing and she informed him ALE was still searching. He stated he had provided an option for an Airbnb on August 18, 2021, in Broken Arrow, Oklahoma. CS Stanley stated she was unaware Plaintiffs were willing to extend their search to Broken Arrow and without a physical address and pricing on the Airbnb, she was unable to determine if the option was suitable. (Ex. 2, No. 0036-0037).

97.     CS Stanley then attempted to take pictures of lawnmowers and PA Rupert again began accusing her of being non-responsive and began videoing her. (Ex. 2, No. 0036-0037).

98.     At the end of the inspection, PA Rupert approached CS Stanley at her vehicle and asked if she was issuing supplemental Actual Cash Value ("ACV") for the dwelling. She informed him no additional payments were due at the time and that she would reach out to him once she received Mr. VanDorn's estimate. (Ex. 2, No. 0036-0037).

99.     On September 9, 2021, CS Stanley spoke with ALE and instructed them to extend the search to include Muskogee, Wagoner, Ft. Gibson, Porter, Coweta, and Broken Arrow. (Ex. 2, No. 0033-0034).

100.    On September 27, 2021, ALE e-mailed CS Stanley and stated the housing search was ongoing. (Ex. 2, No. 0034).

101.    On September 29, 2021, CS Stanley performed a search on Zillow and found a rental option in Broken Arrow and e-mailed ALE to see if it was a viable option. (Ex. 2, No. 0033).

102.    CS Stanley and TM Richwine viewed Plaintiffs' contents stored at ServPro on September 29, 2021, to determine what was cleanable versus what needed to be replaced. (Ex. 2, No. 0033).

103.    On September 29, 2021, CS Stanley reviewed the Berryman estimate. Mr. VanDorn estimated it would cost $317,328.20 to repair Plaintiffs' home and estimated six (6) months for

repair. (Ex. 2, No. 0033-0032; Berryman Enterprises, Inc. Bid, attached herein as Exhibit "7", No. 7373-7430).

104.    Also, on September 29, 2021, CS Stanley received a housing option from ALE and advised it could be presented to Plaintiffs. (Ex. 2, No. 0032).

105.    On October 1, 2021, CS Stanley sent a Status Letter to PA Rubert by e-mail advising him State Farm received Berryman Enterprises, Inc.'s bid for rebuild and was in the process of reviewing it, continuing to process the contents list he provided, noted ALE had been instructed to expand its search and invited both him and Plaintiffs to submit any housing options they would like considered. (Ex. 2, No. 0032, 0999).

106.    On October 5, 2021, CS Stanley received an e-mail from ALE stating Plaintiffs had asked them to put the housing search on hold as Mrs. Collins may be relocated to Tulsa. (Ex. 2, No. 0031).

107.    On October 11, 2021, CS Stanley mailed a letter to PA Rupert and Plaintiffs regarding Coverage A and B. Based on the Berryman Enterprises, Inc. bid, State Farm increased its estimate to $322,065.42 under Coverage A. This resulted in an ACV settlement of $286,343.09 and a supplemental ACV payment to Plaintiffs of $69,172.19. The letter also stated that after repairs were completed, Plaintiffs could make a supplemental claim for $35,722.33 or the actual cost to repair, whichever is less. In addition, State Farm issued an additional payment of $20,241.05 under Coverage B. Finally, the letter stated State Farm would only continue to pay for the hotel through October 31, 2021, unless additional information was provided to support the need for the hotel. (Ex. 2, No. 0030, 1001-1003).

108.    On October 12, 2021, CS Stanley received a mortgage release from PA Rupert for Plaintiffs' home and a demand for documents that had previously been addressed on June 28, 2021. (Ex. 2, No. 0030).

109.    On October 14, 2021, ALE e-mailed CS Stanley stating it had checked with Plaintiffs regarding housing and Plaintiffs reported they were still unsure of whether they would be relocating to Tulsa. (Ex. 2, No. 0030).

110.    On October 19, 2021, CS Stanley sent an email with the attached letter from June 28, 2021, reminding PA Rupert that State Farm had already responded to his document requests. She also attached the estimate provided by Berryman and the contents cleaning estimate by ServPro. Additionally, State Farm opted to pay for an engineering report requested by PA Rupert for $1,400.00 as it assisted Berryman in its evaluation of damages. (Ex. 2, No. 0029, 1025).

111.    On October 21, 2021, CS Stanley received a message from DJ Witty's staff stating Plaintiffs had canceled their homeowner's policy as they are not proceeding with a rebuild. (Ex. 2, No. 0028).

