```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF OKLAHOMA

 3

 4   (1) GEORGE COLLINS AND
     (2) ALRIKA COLLINS,
 5        Plaintiffs,

 6   vs.                           No. 22-CV-00318-RAW-JAR

 7   (1) STATE FARM FIRE AND
     CASUALTY COMPANY,
 8        Defendant.

 9

10            DEPOSITION OF GEORGE COLLINS
          TAKEN ON BEHALF OF THE DEFENDANT
11     ON NOVEMBER 29, 2023, BEGINNING AT 10:44 A.M.
               IN MUSKOGEE, OKLAHOMA
12

13                    APPEARANCES:

14   Appearing on behalf of the PLAINTIFFS:

15   Terry M. McKeever
     FOSHEE & YAFFEE
16   12231 S. May
     Oklahoma City, Oklahoma 73170
17   (405)  632-6668
     tmm@fylaw.com
18
     Appearing on behalf of the DEFENDANT:
19
     Andrew Gordon Wakeman
20   ATKINSON, HASKINS, NELLIS, BRITTINGHAM, GLADD
     1500 ParkCentre
21   525 South Main
     Tulsa, Oklahoma 74103
22   (918) 582-8877
     Awakeman@ahn-law.com
23

24           ALSO PRESENT:  Alrika Collins

25   REPORTED BY:  Lacy Antle, CSR, CCR, RPR
```

EXHIBIT
4

1      Q    Was the address and the home that was

2   there before the new home was built, was the address

3   still the same?

4      A    I've been at that address for 20 years.

5      Q    Are you presently employed?

6      A    Yes, I am.

7      Q    Where at?

8      A    Stonewood -- Stoney Creek Hotel.

9      Q    I'm sorry?

10      A    Stoney Creek Hotel.

11      Q    And in what capacity?

12      A    Full-time.

13      Q    Okay.  And what do you do?

14      A    Front desk supervisor.

15      Q    How long have you been employed there?

16      A    About four months.

17      Q    Prior to Stoney Creek Hotel, where were

18   you employed?

19      A    AT&T.

20      Q    And what were you doing for AT&T?

21      A    Store manager.

22      Q    How long were you employed at AT&T?

23      A    Possibly a year.

24      Q    And prior to AT&T, where were you

25   employed?

```
 1        A     Before AT&T, I'm not sure.

 2        Q     Were you employed prior to AT&T, or did

 3   you have a gap in employment?

 4        A     I don't have any idea.

 5        Q     Prior to AT&T, what's the job you recall

 6   prior to going to AT&T?

 7        A     I don't recall.

 8        Q     In your whole life, the last job you

 9   recall is working at AT&T?

10        A     I drove trucks.

11        Q     Okay.  When did you drive trucks?

12        A     I'm unsure.

13        Q     When were you born?

14        A     1980.

15        Q     Okay.  Did you go to high school?

16        A     Muskogee High.

17        Q     Did you graduate?

18        A     I did not.

19        Q     When was your last year of employment --

20   or last year that you completed in high school?

21        A     I'm unsure.

22        Q     So you don't know if you completed ninth

23   grade?

24        A     I do not.

25        Q     When you dropped out, what did you do?
```

1    then we'll get to the ALEs and we'll go through

2    that.

3            So you -- do you recall if you received a

4    payment from State Farm as it relates to the

5    contents portion of your coverage?

6        A    Based on this?

7        Q    Well, just, I mean, I'm not saying that

8    it's based on what you submitted, I'm not saying

9    it's based on anything, I'm just saying, if you have

10   a recollection of ever seeing a payment from State

11   Farm as it relates to the contents portion of your

12   coverage?

13       A    Okay.  Based on what was submitted to

14   State Farm on the contents, that we did receive a

15   partial payment on contents.

16       Q    And you understand that your policy had --

17   well, maybe you don't understand.  Let me know if

18   you don't.  But your policy had coverage for the

19   dwelling, your policy had coverage for the contents,

20   and your policy had coverage for ALE, is that your

21   understanding?

22       A    Yes.

23       Q    Okay.  And so do you have an understanding

24   that you received payments on both -- under the

25   dwelling portion of the coverage, under the contents

1        A     I don't believe so.

2        Q     **All right.  So as it relates to the**

3    **contents portion of the claim, do you feel you have**

4    **expressed to me the issues you have with State**

5    **Farm's handling of that portion of the claim?**

6        A     I don't.

7        Q     **Okay.**

8        A     I don't feel like that I can explain the

9    issue that we have with the incompetentness of State

10   Farm, I don't think it can be explained.  I feel

11   like the issues that I have shouldn't be an issue,

12   so I don't feel like there's enough explaining to do

13   behind the actions in a way State Farm handled the

14   claim.

15       Q     **So do you need to give me other -- are**

16   **there other examples that you can provide me, or**

17   **have you provided me the examples that you take**

18   **issues with?**

19       A     Just incompetent.

20       Q     **And what was incompetent?**

21       A     Just the way they handled it.

22       Q     **Okay.  And what about how they handled it**

23   **was incompetent?**

24       A     I mean, how long -- you said this fire

25   took place, I believe you said January, what year?

1    Q    -- I do not believe you told me that.

2         Okay.  Let's talk about your

3    communications with the agent, please.

4    A    Okay.  But it wasn't the agent, it was the

5    lady up front.  It wasn't D.J. himself.  We just

6    dropped off receipts, they scan them in.

7    Q    I got you.  I got you.  I got you.  Tell

8    me about all your communications with D.J. Witty or

9    his office as it relates to this claim.

10   A    I don't recall all my communications with

11   him, just, when we talked about receipts, that just

12   came up.

13   Q    So you dropped receipts off at the office?

14   A    That is correct.

15   Q    Why did you do that?

16   A    Scan them in.

17   Q    And send them to State Farm?

18   A    Yes.

19   Q    How long did you receive additional living

20   expense payments from State Farm?

21   A    For the time of the hotel stay.

22   Q    Okay.  Was that 10 and a half months?

23   A    I don't recall how long it was, but the

24   time I was in the hotel, Home2 Suites under ALE,

25   they was -- I guess, paid ALE.