112.    On October 27, 2021, CS Stanley sent an e-mail to PA Rupert and Plaintiffs which advised that ALE would cease billing State Farm for the hotel on October 31, 2021, based on Plaintiffs failure to update ALE as to their potential relocation and Plaintiffs notice that they did not intend to rebuild their home. (Ex. 2, No. 0027, 1026).

113.    On October 28, 2021, PA Rupert responded State Farm was mistaken and Plaintiffs never communicated a desire to permanently relocate to anyone, and that Plaintiffs intended to rebuild. (Ex. 2, No. 0027, 1172).

114.    CS Stanley responded to PA Rupert stating State Farm had confirmed with ALE and the agent's office that Plaintiffs communicated their plans to relocate to both. However, State

Farm would extend the hotel until November 30, 2021, and pay an additional month of contents storage to ServPro. (Ex. 2, No. 0026-0027, 1027).

115.    On November 2, 2021, CS Stanley returned a call to Mr. Collins who asked if they could work around PA Rupert and directly with State Farm to avoid getting a bad-faith lawyer as directed by PA Rupert. CS Stanley advised Mr. Collins that State Farm does not do negotiated settlements and has to determine the cost of reasonable and necessary repairs and make payments based on that information. She further advised State Farm felt as if it had already done that by obtaining the Berryman Enterprises, Inc. bid, the cleaning estimate from ServPro, the ACV payment on contents, and ALE payments for the hotel. Mr. Collins indicated an intent to rebuild the house and use Williams Construction. CS Stanley explained State Farm had already paid nearly eleven (11) months of ALE with a settlement issued in February of 2021 and stated she did not know if ALE could be extended, but she would send the information to her manager for review. (Ex. 2, No. 0026).

116.    On November 3, 2021, CS Stanley e-mailed Plaintiffs to confirm they were planning to rebuild the home and were continuing to search for temporary housing. CS Stanley informed Plaintiffs if they entered a contract to rebuild, they could contact State Farm for reconsideration of additional living expenses beyond the end date of November 30, 2021. CS Stanley also asked for confirmation Plaintiffs were no longer represented by PA Rupert. (Ex. 2, No. 26).

117.    On November 17, 2021, CS Stanley spoke with ServPro who informed her Mr. Collins had told them to move forward with the cleaning. CS Stanley advised State Farm would continue to pay storage through December so long as Plaintiffs were moving forward with the cleaning; however, if Plaintiffs were not moving forward, Plaintiffs needed to pay for storage.

ServPro agreed and said it had requested half of the storage up front, but Mr. Collins said State Farm had not paid him. CS Stanley advised Plaintiffs had been paid in October and the check had been cashed. (Ex. 2, No. 0025-0026).

118.    On November 29, 2021, CS Stanley sent an e-mail to PA Rupert to ask whether he still represented Plaintiffs. (Ex. 2, Bates No. 0025, 1033).

119.    On that same day, CS Stanley received an e-mail from ALE asking if the housing search should be reopened. ALE had received an e-mail from Mr. Collins regarding an available rental. (Ex. 2, No. 0025).

120.    On November 30, 2021, TM Richwine noted Plaintiffs had not moved forward with plans to rebuild or signed a contract for repairs and, as a result, ALE could not be extended. State Farm issued an initial ACV payment on February 17, 2021, and a supplemental payment on October 12, 2021. ALE would be reconsidered in the event Plaintiffs submitted an agreement or contract for rebuild. (Ex. 2, No. 0024).

121.    On December 1, 2021, CS Stanley e-mailed Plaintiffs and informed them State Farm had received the e-mail Plaintiffs sent ALE regarding the rental. CS Stanley reminded Plaintiffs that ALE could not be extended unless Plaintiffs entered into a contract to rebuild, at which time, State Farm would reconsider ALE. (Ex. 2, No. 0023-0024).

122.    CS Stanley also e-mailed ALE and stated the housing search did not need to be re-opened. (Ex. 2, No. 0023-0024).

123.    On December 22, 2021, CS Stanley received an e-mail from PA Rupert seeking an extension of suit limitation. (Ex. 2, No. 0023, 1179-1180).

124.     On December 23, 2021, CS Stanley e-mailed PA Rupert and Plaintiffs stating the suit limitation could not be extended and included policy language regarding suits against State Farm. (Ex. 2, No. 0023, 1044).

   **C.**  ***The Filing of This Lawsuit and Discovery***

125.     Plaintiffs filed this action on January 11, 2022, alleging State Farm breached the insurance contract and the duty of good faith and fair dealing. Plaintiffs also sought an award of punitive damages. (Petition, Dkt. No. 2-1). Plaintiffs originally filed as *pro se* litigants, although the original Petition was drafted by Plaintiffs' non-attorney Public Adjuster, Ian Rupert. (Deposition of Ian Rupert, attached herein as Exhibit "3", pp. 29:11-31:5, 90:24-91:4).