PROFESSIONAL  REPORTERS
800.376.1006
proreporters.com

```
 1                  (Exhibit 2 marked for identification.)

 2       A     "Please identify all repairs made to your

 3  home since the incident which is subject to this

 4  litigation."

 5                  Read the response as well?

 6       Q     You can skip the objections and just note

 7  what documents.  It says -- does it -- you can read

 8  it or I can summarize it and you can agree.  It

 9  basically says, "Please see documents."

10       A     You want the Collins 0011 -- 1114?

11       Q     Correct.

12       A     Okay.

13       Q     And I'll tell you those are the documents

14  I have --

15       A     Okay.

16       Q     -- found related to repairs.  All right?

17       A     Okay.  Sounds good.

18       Q     So in general, are you able to identify

19  the repairs that have been done to your home?

20       A     No, I'm not.

21       Q     Did you personally do any of the work?

22       A     I did not.

23       Q     Are you able to identify the people that

24  have done work on your home?

25       A     No, I'm not.
```

```
 1        Q     The Hughes Lumber invoice, do you see
 2    that?
 3        A     Yes.
 4        Q     Do you know what that was for?
 5        A     Not right off, I don't.
 6        Q     Who is Robert Walker?
 7        A     Contractor.
 8        Q     Does he have a company?
 9        A     Not that I'm aware of.
10        Q     How do you know Robert Walker?
11        A     Contractor.
12        Q     How did you meet Robert Walker?
13        A     Just through people, just trying to get
14    some work done, or you can go to Lowe's and Lowe's
15    sends people out there.
16        Q     And you retained Mr. Walker to do work?
17        A     Yes.
18        Q     And this $2,082.72 invoice was for work he
19    did?
20        A     Yes, it looks that way.
21        Q     But you don't know what the work was?
22        A     I'm unsure what all was going on.
23        Q     All right.  Next one, 1046, do you have
24    any understanding of what this invoice is for or
25    what work was done related to it?  The next page,
```

1    after the Hughes Lumber.  Looks like it's a smoke

2    alarm, battery maybe, I don't know.

3        A    Yeah.

4        Q    Do you know what this invoice is for?

5        A    I don't.

6        Q    Do you know who paid this money?

7        A    Probably me.

8        Q    Okay.  So this isn't something that you

9    would have hired somebody to do; you went to Locke

10   Supply and purchased this "smoke alarm bat," which I

11   assume is battery?

12       A    I doubt it.

13       Q    What's that?

14       A    I doubt if I did.  I really don't know.

15       Q    You submitted this to State Farm as it

16   relates to the repairs done on your home, So this

17   looks to be an invoice for 9-volt batteries, five,

18   and I'm wondering, is it you that went and purchased

19   nine -- five 9-volt batteries, or did somebody do

20   that on your behalf?

21       A    Right.  Probably on my behalf.  I don't do

22   a whole lot.

23       Q    So that wasn't you?

24       A    Probably not.  I don't recall.  I mean, it

25   was 20 -- what, 2021, I have no idea half this

```
 1    stuff, I'm not going to be -- we're talking, what,

 2    two, three years ago, I can't tell you from the

 3    store receipt.

 4         Q    Next page, please?

 5         A    Okay.

 6         Q    1047.

 7         A    Yes, sir.

 8         Q    At the bottom there's numbered pages,

 9    you'll see it's 1047.

10         A    Yes, sir.

11         Q    This is an invoice for $633.22 you've

12    submitted to State Farm as representing repairs on

13    the property.

14         A    Okay.

15         Q    What is this for?

16         A    I have no idea.

17         Q    Did you go to Locke Supply and purchase

18    this stuff?

19         A    I don't recall.

20         Q    Do you have a recollection of who would

21    have done it?

22         A    I don't.

23         Q    And do you have any idea of what this was,

24    these items were purchased for?

25         A    I don't.
```

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

 1      Q    Next page, that is 1048, it's another
 2 invoice from Locke Supply totaling $87.16.  Do you
 3 have any understanding of what this invoice is for?
 4      A    I do not.
 5      Q    Next page.  Looks like this is a return, I
 6 don't know, of returning items.  Have -- do you know
 7 what this is for?
 8      A    I don't.
 9      Q    Do you know why items were returned?
10      A    May not have needed them.
11      Q    Do you know where you got these Locke
12 Supply invoices?
13      A    It's got -- my signature's down at the
14 bottom, but I don't know.
15      Q    Is that your signature down there?
16      A    Looks like it.
17      Q    And they're not on some of the other
18 pages, though, right?
19      A    Yeah.
20      Q    Looks like your signatures are on the
21 documents identifying returns, does that -- I mean
22 --
23      A    Oh, okay.
24      Q    Does that refresh your recollection as to
25 why your signature would be on there?

```
 1        A    Possibly.  I'm not sure.

 2        Q    Because the next page, 1050, is returns.

 3   Do you see that?

 4        A    I do.

 5        Q    Do you know what those were purchased for?

 6        A    I do not.

 7        Q    But it was in relation to repairs on your

 8   home, correct?

 9        A    Correct.

10        Q    Next page, 1051, do you have any

11   understanding of what that -- those items were

12   purchased for as it relates to the repairs on your

13   home?

14        A    I do not.

15        Q    Okay.  Next one, 10 -- 1052, do you have

16   any understanding of what that is being purchased

17   for?

18        A    I do not.

19        Q    And you don't know if you were the one

20   doing the purchasing or somebody else on your

21   behalf?

22        A    Right.

23        Q    Did you keep track of -- I mean, the

24   people you hired, did you keep track of how you paid

25   them?
```

```
 1        A     No, not really.

 2        Q     Did you pay them by cash or check?

 3        A     Probably cash.

 4        Q     Let's see, 1054, can you tell me what that

 5   is?

 6        A     I don't even -- I do not know.

 7        Q     It appears to be an invoice from Mathis

 8   Brothers.

 9        A     Yeah, it looks that way.

10        Q     Did you purchase the stuff from Mathis

11   Brothers?

12        A     I don't recall.  I don't know what I would

13   have -- I don't know.  Maybe had to get a new -- a

14   new mattress, it looked like.  Yeah, that's what we

15   purchased, king mattress on there, so I guess --

16        Q     Do you have a recollection -- I mean,

17   these are your documents that you produced, man.

18        A     Right.  Right.

19        Q     Do you have a recollection of this

20   purchase?

21        A     This is the -- I mean, this is it, the

22   receipt, that's all -- I mean, that's my

23   recollection.  That's what a receipt is for, I

24   thought.  I don't --

25        Q     Do you have a specific recollection of
```

PROFESSIONAL REPORTERS

800.376.1006
proreporters.com

1    **going down to Mathis Brothers and purchasing this**

2    **stuff or did you forget?**

3          A     Well, it says "Sold to George Collins."

4                MR. WAKEMAN:  Can you read back my

5    question, please?

6                     (Record read as requested.)

7                THE WITNESS:  Yeah, it says, "Sold to

8    George Collins."

9          Q     **(BY MR. WAKEMAN) I understand it says that.**

10    **I'm asking if, as we sit here, you recall going to**

11    **Mathis Brothers and purchasing it?**

12          A     Sir, when we got these documents, I looked

13    and it said 2021; I don't have no recollection of

14    any of these documents.