126.     Thereafter, on November 7, 2022, Plaintiffs filed an Amended Petition and obtained counsel. Again, Plaintiffs alleged breach of contract and breach of the duty of good faith and fair dealings against State Farm. Plaintiffs also alleged entitlement to punitive damages. (Amended Petition, Dkt. No. 2-2).

127.     State Farm removed this case based on diversity jurisdiction on November 10, 2022. (Notice of Removal, Dkt. No. 2).

   ***i.***  ***Deposition of Plaintiff George Collins***

128.     Plaintiff George Collins was deposed on November 29, 2023. (Deposition of George Collins, attached herein as Exhibit "4"). Mr. Collins was highly unresponsive during his deposition and answered "I don't know" approximately 88 times, "I'm not sure" approximately 54 times, "I'm unsure" approximately 45 times, "I don't recall" approximately 27 times, "I don't remember" approximately 8 times, and "I do not" approximately 70 times. (Ex. 4, generally). Examples of basic information he alleged he did not know included the last grade he completed in high school and most of his work history. (Ex. 4, pp. 16:5-17:12, 17:19-24).

129.     When questioned regarding the Safety Report of Kevin Dandridge, Mr. Collins agreed it was reasonable for State Farm to question the amounts contained within the report, such as $20,312.50 for goggles, $47,500.00 for a safety monitor, $6,240.00 for earplugs, $30,000.00 for signaling labor, and $60,000.00 for electrical safety (Ex. 4, pp. 217:17-229:20, 220:20-221:12, 223:18-224:23, 225:8-227:17).

130.     Mr. Collins admitted during his deposition to receiving payments under Coverages A, B, and C of his Policy. (Ex. 4, pp. 104:7-105:3, 170:19-25).

131.     Despite being unable to answer most of the questions asked of him during his deposition, including questions about his personal history, Mr. Collins alleged State Farm was incompetent. However, when asked to explain how State Farm was incompetent, Mr. Collins stated it could not be explained. (Ex. 4, p. 107:2-14).

132.     When asked if either he or his wife had filed for bankruptcy, Mr. Collins stated he had not, but then admitted to filing for bankruptcy and not obtaining a bankruptcy. When asked why he did not obtain a bankruptcy, Mr. Collins stated he simply did not need one. (Ex. 4, pp. 260:19-261:21).

133.     Mr. Collins was presented with his bankruptcy pleading, which was filed on October 12, 2017, in the United States Bankruptcy Court in the Eastern District of Oklahoma, and indicated he had $8,220.00 in household furnishings and $2500.00 worth of personal clothing. Mr. Collins testified these numbers presented to the bankruptcy court were incorrect. (Ex. 4, pp. 264:20-265:20).

134.     The bankruptcy pleading indicated Plaintiffs did not own any televisions or phones in 2017 and Mr. Collins went on to testify he had no recollection of whether or not he had a television or phone in 2017. (Ex. 4, pp. 267:2-269:3).

135.    When asked if he was ever ordered to produce financial documents or sit for a deposition regarding the bankruptcy, Mr. Collins stated he had not despite being presented with documents ordering the same. (Ex. 4, pp. 270:20-271:13, 273:12-275:11). When presented with evidence that the trustee attempted to contact him by both mail and telephone regarding the deposition, Mr. Collins testified no one tried to contact him. Upon being presented with further evidence that he hung up on the trustee on the day of the scheduled deposition, Mr. Collins testified he did not have any memory of that. Mr. Collins also testified he did not engage in bankruptcy or insurance fraud despite the trustee alleging he had. (Ex. 4, pp. 273:12-275:11).

136.    Finally, when presented with evidence of conflicting information regarding the age and worth of appliances in this claim and his bankruptcy proceeding, Mr. Collins testified he had zero explanation as to the discrepancies. (Ex. 4, pp. 281:13-285:8).

### ii.    *Deposition of Plaintiffs' Public Adjuster Ian Rupert*

137.    Plaintiffs' Public Adjuster, Ian Rupert, was deposed on October 12, 2023. (Ex. 3). Despite being subpoenaed to produce documents in May of 2023, PA Rupert did not produce any documents until the morning of his deposition, at which time he produced nearly 3,000 documents at 6:00 a.m. Thereby giving State Farm no time to review his production before his deposition. (Ex. 3, pp. 7:1-25; 9:3-9).

138.    PA Rupert admitted to engaging in the unauthorized practice of law when he drafted and filed Plaintiffs' first Petition. (Ex. 3, pp. 29:11-31:5, 90:24-91:4).

139.    During his deposition, PA Rupert testified he would tell a jury State Farm forced Plaintiffs into housing that was not comparable. (Ex. 3, p. 152:2-9).