15          Q     **Then say "I don't have a specific**

16    **recollection."**

17          A     I said that --

18          Q     **No, you didn't.**

19          A     -- before we got started, so I mean, this

20    document says 2021, it says the same thing as the

21    10, the 15 before we went through.  I don't have a

22    recollection of any of these documents.  My job was

23    to keep them and turn them in and that's what I

24    done.

25          Q     **If you look down at the bottom, will you**

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

```
 1   go to 1062?

 2           MR. MCKEEVER:  It's this one right here.

 3           THE WITNESS:  Right here, right?  Okay.

 4       Q   (BY MR. WAKEMAN) Now, this also is an

 5   invoice you submitted, you see it's from Hahn

 6   Appliance?

 7       A   Yes, I do.

 8       Q   And what is it for?

 9       A   Appliances.

10       Q   And where are those appliances now?

11       A   Those appliances are at 510 North 21st

12   Street.

13       Q   What did you do with the old appliances?

14       A   Old appliances?  The house we're in never

15   had appliances.

16       Q   No, I'm sorry.  The appliances at the

17   house that caught on fire, are they still in the

18   house or --

19       A   No, everything's been redone in the house,

20   the appliances.

21       Q   When you say "redone," what do you mean?

22       A   Well, it's a new refrigerator in there, I

23   believe a new dishwasher, so there's been appliances

24   put in.

25       Q   So the house that is issue at this loss
```

PROFESSIONAL REPORTERS

800.376.1006
proreporters.com

```
 1    has new appliances; is that correct?

 2         A    Yes.

 3         Q    And these appliances that you've submitted

 4    to State Farm to represent repairs made to the home

 5    are for appliances in the 510 North 21st Street; is

 6    that correct?

 7         A    That's correct.

 8         Q    Okay.

 9         A    That's correct.

10         Q    Okay.  Next page, the work order, what is

11    this for?

12         A    Added vent light switch, added four can

13    lights; looks like an electrician to me, being our

14    electric.

15         Q    And the address on this receipt is

16    identified as what?

17         A    510 North 21st.

18         Q    Is this to signify repairs done at the

19    home that is at issue from this loss?

20         A    No, I believe this is 510 North 21st.

21         Q    So why would you produce receipts for

22    repairs done at 510 North 21st Street?

23         A    For one, these receipts was just all

24    together; and then for two, it's just what we had to

25    do to be in a state of living until we got back into
```

```
 1    our home.
 2         Q    Let's go on to the next one.  What is this
 3    one?
 4         A    I'm unsure.  But this is probably also
 5    from 510.
 6         Q    This one says 521 North 21st Street.
 7         A    Yeah, that's probably just a missed typo
 8    on the address.
 9         Q    Who did the work on this one?
10         A    I'm unsure.
11         Q    So this one also isn't for work related at
12    the residence?
13         A    No.
14         Q    Next one.
15         A    Yeah, that's another.
16         Q    1065?
17         A    Yeah.
18         Q    The address is 564 North 8th Street.
19         A    Yeah.
20         Q    That's not for the residence at issue?
21         A    That's not.
22         Q    Next one, 1066, what is that for?
23         A    I have no idea.  You said I said --
24         Q    Next one, please.
25         A    Yeah.
```

```
 1       Q      1067.

 2       A      Yeah.

 3       Q      What is that for?

 4       A      I have no idea.

 5       Q      But you're representing to State Farm that

 6   it's for work done related to your home that is at

 7   issue at this lawsuit?

 8       A      I'm not -- I'm guessing just a bunch of --

 9   all my receipts are together and I just submitted

10   everything without looking through them until today.

11       Q      All right.

12       A      Because I have a lot of receipts for the

13   home.

14       Q      Then one, two, three, four, five, six,

15   seven, seven, eight, nine, nine pages of receipts

16   for rent.  Then 1077.

17       A      Yeah.

18       Q      And that would be -- it's actually on the

19   invoice itself.  Do you know what that is for?

20       A      Floor work at the house they were working

21   on that day.

22       Q      Who's paying for that?

23       A      I'm paying for it.

24       Q      Now, is this a rental property?

25       A      It is a rental property.
```

```
 1        Q    But you're paying for all these repairs?

 2        A    Yeah.

 3        Q    Do you have any ownership interest in the

 4   property?

 5        A    I do not.  It was -- the house wasn't

 6   ready and we was kicked out of the hotel, so we had

 7   to do what we had to do to have comparable living,

 8   so that's what that's for.

 9        Q    Did that come off the rent then, when you

10   paid for these repairs?

11        A    No, hasn't nothing come off it.

12        Q    Do you have any type of agreement with

13   Rashea Wilkinson as it relates to the property at

14   510 North 21st Street?

15        A    I don't.

16        Q    Do you ever have any ownership interest in

17   the property at 510 North 21st Street?

18        A    I have not.

19        Q    Next invoice, 1078, what is that for?

20        A    Looks like some plumbing work.

21        Q    For what residence, please?

22        A    This is 510, it's going to be the same.

23        Q    All right.  Next one, please, 1079, what

24   is that for?

25        A    Same.
```

PROFESSIONAL  REPORTERS
800.376.1006
proreporters.com

```
 1        Q    When you say "same," it means the 510

 2   North 21st Street residence?

 3        A    510, yeah.

 4        Q    1080.

 5        A    Same all those receipts as well.

 6        Q    See, I don't want to go through all those,

 7   because I want to be very specific on the record, so

 8   --

 9        A    Yeah.

10        Q    -- I don't want there to be any confusion

11   later on.

12        A    Right.

13        Q    So 1080 is for the 510 North 21st Street

14   residence?

15        A    That is correct.

16        Q    The 1081, what residence is that for?

17        A    Same.

18        Q    1082, what is that residence?

19        A    Same.

20        Q    "Same" as in being it's for the 510 North

21   21st Street?

22        A    That's correct.

23        Q    All right.  There's no address on 1083, do

24   you know what residence that was?

25        A    The same.  Yeah, that bill out there is a
```

1    lot higher from them.

2        Q    **What did you say?  I'm sorry.**

3        A    The bill for the house at 1312, for Chris,

4    is a lot higher than that, so I guess I just got

5    them mixed up.

6        Q    **Where is that bill?**

7        A    Probably at --

8        Q    **I mean, is it in the documents you**

9    **produced?**

10        A    No, it's not in the documents, that's what

11    I'm looking at, so I must have put the wrong ones in

12    there.