140.    When questioned about the Proof of Loss, which included an estimate for Safety Protocols totaling $166,236.00; (2) a Structure Estimate totaling $500,584.69; (3) an estimate for

"Other Structures" totaling $4,792.07; (4) a request for Loss of Use totaling $61,616.00 based on eight (8) months of an Airbnb rental; and (5) pet boarding for $4,320.00, PA Rupert testified he deeply considered Kevin Dandridge's report regarding safety protocols when creating his Proof of Loss. (Ex. 2, Bates No. 0042-0043; Ex. 3, pp. 175:21-176:1).

141.    Regarding the report of Kevin Dandridge, PA Rupert stated he only paid for a $1,000.00 report as opposed to Mr. Dandridge's $5,000.00 report and State Farm should pay for the $5,000.00 report if it had questions regarding the $166,236.00 for Safety Protocols needed to rebuild Plaintiffs' house. (Ex. 3, 198:25-199:12, 203:19-205:2).

### iii.    Deposition of Kevin Dandridge of Life 1 Safety

142.    The deposition of Kevin Dandridge was taken on October 30, 2023. (Deposition of Kevin Dandridge, attached herein as Exhibit "5"). Mr. Dandridge produced a safety protocol report relied upon by PA Rupert and was included with PA Rupert's Proof of Loss packet. Mr. Dandridge confirmed he charged $1,000.00 for his report, which was a review and not a full protocol. In other words, Mr. Dandridge never visited Plaintiffs' property, but only reviewed documents provided by PA Rupert. (Ex. 5, pp. 23:2-24:22, 58:15-20; Ex. 2, Bates No. 0042-0043; Ex. 3, pp. 175:21-176:1).

143.    Mr. Danridge confirmed his report was not intended to make claims decision and it is common for disputes to occur regarding what may or may not be covered by insurance. (Ex. 5, 60:10-20).

144.    Mr. Dandridge further testified his report is more of a checklist of safety protocols versus an actual estimate. (Ex. 5, p. 77:3-9).

145.    When questioned why he allocated $2,300.00 for rubber gloves, he stated rubber gloves may be needed for debris removal or possibly painting, but that it is not commonplace for painters to wear gloves. (Ex. 5, pp. 97:9-98:12).

146.    Mr. Dandridge admitted to mistakes within his report, such as allocating $20,000.00 for face shields over a period of 65 weeks, when he initially estimated the time to rebuild would be 25 weeks. Similarly, Mr. Dandridge estimated a need for earplugs for a period of 52 weeks, when the estimate should have been for 25 weeks. (Ex. 5, p. 101:10-22).

147.    When asked whether the contractors utilized by Plaintiffs provided equipment for their employees, such as hard hats, Mr. Dandridge testified he did not know, but if the contractors did provide equipment, his prices would be inflated. (Ex. 5, pp. 102:24-103:23).

148.    Mr. Dandridge further testified that his estimate of $30,000.00 for a flagman to direct traffic was inflated due to the fact Plaintiffs' home is located in the country. (Ex. 5, 106:13-107:3).

149.    Finally, Mr. Dandridge emphasized his report is strictly a guideline and agreed the report was based on limited information provided by PA Rupert. (Ex. 5, 122:6-13, 125:3-6).

### iv.    *Expert Report of Derek VanDorn*

150.    On September 8, 2021, and May 19, 2023, Mr. VanDorn inspected Plaintiffs' home. (Expert Report of Derek VanDorn of Berryman Enterprises, Inc., attached herein as Exhibit "6").

151.    Based on his prelitigation and post litigation inspections of Plaintiffs' home and his review of PA Rupert's Proof of Loss package, Mr. VanDorn provided five (5) opinions regarding the damage to the home. (Ex. 6, pp. 44-54).

152.    In his first opinion, Mr. VanDorn discussed the report of Chad Williams, which offered a conceptual scope of repairs. Mr. VanDorn found the scope of repairs offered and damages

discussed were mostly in line with what he had observed as well. Although a few recommendations, such as the replacement of the kitchen cabinets, replacement of all reflective sheathing in Attic 2, reframing of an entire wall in Attic 2, replacement of all roof and second-floor framing around the Bonus Rooms, and the replacement of four (4) windows, appeared to be excessive. (Ex. 6, pp. 44-47).

153.    In his second opinion, Mr. VanDorn expressed the recommendations offered in the report of Luke Gibbs of The Mold Consultant had been almost entirely addressed within State Farm's estimate dated October 11, 2021. (Ex. 6, p. 47).