13        Q    **1084?**

14        A    I'll get those to the attorneys.

15        Q    **10848.**

16        A    Same.

17        Q    **It's for the address at 510 North 21st**

18    **Street?**

19        A    Yeah.

20        Q    **All right.  1085 is for the address at 510**

21    **North 21st Street?**

22        A    That is correct.

23        Q    **Okay.  Now we've got a bunch of Walmart**

24    **receipts, so I want you to look through these -- or,**

25    **well, there's Walmart and Lowe's receipts and I want**

 1    you to look through and tell me if you believe any
 2    of these relate to repairs done at the house at
 3    issue.
 4         A    I know the Walmart receipt was just a
 5    replacement of a TV.
 6         Q    Okay.  So let's start with the replacement
 7    of the TV.
 8         A    Okay.
 9         Q    And that would be one of the TVs that was
10    lost in the fire?
11         A    Yes.
12         Q    But that isn't at -- I mean, because
13    you're not at the address -- I mean, you're not --
14    you have that TV at the 510?
15         A    That is correct.
16         Q    Okay.  And so the TV at least, how many
17    TVs did you have in your house at the time of the
18    fire?
19         A    One in every room, one in the front room,
20    so four, five -- five, six TVs.
21         Q    Yeah, I mean, let's -- if we want to be
22    crystal clear so there's no confusion, you've got
23    one in the exercise room, one in the theater room,
24    four bedrooms, an office?
25         A    A total of six.

1        Q    So six TVs?

2        A    Six TVs.

3        Q    All right.  Because I mean, if there were

4   one in every room, there'd be more than six.

5             All right.  Next one.  All right.  So the

6   Lowe's receipts, are you able to tell me anything

7   about what those represent?

8        A    I'm not sure.

9        Q    Well, just look through each one and tell

10  me, "Hey, this jogs my recollection, it was, in

11  fact, for at home at issue or it wasn't" so that I

12  don't have any surprises later.

13       A    No, I'm just going to go through

14  everything in my paperwork and resubmit, because I'm

15  not sure what's what.

16       Q    I'm not asking you about your paperwork.

17  I'm asking you about that stuff right there.  I'm

18  asking you to look through the stuff I have in front

19  of you and tell me if you're able to say what those

20  receipts are for.

21       A    I'm not sure.

22       Q    Because I don't want you to come to trial

23  and be like, "Oh, yeah, wait a minute, you didn't

24  ask me to look at 1089 and that was definitely for

25  the house."

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

```
 1        A     Oh, no.

 2        Q     So I want you to look at every single one,

 3   I want to be --

 4        A     No, I got receipts for the houses, but no,

 5   these are not receipts, don't -- nothing -- yeah.

 6        Q     Are you coming across anything that's

 7   related to the house at issue?

 8        A     Not to my recollection.

 9        Q     Well, in looking at those invoices that

10   you have in front of you, that's basically -- let me

11   just see this real quick.  Start at 1087, is for the

12   TVs, we talked about that, right?

13        A     Uh-huh.

14        Q     You confirmed that for me?

15        A     Uh-huh.

16        Q     And then for 1088 through 1114, which is

17   the last page --

18        A     Uh-huh.

19        Q     -- of these ones that we're talking about,

20   you don't see anything in there that leads you to

21   believe that was for the house at issue?

22        A     I don't see anything that leads me to

23   believe either way right now.

24        Q     Let me put a paper clip on that so that

25   doesn't go -- doesn't disappear, make a mess.
```

1      Q    Do they come on to your property?

2      A    They could.  I don't have any hunters that

3  I personally allowed on there, but all of my -- all

4  our properties they hunt, trespass, so I'm unsure

5  about that, but it's possible.

6      Q    Do you have an issue with State Farm

7  questioning a 30,000-dollar charge for someone to

8  have a flag out in the street by your property

9  during repairs?

10          MR. MCKEEVER:  Object to the form.

11          You can answer.

12          THE WITNESS:  Whatever was needed.

13      Q   (BY MR. WAKEMAN) I understand, but do you

14  have a problem with State Farm saying, "Hey, wait a

15  minute, this seems excessive"?

16      A    I don't.

17      Q    Okay.  Do you know that Ian submitted to

18  State Farm a charge for goggles and face shields

19  totaling $20,312.50, did you know that?

20      A    I heard.

21      Q    Does that amount of money for goggles and

22  face shields seem reasonable to you?

23      A    Based off the needs of the work, I have no

24  idea.

25      Q    I hear you.  I get it.  But I'm just

1    saying, like, if I tell you, "Hey, I'm going to do

2    the work on your house" -- you hire me to come out

3    there and repair your house, right?

4         A    Uh-huh.

5         Q    You hire me and you're paying out of your

6    pocket, right?

7         A    Okay.

8         Q    And you got to pay me.  And I look at you

9    and I say, "Hey, man, I can repair your house for X,

10   but you also need to pay me $20,312.50 for goggles

11   and face shields," would that cause you some

12   concern?

13        A    Not concern.  I would get a second

14   opinion; if they need the same thing, then that's

15   just what it is.

16        Q    You think that's reasonable?

17             MR. MCKEEVER:  Object to the form.

18             Go ahead.

19             THE WITNESS:  If they need the same thing,

20   then, yes, it would have to be reasonable.

21        Q    (BY MR. WAKEMAN) Let's say you go to

22   McDonald's and you get a quarter pounder with cheese

23   meal, okay?

24        A    Uh-huh.

25        Q    And on the receipt -- you get the receipt

1    and there's a charge for $5 for plastic gloves, do

2    you take issue with that or would you just be like,

3    "Yeah, that's fine, I'll pay that $5, even though

4    I'm paying for the meal"?

5        A    I mean, that's policy.

6        Q    So you wouldn't have a problem with it?

7        A    There's nothing I can have a problem with.

8        Q    Let's see, let me ask you this, do you

9    agree it would be reasonable for State Farm to

10   question that amount of money for goggles and face

11   shields?

12            MR. MCKEEVER:  Object to the form.

13            THE WITNESS:  It's really hard for me to

14   say.  I don't know what's required to do the work,

15   so if that's what 10 people required, then it's not

16   reasonable to question it, if that's what it's going

17   to take to complete the job, you know.

18       Q   (BY MR. WAKEMAN) Do you have a problem with

19   State Farm questioning that amount?

20       A    I do not.

21       Q    Okay.  I want to try to decrease the

22   amount of paper for her.  I'm going to hand him what

23   I'm marking as Exhibit 4.  Have you ever seen that

24   document before?