154.    In his third opinion, Mr. VanDorn found the report prepared by Kevin Dandridge of 1 Life Safety, LLC, was unreliable as it included proposed work and charges that do not apply to the repairs necessary at Plaintiffs' home. For example, proposed units and quantities were inflated and did not reflect realistic charges. Mr. VanDorn opined the report and estimate should be disregarded. (Ex. 6, p. 47-51).

155.    In his fourth opinion, Mr. VanDorn expressed that the estimate submitted by PA Rupert for $505,376.76, should be disregarded due to numerous inaccuracies. Such inaccuracies included manually manipulating prices within estimate to override the Xactimate pricing database, including excessive costs for safety protocol, and changing the standard markup rate of ten (10) percent for overhead and ten (10) percent for profit to twenty (20) percent. (Ex. 6, pp. 51-53).

156.    Finally, in his fifth opinion, Mr. VanDorn found State Farm had reasonably addressed the documented fire-caused damage to the property, State Farm followed industry standard methods, and State Farm's final estimate reasonably included the necessary costs to return Plaintiffs' home to a pre-loss condition. Specifically, Mr. VanDorn noted that State Farm's first estimate was produced within weeks of the loss, which is common in large loss situations.

However, upon receiving the estimate from Berryman, State Farm promptly revised its estimate to reasonably address the necessary costs. (Ex. 6, pp. 54-55).

## II.   ARGUMENTS AND AUTHORITIES

### A. *Summary Judgment Standard*

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The determination as to whether facts are "material" must be made by reference to the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 252). In reviewing a motion for summary judgment, the court examines "the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *19 Solid Waste Dep't Mech. v. City of Albuquerque*, 156 F.3d 1068, 1071 (10th Cir. 1998).

However, the non-movant must present more than a mere "scintilla" of evidence to satisfy its burden of demonstrating the dispute is "genuine." *Anderson*, 477 U.S. at 252. "[T]he non-movant has a burden of doing more than simply showing there is some metaphysical doubt as to the material facts. Rather, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Neustrom v. Union Pac. R.R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).

**B. State Farm is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim**

Federal courts apply the substantive law of the state-to-state law claims. *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 683 (10th Cir. 2007). Under Oklahoma law, parties are "at liberty to contract for insurance to cover such risks as they see fit, and they are bound by the terms of the contract." *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (Okla. 1974). It necessarily follows courts are not at liberty to rewrite the terms of an insurance contract. *Id.* "The general declaration of insurance coverage, as established by the insurance policy and limited by its provisions, normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the policy." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 377 (Okla. 1991). "A contract is breached when a party does not do what [he/she/it] promised to do in the contract." *See* Oklahoma Uniform Jury Instruction-Civil, Instruction No. 23.21.

At all times relevant to this litigation, Plaintiffs were insured under State Farm Homeowner's Policy Number 36-B3-L971-9 (the "Policy"). The Policy provided the following property coverages and limits: Coverage A, Dwelling - $404,100.00; Coverage B, Personal Property - $303,075.00; and Coverage C, Loss of Use - $121,230.00. To date, State Farm has issued payments as follows related to Plaintiffs' claim: Coverage A - $286,343.09; Coverage B - $67,944.11; and Coverage C - $62,067.31, for a total of $416,354.51 under the Policy.

   *i.*  *Coverage A*

On February 17, 2021, CS Stanley completed a dwelling estimate under Coverage A and issued a payment to Plaintiffs for ACV in the amount of $217,170.90. At issue is the Proof of Loss package submitted by PA Rupert with a dwelling estimate of $505,376.76. Of that amount, $166,236.00 was allocated for safety protocols based on a report submitted by Kevin Dandridge.

In response, State Farm hired Derek VanDorn of Berryman Enterprises, Inc. to prepare a dwelling estimate and evaluate both State Farm and PA Rupert's estimate. Mr. VanDorn inspected the property on September 8, 2021, and submitted a dwelling estimate of $317,328.00. After receiving the Berryman bid, State Farm adjusted its dwelling estimate and issued a supplement payment to Plaintiffs for ACV in the amount of $69,172.19 on October 11, 2021. State Farm also informed Plaintiffs they could make a supplemental claim for $35,722.33 or the actual cost to repair, whichever was less, after repairs were completed.

Once discovery commenced, Mr. Dandridge testified during his deposition that his report was meant to be used as a checklist and admitted the report contained numerous errors. Further, Mr. Vandorn reviewed Mr. Dandridge's report and also found the report to be inflated and contain unnecessary line items not applicable to Plaintiffs' home. It was Mr. VanDorn's opinion that Mr. Dandridge's report should be disregarded. If the safety protocols are disregarded, State Farm's October 11, 2021 estimate of $322,065.42 is not out of line with PA Rupert's estimate, particularly when considering PA Rupert inflated the standard markup rate of ten (10) percent for overhead and ten (10) percent for profit to twenty (20) percent. State Farm has paid all that was owed to Plaintiffs under their Policy; therefore, it is entitled to summary judgment on Plaintiffs' breach of contract claim.