25            (Exhibit 4 marked for identification.)

```
1        A    Not to my recollection.

2        Q    I'm going to hand you what I'm marking as

3    Exhibit 4, which is a spreadsheet that's readable

4    that's taken from that document, because the

5    spreadsheet in that document you can't read.

6        A    So it's okay.  So set this --

7        Q    Yeah, yeah.  So this is 4.

8        A    All right.

9        Q    At any point have you retained a safety

10   monitor to be at our property while people are doing

11   repairs?

12       A    I have not.

13       Q    I'll represent to you this is a

14   spreadsheet done by Mr. Dandridge, which was

15   Mr. Rupert to submit certain expenses to State Farm

16   for purposes of your claim, okay?

17       A    Okay.

18       Q    Are we on the same page?

19       A    Yes, sir.

20       Q    If you look at the very top, do you see,

21   "Safety monitor, labor"?

22       A    That's correct.

23       Q    Do you see $47,500?

24       A    Yes, sir.

25       Q    Does that amount cause any concern or --
```

1   well, strike that.

2           If I said, "Hey, man, I'm going to do work

3   at your property, here's my bid.  Oh, by the way,

4   you need to pay me $47,500 to monitor safety," would

5   that cause you concern?

6       A    I'd have to get two or three other quotes

7   before...

8       Q    Do you -- I mean -- strike that.

9           Okay.  Never mind.  Do you have a problem

10  with State Farm saying -- questioning $47,500 for a

11  safety monitor out at the site?

12      A    I don't.

13      Q    Let's see, because, I mean, we talked

14  about the safety monitor, we talked about the 20,000

15  in goggles.  Actually, go to -- it's going to be

16  seven pages in, so count seven, because I didn't.

17  Do you have any understanding of how long the

18  consensus was on how long it was going to take to

19  repair your home?

20      A    I think, isn't it like anywhere from six

21  to 12 months or something?

22      Q    I believe.  And I don't think I'm wrong, I

23  believe the general consensus on both State Farm's

24  part and the people on your part was six months.

25      A    Six months.

```
 1        Q    Which is 24 weeks, okay?

 2        A    Uh-huh.

 3        Q    So if you look at page 7, you'll see

 4   googles -- "googles," do you remember that, because

 5   I remember that?

 6             MR. MCKEEVER:   I remember I looked all

 7   over this form and I don't see -- oh, gosh.

 8        Q    (BY MR. WAKEMAN) Anyways, so see where it

 9   says "Goggles and face shield," it's like four lines

10   down on page 7?  And I can maybe point you there, if

11   that's going to be easier.

12        A    I counted them out.  It's right there.

13        Q    See where it says "Goggles"?

14        A    Yes, sir.

15        Q    So do you see where it says "65"?

16        A    I do.

17        Q    So if we look here, you would agree with

18   me that's under the "Weeks" column, okay?

19        A    Uh-huh.

20        Q    And so we have, six months would be 24

21   weeks, right?

22        A    Okay.

23        Q    Twenty-four, 25?

24        A    Uh-huh.

25        Q    So if the person on your behalf is putting
```

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

1    goggles and face shields for 65 weeks, you would
2    agree that that's excessive because it wasn't going
3    to take 65 weeks to repair your home, fair?
4            MR. MCKEEVER:  Object to the form.
5            Go ahead.
6            THE WITNESS:  I mean, I'm not sure what
7    the reason was, giving the 65, so I don't know.
8        Q   (BY MR. WAKEMAN) Okay.
9            MR. MCKEEVER:  It could have been a typo,
10   so...
11           THE WITNESS:  Okay.  Yeah, I'm not sure
12   about that.
13       Q   (BY MR. WAKEMAN) A typo that still resulted
14   in an excessive amount of money for goggles and face
15   shields?
16           MR. MCKEEVER:  Right.  Which I don't think
17   made it in his report, so...
18       Q   (BY MR. WAKEMAN) Then if you look down, you
19   see earplugs, do you see that?
20       A   Yes.
21       Q   Okay.  What amount of money does this
22   person have for earplugs?
23       A   $6,240.
24       Q   So if you came to me and you hired me as a
25   contractor to do work at your home and I said, "Hey,

1  man, I'm going to do to need $6,240 for earplugs,"

2  would you have a problem for that?

3      A    It is possible.  I mean, you know, the

4  thing -- I don't know what anybody charged.  I see

5  it broke down here, but if you came and that was

6  just in the quote that you give me, then there's not

7  really a whole lot of argument I can do; I'm going

8  to accept the job, because if you don't break it

9  down, then I'll never know it's there, so it's

10  really hard for me to say if I would have a issue

11  with it.  Of course, you see it, so it's easy to

12  have an issue with it, you know, you see $6,240,

13  so...

14      Q    You won't get any argument out of me.

15      A    Right.

16      Q    So my question would be:  Do you think

17  it's reasonable -- or would you agree that it's

18  reasonable for State Farm to question this charge?

19      A    I mean, yeah.

20      Q    $6,240 for earplugs, to do work on your

21  home, you would agree it would be reasonable for

22  State Farm to question that charge?

23      A    Yes.

24      Q    Okay.  Appreciate that.

25          And do you see there it says 52, under

```
 1   Weeks?

 2       A    Yeah, I do.

 3       Q    And so if you would agree that, if it's

 4   supposed to be 24 to 25 weeks to do your home, then

 5   that would probably be excessive, would you agree

 6   with that?

 7       A    Yes.

 8       Q    All right.  Then if you turn the page, you

 9   see at the top where it's 30,000, that's $30,000 for

10   someone to go wave flags out on the street for

11   traffic, and if I told you -- again, you come to me

12   to do work on your home, I said, "Hey, man, I'm

13   going to need $30,000 to send my cousin out there to

14   wave a flag to make sure that everybody sees that

15   we're working," would you have a problem with that?

16            MR. MCKEEVER:  Object to the form.

17            Go ahead.

18            THE WITNESS:  It's 25 weeks.

19       Q    (BY MR. WAKEMAN) I'm not talking about the

20   25.  I get it, I get that's six months, I get it.

21       A    Right.

22       Q    So I'm telling you, if I said, "Hey" --

23       A    Yeah.

24       Q    -- "I need $30,000 to send my cousin out

25   in the street with a flag," are you going to pay it,
```

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

1    I mean, what would you do in response?

2        A    Right, I would just -- I mean, like I

3    said, I would just have to get other quotes on what

4    other kind of general labor is doing, and if that's

5    a part of it, then that's just something I have to

6    deal with, and if it's not, then I have a decision

7    to make.

8        Q    So let me ask you this, do you see down

9    there, that $60,000 charge?

10       A    I do.

11       Q    The guys that came out to do the work on

12   your home, the electrical work, did you pay them

13   $60,000?

14       A    I'd just have to -- I would just have to

15   look at those invoices.

16       Q    You're telling me, as we sit here, you

17   have no recollection of whether you paid those guys

18   60 grand to do work on your home?

19       A    The way it was, it was broke down in

20   sections, so I just got to look and see exactly what

21   the total price was.

22       Q    So did you -- because this is -- this

23   60,000 is in addition to any work they would do,

24   this is just to have somebody at the breaker,

25   basically turning it on and off.