        *ii.    Coverage B*

Coverage B provided that State Farm would pay for loss caused by physical direct damage to personal property caused by fire or smoke. State Farm has paid $416,354.51 on this claim— $67,944.11 of which was paid under Coverage B. Both Plaintiffs and PA Rupert submitted a contents inventory. State Farm worked diligently to either pay for the replacement of Plaintiffs' personal property or have it restored.

PA Rupert instructed ServPro to stop cleaning Plaintiffs' personal property as he did not believe it was being properly cleaned. As a result, CS Stanley and TM Richwine viewed Plaintiffs' contents stored at ServPro on September 29, 2021, to determine what was cleanable versus what needed to be replaced. As would be expected with a fire, it was found some items needed to be replaced while others were cleanable. State Farm continued to issue supplement payments for personal property as it gathered more information. Further, based on Mr. Collins' deposition testimony regarding his 2017 bankruptcy filing, it is likely he over-valued his possessions. State Farm has paid all that was owed to Plaintiffs under their Policy; therefore, it is entitled to summary judgment on Plaintiffs' breach of contract claim.

### iii.     Coverage C

State Farm paid $62,067.31 in additional living expenses over eleven (11) months. During that period of time, State Farm had ALE Solutions searching for long-term housing. Plaintiffs turned down approximately eight (8) different housing options presented by ALE Solutions stating the housing was not comparable and there needed to be a dedicated space or additional room for a workout/home gym. PA Rupert also instructed Plaintiffs to turn down a housing option Plaintiffs found and arranged on their own. ALE Solutions also had a difficult time finding long-term housing that would take Plaintiffs' dog, which was a bully breed. Finally, at times, ALE Solutions had difficulty contacting Plaintiffs and weeks would pass where Plaintiffs failed to call back or look at housing options.

In October of 2021, ten (10) months after the fire and after numerous failed attempts to place Plaintiffs in long-term housing, State Farm communicated with Plaintiffs and stated additional living expenses could not be continued beyond October 31, 2021, without proof Plaintiffs had entered into a contract to repair their home. State Farm originally estimated repairs

would take six (6) to eight (8) months, yet continued to pay additional living expenses beyond the time estimated for repairs. Plaintiffs stated they intended to repair the property and would use the contractor who built the home. Based on this representation, State Farm agreed to continue additional living expenses through November 30, 2021; however, indicated Plaintiffs needed to present a contract to repair the home. Plaintiffs failed to present a contract to repair the home and State Farm discontinued additional living expenses, but invited Plaintiffs to submit a contract for repair and State Farm would reconsider payment of additional living expenses.

In no way did State Farm fail to give notice to Plaintiffs that additional living expenses would be discontinued. Plaintiffs had two (2) months of notice before State Farm terminated additional living expenses. Even then, State Farm assured Plaintiffs additional living expenses would be reconsidered if Plaintiffs submitted a contract for repair. State Farm has paid all that was owed to Plaintiffs under their Policy; therefore, it is entitled to summary judgment on Plaintiffs' breach of contract claim.

### C. State Farm is Entitled to Summary Judgment on Plaintiffs' Breach of the Duty of Good Faith and Fair Dealing Claim

First, "a determination of liability under the contract is a prerequisite to a recovery for bad faith breach on an insurance contract." *Davis v. GHS Health Maint. Org., Inc.*, 22 P.3d 1204, 1210 (Okla. 2001); *see also Davis-Travis v. State Farm Fire & Cas. Co.*, 336 Fed. App'x 770, 774 (10th Cir. 2009) (applying Oklahoma law) (declining to address bad faith claim after finding insurer did not breach the contract in denying coverage). Consequently, in the absence of a breach of contract claim, a plaintiff may not maintain a bad faith claim. *See Sims v. Great Am. Life Ins. Co.,* 469 F.3d 870, 891 (10th Cir. 2006) ("In order to prove her bad faith claim, Ms. Sims had to establish that the insurance contract was breached."); *Gillogly v. Gen. Elec. Capital Assurance Co.,* 430 F.3d 1284 (10th Cir. 2005); *Expertise, Inc. v. Aetna Fin. Co.,* 810 F.2d 968, 972 (10th Cir. 1987) ("the

plaintiff obviously must establish that a binding agreement has been breached to invoke this theory" of bad faith breach of contract under Oklahoma law).