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

```
 1          A     Oh, I can't say that.

 2          Q     So if I said, "Hey, man, I'll do your

 3    electrical work, but I've got to pay my cousin 60

 4    grand to sit at the breaker and turn it on and off,"

 5    I mean, would you kind of go, "Wait a minute, hold

 6    on"?

 7          A     Right.

 8          Q     Do you have any problem with State Farm

 9    questioning that amount of money?

10          A     I don't.

11          Q     Okay.  I mean, it's not unreasonable for

12    them to be like, that's a lot of money --

13          A     Right.

14          Q     -- for this, right?

15          A     Uh-huh.

16          Q     You would agree with that?

17          A     Right, yes.

18                (Break taken from 3:18 p.m. to 3:27 p.m.)

19          Q     (BY MR. WAKEMAN) Mr. Collins, you

20    understand you're still under oath?

21          A     Yes, sir.

22          Q     We left, we were talking about

23    Mr. Dandridge's safety report, okay?

24          A     Yes, sir.

25          Q     I handed that safety report to you as
```

1    Exhibit 3, okay?

2              (Exhibit 3 marked for identification.)

3        A    Yes.

4        Q    All right.  So I'll represent to you that

5    Mr. Dandridge's safety report is above and beyond --

6    well, strike that.

7              Let me ask you to turn to -- keep going a

8    couple more pages.  Keep going.  It's going to be --

9    it's going to be the page before the page where

10   there's pretty much no data, so keep going.  Yeah, I

11   think it's that page.  Does that page, at the

12   bottom -- do you see at the bottom where it says

13   "Total"?

14       A    Yes.

15       Q    Do you see that large number there?

16       A    Yes, sir.

17       Q    What's that number?

18       A    $166,236.

19       Q    And so that is the total amount for costs

20   Mr. Dandridge has identified for applying certain

21   safety measures, okay?

22       A    Yes, sir.

23       Q    Would you agree, based on going through

24   this, that it would at least be reasonable for State

25   Farm to question that number and look at that

```
 1   number?

 2        A    Yes.

 3        Q    All right.  So then this is Defendant's

 4   Exhibit Number 5.  I asked you earlier if you knew a

 5   Darrell Smith.

 6             (Exhibit 5 marked for identification.)

 7        A    Okay.

 8             MR. MCKEEVER:  It's Dewayne, right?

 9        Q    (BY MR. WAKEMAN) Is his middle name

10   Darrell?  I think it's Dewayne Darrell Smith.

11             MR. MCKEEVER:  Yeah, and it may be Darrell

12   Dewayne Smith.

13             MR. WAKEMAN:  I thought Darrell Dewayne

14   Smith.

15             MR. MCKEEVER:  It maybe I just call him

16   "Mr. Smith."

17        Q    (BY MR. WAKEMAN) In any event, Mr. Smith,

18   this is his report, okay?

19        A    Okay.

20        Q    This was recently provided to us by your

21   counsel.

22        A    Okay.

23        Q    Mr. Smith is a public adjuster that's been

24   retained to provide testimony in this case, okay?

25        A    Yes.
```

```
 1        Q     Okay.  Do you recall your communications
 2   with Ian with regard to filing a lawsuit?
 3        A     I don't recall them.
 4        Q     Did you have them and you just don't
 5   recall them, or do you just don't recall either way?
 6        A     I mean, I'm pretty sure we had them.
 7        Q     Did Ian ever represent to you that he was
 8   acting as your attorney?
 9        A     No, he did not.
10        Q     Did you withhold any communications from
11   production because you felt like Ian was acting as
12   your attorney?
13        A     From production?
14        Q     Yeah, in giving me, like, did you -- do
15   you have a recollection of looking at some emails
16   and say, "Oh, that's Ian, he's my attorney, I'm not
17   going to give those"?
18        A     No.
19        Q     Okay.  Have you ever filed for bankruptcy?
20        A     No.  No.
21        Q     Has your wife ever filed for bankruptcy?
22        A     Hers is like 2007, we attempt -- we
23   attempted, but we backed out, so we didn't file, but
24   she's filed bankruptcy; I don't know when that might
25   have been.
```

```
 1        Q    Did you ever file a document for
 2   bankruptcy but not obtain a bankruptcy?
 3        A    Yes.
 4        Q    Okay.  To me, that's filing for
 5   bankruptcy.
 6        A    Okay.
 7        Q    So with that caveat, so you filed a
 8   document for bankruptcy?
 9        A    Uh-huh.
10        Q    Is that correct?
11        A    I guess.
12        Q    I mean, I don't know, did you file for
13   bankruptcy?
14        A    I don't know; as far as I know, we didn't
15   go through with it.  I called a bankruptcy lawyer
16   and told him never mind, we're not going to do it,
17   so that just canceled everything out.  I never went
18   to court, I never did anything.
19        Q    So why was it you called the bankruptcy
20   lawyer and said, "Hey, we're not going to do this"?
21        A    Because I didn't need to file.
22        Q    And that was the only reason?
23        A    Yeah.  So what happened was, during the
24   process -- the only reason I thought I had to go
25   through bankruptcy was for FSA and trying to get
```

1  approved it.  Did you approve the filing of this

2  document?

3      A    I did not, but again, if there's somewhere

4  you can tell me to go that would make -- bring back

5  anything, then I'm willing to do that.

6      Q    So do you remember the attorney you hired

7  to file this document?

8      A    I do.

9      Q    What's his name, or her name?

10     A    I believe it was Jeff Potts.

11     Q    Jeff Potts?

12     A    Uh-huh, met with him just a handful of

13 times, if that.

14     Q    All right.  Let's go to -- well, let's

15 look at the date at the bottom.  What day was that

16 filed?  Do you see that file date down at the

17 bottom?

18     A    I do.

19     Q    What date is that?

20     A    10/12/17.

21     Q    Okay.  Look at page 24 for me.  See that

22 down at the bottom, "Household goods and

23 furnishing," do you see that?

24     A    Yes, I do.

25     Q    And so Mr. Potts, is that right,

1    Mr. Potts?

2        A    That's correct.

3        Q    Is identifying, at the time of the

4    bankruptcy, this is the amount of household goods

5    and furnishing you own, okay?

6        A    Okay.

7        Q    And so I'll represent to you that, as of

8    10/12/17, he's representing to the bankruptcy court

9    that your household and furnishing total $8,220

10   okay?

11       A    Okay.

12       Q    Is that an accurate number?

13       A    It's not accurate of what -- I don't know

14   what it was then, I have no idea.

15       Q    Okay.  Then if you turn the page, personal

16   clothing, as of 10/12/2017, Mr. Potts is

17   representing to the bankruptcy you have $2,500 worth

18   of personal clothing.  Is that an accurate number?