As explained in subsection II.B. *supra*, State Farm did not breach the insurance contract between it and Plaintiffs. Rather, State Farm paid all monies owed to Plaintiffs under the Policy. Therefore, because Plaintiffs' breach of contract claim fails, so too does their breach of the duty of good faith and fair dealing claims.

Even if State Farm did breach its contract with Plaintiffs, which it did not, it would still be entitled to summary judgment on their bad faith claim. The Oklahoma Supreme Court has developed well-settled rules specific to insurance bad faith cases, which dictate when a bad faith claim may be submitted to a jury. Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious. In the case of *Christian v. American Home Assurance Co.*, the Oklahoma Supreme Court held "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort . . ." 577 P.2d 899, 904-05 (Okla. 1977). "The minimum level of culpability necessary for liability against an insurer for liability to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award against said insurer." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005). ***The burden is upon Plaintiff to show bad faith***. *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 761 (Okla. 1984)**.**

It is well-settled an insurer's refusal to pay, in whole or in part, is not unreasonable or in bad faith when there is a legitimate dispute concerning coverage. *See Claborn v. Wash. Nat'l Ins. Co.*, 910 P.2d 1046, 1051 (Okla. 1996); *Christian*, 577 P.2d 899. "The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested, that it had justifiable reason for withholding payment under the policy*." *Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 137-38 (emphasis in the original) (Okla. Civ. App. 2006).

As described in detail above, a legitimate dispute as to the value of Plaintiffs' claims during the claims handling process. State Farm has paid the following amounts under the Policy: Coverage A - $286,343.09; Coverage B - $67,944.11; and Coverage C - $62,067.31, for a total of $416,354.51. This is a matter of legitimate dispute as to the value of the claim and is not a basis for a finding of bad faith.

"[W]hen presented with a claim by its insured, an insurer 'must conduct an investigation reasonably appropriate under the circumstances' and 'the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient.'" *Newport v. USAA*, 11 P.3d 191, 195 (Okla. 2000). However, "[t]he tort of bad faith does not foreclose the insurer's right to deny a claim, resist payment, or litigate any claim 'to which the insurer has a reasonable defense.'" *Id.* at 195 (quoting *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991)). As the Court explained in *McCorkle v. Great Atlantic Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981):

> We recognize that there can be disagreement between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions. Resort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. Rather, tort liability may be imposed only where there is a clear showing that the insurer unreasonable, and in bad faith, withholds payment of the claim of its insured.

*Id.* (quoting *Christian*, P.2d at 904-05).

"The tort of bad faith hence does not prevent an insurer denying, resisting or litigating any claim as to which the insurer has a reasonable defense." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009). "It is not a breach of the duty of good faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the validity or amount of an insurance claim." *Garnett v. Gov't Emps. Ins. Co.*, 186 P.3d 935, 944. (Okla. 2008).

There is simply no evidence whatsoever to support Plaintiffs' claim of bad faith based on State Farm's investigation and evaluation. To prove this claim, "the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information." *Timberlake Constr. Co. v. U.S.F. & G. Co.*, 71 F.3d 335, 345 (10th Cir.

1995) (applying Oklahoma law). Failure to make such a showing renders summary judgment appropriate. *Id.* State Farm's investigation need not be perfect; rather, it should be "reasonably appropriate under the circumstances." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006). An investigation will generally meet this standard *unless* the plaintiff can show "(1) the manner of investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) the insurer intentionally disregarded undisputed facts supporting the insured's claim." *Id.* (citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993)). Plaintiffs cannot make such a showing.

Plaintiffs claim that State Farm did not investigate their loss. This is not true; the dwelling loss was reported to State Farm on January 12, 2021. State Farm promptly inspected the property on January 14, 2021, and an initial payment was made on February 17, 2021, based on the estimate created from that inspection. An additional supplement payment was issued on October 11, 2021. In fact, State Farm prepared three (3) estimates for the dwelling repair: (1) $249,269.80 on February 17, 2021; (2) $276,513.57 on June 28, 2021; and (3) $322,065.42 on October 11, 2021. State Farm diligently investigated Plaintiffs' loss and continued to investigate throughout the claims process although Plaintiffs never entered into a contract to repair their home and did not provide receipts for repairs to the home. Instead, Plaintiffs paid off their mortgage and pocketed the rest of the money paid under Coverage A.

As to the contents, State Farm diligently inspected the contents loss and continued to issue supplement payments under Coverage B as State Farm received more information. State Farm was in frequent contact with Plaintiffs, PA Rupert, and ServPro and CRND throughout the claims process. Further, based on Mr. Collins' deposition testimony regarding his 2017 bankruptcy filing, it is likely he over-valued his possessions. Nevertheless, State Farm paid $67,944.11 under

Coverage B.