19       A    That's not an accurate for me, but for

20   Mr. Potts, he's the bankruptcy lawyer, so...

21       Q    So are you saying that this bankruptcy

22   filing that was in the United States Bankruptcy

23   Court in the Eastern District of Oklahoma that was

24   done on your behalf, as it relates to the household

25   personal clothing you had at the time of the filing

1      A    Uh-huh.

2      Q    **Does it say "none" or "no," it says "no,"**

3 **correct?  See at the very top, "7:  Electronic,**

4 **televisions, radios, audio, visual, stereos and**

5 **digital equipment, computers, printers, scanners,**

6 **electronic devices" --**

7      A    Yeah, that's what it says.

8      Q    **-- "including cell phones, cameras, media**

9 **players, games," it says, "no."  Correct?  You see**

10 **that?**

11     A    Yes, that's correct.

12     Q    **As of 10/12/17, is it accurate to say you**

13 **had no TVs, any of those items in your possession**

14 **that you owned?**

15     A    It's just accurate to say that I'm not

16 sure what it takes for Mr. Potts to do a bankruptcy

17 case, so I'm not sure where he got that from.

18          MR. WAKEMAN:  Will you read my question

19 back, please?  Because I mean, you can spin it

20 however you want, you can say it --

21          THE WITNESS:  Right.

22          MR. WAKEMAN:  -- but I'm going to ask the

23 question; we'll just keep going.

24          THE WITNESS:  Okay.

25     Q   **(BY MR. WAKEMAN) And I'll preface this, I**

 1   don't care if it's right or wrong, I don't care if

 2   Mr. Potts screwed up, I don't care, I'm just asking

 3   you personally, if at the time of October 12, '17,

 4   did you, in fact, own televisions or radios or cell

 5   phones, did you own those at the time of 10/12/17?

 6        A    I have no idea.

 7        Q    You don't recall if you owned --

 8        A    I have -- I do not recall.  We are in

 9   2023, you're taking it back to 2017, I have no

10   recollection.

11        Q    So we're going to be in front of a jury --

12        A    That's fine, I'm ready for the jury.

13        Q    -- and I'm going to ask you:  "Hey, man,

14   back in 20/12 of '17, did you own TVs and cell

15   phones?"

16             And you're going to look the jury in the

17   eye and say, "I don't remember"?

18        A    Exactly.

19        Q    Okay.

20        A    I'm going to remember my son's dog dying,

21   based on State Farm and what they done.

22        Q    Obviously, what is being represented to

23   the bankruptcy court is that you did not own those;

24   is that correct?

25        A    Whatever, you got the paperwork, sir.  I'm

1   looking at the same thing you're looking at.  I got

2   the jury, though, don't worry about them, I can

3   handle them.

4       Q    Do you remember the Court ordering you

5   turn over financial information, do you ever recall

6   that happening?

7       A    I don't.

8       Q    Okay.  All right.  Do you remember

9   receiving that document?

10           (Exhibit 12 marked for identification.)

11      A    I never received this document.

12      Q    So you don't -- do you recall Mr. Potts

13  ever saying, "Hey, man, we've got to give these

14  people information"?

15      A    I don't recall Mr. Potts saying anything

16  to me after I left the courthouse that day.

17      Q    Which day?

18      A    The only day I went.

19      Q    Which day was that?

20      A    I have no idea.

21      Q    What did you go for?

22      A    Bankruptcy.

23      Q    And what did you do at the courthouse that

24  day?

25      A    Told Mr. Potts we no longer needed him.

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com

```
 1        Q    Okay.  Was that a hearing?  Do you have a

 2   recollection of what?

 3        A    No hearing.

 4        Q    All right.  Let's do this.  Exhibit 13.

 5             Is Mr. Potts still alive or pass away?

 6             (Exhibit 13 marked for identification.)

 7        A    I have no idea.

 8        Q    Number 12 is the order to turn over

 9   documents and records.  Let me do this, because I --

10   have you ever seen that document --

11        A    Never seen it, sir.

12        Q    -- ordering you to --

13        A    No, sir.

14        Q    Can you let me finish my question, please?

15        A    Yes, sir.

16        Q    Have you ever seen the document that

17   orders you to turn over the financial information

18   identified therein?

19        A    No, sir.

20        Q    Now, Exhibit 13 is the complaint filed of

21   bankruptcy trustee in your bankruptcy.  Have you

22   ever seen that document?

23        A    No, sir.

24        Q    Turn the page for me -- actually, let me

25   start with four.  Paragraph 4 states that, "Although
```

```
 1    the debtors partially complied with the orders,
 2    other items requested were omitted, particularly
 3    with regard to bank statements, transfers of
 4    property and insurance about an insurance settlement
 5    the debtors received shortly before the petition was
 6    filed in the amount of approximately $66,000 and the
 7    disposition of those proceeds.  Further, the debtors
 8    have failed to communicate with their attorney or
 9    corporate with the trustee in regards to trustee's
10    investigation," or "of the financial affairs of the
11    debtors."
12            Did I read that accurately?
13        A    Looks like you did.
14        Q    Okay.  Do you have an understanding of
15    what insurance settlement the bankruptcy trustee is
16    referencing?
17        A    Possibly.
18        Q    Which one?
19        A    I don't know which one.
20        Q    You don't know which one?
21        A    No.
22        Q    Is that because you had multiple insurance
23    settlements around that time?
24        A    Not that I'm aware of.  I don't know what
25    time it was.
```

1      Q    So you don't recall any insurance

2   settlements around that time?

3      A    I don't.

4      Q    What about the ones we went through

5   earlier with your claims that we talked about --

6      A    I'm not sure.

7      Q    -- the various fires and the other stuff?

8      A    I understand.

9      Q    Could it have been one of those claims or

10  could it have been a different claim?

11     A    I have no idea, sir.

12     Q    And then 5, in order for examination

13  pursuant to Fed R Bank P, that's a site, 2004, was

14  entered on February 13, 2018.

15          All right.  Did you recall the bankruptcy

16  -- the Court issuing an order requiring you to sit

17  for an examination under oath?

18     A    I do not.

19     Q    Do you recall failing to appear for that?

20     A    I do not.

21     Q    Okay.  It says, "Debtor's counsel appeared

22  and informed the trustee that he attempted to notify

23  the debtors by mail and by telephone and received no

24  response from the debtors."

25          Okay.  Do you recall that being attempted

 1   by mail or telephone?

 2       A    I do not.

 3       Q    Did you have a landline at that time?

 4       A    Who knows.

 5       Q    I mean, you represented to the bankruptcy

 6   court that you didn't have any cell phones --

 7       A    Right.

 8       Q    -- so I'm just wondering if you had a

 9   landline that he was communicating with you on.