Although State Farm estimated repairs to Plaintiffs' home would take six (6) to (8) months, State Farm worked to place Plaintiffs in long-term housing throughout the claims process. Plaintiffs turned down eight (8) homes and PA Rupert instructed them to turn down a ninth (9) home. Nevertheless, State Farm continued to pay additional living expenses for eleven (11) months and gave Plaintiffs two months' notice regarding the termination of additional living expenses and repeatedly explained to Plaintiffs that additional living expenses could be continued if Plaintiffs would enter into a contract to repair their home. During post-litigation discovery, Plaintiffs produced numerous receipts for repairs, but during Mr. Collins' deposition, he testified those receipts were for a different house. (Ex. 4, pp. 192:2-209:2-8)

To date, Plaintiffs have not shown any evidence supporting their claims that was presented to State Farm and that it overlooked in evaluating the claims. State Farm is entitled to an order granting it summary judgment on Plaintiffs' bad faith claim.

### D. *Plaintiffs' Claim of Entitlement to Punitive Damages Similarly Fails*

Plaintiffs' punitive damage claim similarly fails. The availability of punitive damages in an insurance bad faith case is not automatic. *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 175 (Okla. 2000). Submission of the issue of punitive damages to a jury may be improper, even where there is evidence to support the recovery of actual damages for bad faith. *McLaughlin v. Nat'l Benefit Life Ins. Co.*, 772 P.2d 383, 385, 387, 389 (Okla. 1988). In *McLaughlin*, the Oklahoma Supreme Court noted: "[c]learly, punitive damages do not ipso facto follow from *every* breach of this duty or in *every* case [in which] a jury may render a verdict for the wronged party." 772 P.2d at 385 (emphasis in original). In *Badillo*, the Oklahoma Supreme Court similarly opined:

> . . . 23 O.S. 2001, § 9.1 provides that a jury may award punitive damages if it finds, by clear and convincing evidence, that an insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured [§ 9.1(B)] or an insurer has intentionally and with malice breached said duty. § 9.1(C)(2). In that punitive damages are **only** allowable under § 9.1 when, at a minimum, there is competent

evidence of a reckless disregard by the defendant of the plaintiff's rights from which malice and evil intent may be inferred. . . .

This Court has recognized that the availability of punitive damages in a case by an insured against his/her insurer for breach of the implied duty of good faith and fair dealing is not automatic, but rather is governed by the standard applicable in other court cases. Even where there is evidence to support recovery of actual damages in this type of case, submission of the issue of punitive damages to a jury may be improper.

121 P.3d at 1105-06 (emphasis in original) (internal citations omitted). The question of whether competent and sufficient evidence has been presented to establish a jury question on the issue of punitive damages is a question of law for the Court. *Id.*

Plaintiffs cannot show by clear and convincing evidence State Farm "recklessly disregarded its duty to deal fairly and act in good faith with its insured." *See* 23 O.S. § 9.1(B)(2). The undisputed facts of this case show that this is simply a legitimate dispute between insurer and insured about the extent of the alleged damages to extent of the alleged damages to Plaintiffs' dwelling and personal property. Because a legitimate dispute cannot amount to bad faith, it necessarily cannot amount to the level of culpability necessary for a punitive damages award. For this reason, State Farm is entitled to summary judgment on Plaintiffs' punitive damages claim.

## III.   <u>CONCLUSION</u>

**WHEREFORE**, premises considered, State Farm Fire & Casualty Company respectfully requests this Court grant it summary judgment on Plaintiffs' breach of contract, bad faith, and punitive damages claims and any further relief this Court deems just and equitable.

Respectfully submitted,

**ATKINSON, BRITTINGHAM,**
**GLADD, FIASCO & EDMONDS**
A PROFESSIONAL CORPORATION

/s/ J. Andrew Brown
 J. Andrew Brown, OBA #22504
 Andrew G. Wakeman, OBA #21393
 1500 ParkCentre
 525 South Main Street
 Tulsa, OK 74103-4524
 Telephone:  (918) 582-8877
 Facsimile:   (918) 585-8096
 Email:   dbrown@abg-oklaw.com
 *Attorneys for Defendant SFF&CC*

## CERTIFICATE OF MAILING

I hereby certify that on the 16th day of February, 2024, a true and correct copy of the aforementioned document was mailed to the following, with postage prepaid:

 S. Alex Yaffe
 Terry M. McKeever
 FOSHEE & YAFFE
 P.O. Box 890420
 Oklahoma City, OK 73170
 Email:   say@fylaw.com
 Email:   tmm@fylaw.com
 *Attorneys for the Plaintiffs*

         /s/ J. Andrew Brown

R:\416\416\Defendant's MSJ - rje.docx