10       A    Understood.

11       Q    Did you have a landline?

12       A    I'm unaware.

13       Q    Okay.

14       A    No, sir.

15       Q    "Further, the trustee attempted to contact

16   the debtors by telephone on the record and

17   Mr. Collins appeared to answer, but then

18   disconnected the call when the trustee identified

19   himself."

20            Do you recall hanging up on the bankruptcy

21   trustee, who was trying to contact you on the date

22   of your examination?

23       A    I do not.

24       Q    Then 6, "The trustee believes that the

25   debtors may have been engaged in activities that may

1    be related to insurance and bankruptcy fraud."

2            Do you see that?

3       A    I do.

4       Q    So what do you have to say about the

5    bankruptcy trustee alleging you had committed --

6    been engaged in activities that could relate to

7    insurance and bankruptcy fraud?

8       A    I believe they have places for people that

9    do anything fraudulent and I'm here talking to you,

10   so obviously it must have just been an allegation

11   that, for whatever reason, that's what he felt, sir.

12      Q    Is that in any reason why you dropped the

13   bankruptcy?

14      A    You asked me if I knew about it, sir, my

15   answer was "no."

16      Q    So my follow up, just to be crystal clear,

17   is that the reason you dropped the bankruptcy, what

18   the bankruptcy trustee identifies in the complaint?

19      A    I never knew any of those allegations

20   until today, sir.

21           MR. WAKEMAN:  What time are we at?

22           MR. MCKEEVER:  I've got 4:22.

23      Q    (BY MR. WAKEMAN) I previously marked

24   something Exhibit 14, I think, that was that proof

25   of loss; can you grab that for me, please?

```
 1                MR. MCKEEVER:  You just don't have
 2   receipts for those.
 3                MR. WAKEMAN:  What's that?
 4                MR. MCKEEVER:  You just don't have the
 5   receipts for those, that's what I'm remembering.
 6        Q   (BY MR. WAKEMAN) All right.  And so the
 7   cost to replace these items, like the fridge,
 8   $2,150, right?  So is that what you spent to replace
 9   them, or is that what you valued the items as they
10   were at the time of the fire?
11        A    Yeah, I'm sure I spent a lot more to
12   replace them.
13        Q    So $2,150 for the refrigerator is what it
14   was worth at the time of the fire?
15        A    That's correct.
16        Q    Okay.  So the oven was worth $999.95 at
17   the time of the fire, the built-in oven, electric,
18   correct?
19        A    That's what it says.
20        Q    Microwave oven was worth $249.95 at the
21   time of the fire, correct?
22        A    Yes.
23        Q    That's what you believed it to be worth --
24        A    Yes.
25        Q    -- at the time of the fire?
```

```
 1        A      That's correct.

 2        Q      And the cooktop stove you believe to be

 3   valued at $769.95 at the time of the fire?

 4        A      Yes.

 5        Q      And the dishwasher, built in, you

 6   believed, at the time of the fire, to be worth

 7   $595.95?

 8        A      Yes.

 9        Q      And the refrigerator, at the time of the

10   fire, you believed to be worth $2,150?

11        A      Yes.

12        Q      And the washer, at the time of the fire,

13   you believed to be worth $649.95?

14        A      Yes.

15        Q      And the dryer, at the time of the fire,

16   you believed to be worth $649.95?

17        A      Yes.

18        Q      Pull the bankruptcy petition out for me,

19   please.

20        A      Never put it up.  I don't know which one

21   that is, actually.  It's one of these.

22               MR. MCKEEVER:  It's this.

23        Q      (BY MR. WAKEMAN) So if you look at page 24,

24   you see 24?

25        A      That is correct, yes.
```

1       Q    So at least the filing would suggest that
2   your washer and dryer was worth $600 at the time,
3   okay?  You see that?
4       A    Okay.
5       Q    And $600 off what you believed it to be
6   worth at the time of the fire, agreed?
7       A    That's what he has.
8       Q    Okay.  And I'm just saying -- I
9   understand.  I'm just asking if you agree that it's
10  $600 less than what you believed it to be worth at
11  the time of the fire, fair?
12      A    I don't know, I just got to figure out
13  when we bought those washers and dryers and if it's
14  the same stuff.  I don't even know if it's the same
15  stuff he has on here, so --
16      Q    So are you changing your testimony that
17  you just gave me earlier?
18      A    I'm not changing anything.  I'm unsure.
19      Q    Well, I mean, let's do this, you have the
20  fridge at -- representing to State Farm that you
21  believe the fridge to be worth $2,150 at the time of
22  the fire, but it's represented to the bankruptcy
23  court that the fridge and stove only are worth $650,
24  do you see that discrepancy?
25      A    I'm not sure it's the same fridge and

```
 1    stove, so I'm unsure.
 2         Q    Well, if you look at the -- if you look at
 3    -- go back to the list of items that you had that I
 4    -- okay?  And if you -- will you tell me what year
 5    age you have identified for those kitchen items that
 6    were purchased at Hahn Appliance?
 7         A    The kitchen items.
 8         Q    It's probably the third page in.  There
 9    you go.
10         A    Five years.
11         Q    So you're representing that, as of
12    January 26, '21, you're representing to State Farm
13    that those items are five years old?
14         A    That's what it says.
15         Q    Okay.  So are you telling me that the
16    information -- so is there a discrepancy in the
17    information?
18         A    Who knows.  State Farm said, do your best,
19    that's what they tell you, do your best at
20    recognizing the time frame, do your best, if you
21    don't know, just do your best at guessing, that's
22    what we do.
23         Q    So do you have any explanation as to why
24    your bankruptcy filing notes the refrigerator and
25    stove is $650, but yet your proof of loss represents
```

```
 1    the refrigerator and stove is $2,150 for the fridge

 2    and the stove is $769.95, do you have any

 3    explanation?

 4         A    Zero explanation.

 5         Q    Huh?

 6         A    Zero.

 7         Q    You have zero explanation?

 8         A    Zero explanation.

 9         Q    So any discrepancies between the items

10    you're representing in the bankruptcy court and the

11    value as it relates to the items of the value you

12    represent to State Farm, you have no explanation?

13              MR. MCKEEVER:  Let me object to the form.

14         Q    (BY MR. WAKEMAN) Go ahead.

15         A    Huh?

16         Q    Go ahead.

17         A    State Farm, they know where I live, they

18    can come in the house and they can get their own

19    numbers.

20         Q    I'm just asking you if you have any

21    explanation as to the --

22         A    I'm not on trial for bankruptcy, but as

23    far as what I gave State Farm, they can come to the

24    house and get they own prices on the things I have

25    there.
```

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com