```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF OKLAHOMA

 3

 4

 5   (1) GEORGE COLLINS and      )
     (2) ALRIKA COLLINS,         )
 6                               )
                                 )
 7        Plaintiffs,            )
                                 )
 8   v.                          )  No. 22:cv-00318-RAW-JAR
                                 )
 9   (1) STATE FARM FIRE AND     )
     CASUALTY COMPANY            )
10                               )
          Defendant.            )
11                               )
     _____)
12

13

14

15

16        DEPOSITION OF KEVIN CHESTER DANDRIDGE

17             30(b)(6) 1 LIFE SAFETY

18                 Phoenix, Arizona
                   October 30, 2023
19                    8:23 a.m.

20

21

22

23   REPORTED BY:
     Kate E. Roundy, RPR
24   Arizona Certified Reporter
     Certificate No. 50582
25
```

**EXHIBIT 5**

```
 1                         I N D E X

 2   WITNESS                                              PAGE

 3   KEVIN CHESTER DANDRIDGE

 4        EXAMINATION BY MR. BROWN                          4

 5        EXAMINATION BY MR. MCKEEVER                      126

 6

 7

 8

 9

10

11

12                       E X H I B I T S

13    NO.          DESCRIPTION                           PAGE

14   Exhibit 1    Subpoena to Produce Documents,           7
                  Information, or Objects or to Permit
15                Inspection of Premises in a Civil
                  Action
16
     Exhibit 2    August 30, 2023, letter regarding       12
17                Subpoena to Produce Documents,
                  Information, or Objects to Permit
18                Inspection of Premises in a Civil
                  Action
19
     Exhibit 3    Safety Review Plan, Bates Nos.          56
20                COLLINS_000273 to 330

21

22

23

24

25
```

GEORGE COLLINS, ET AL. vs STATE FARM FIRE AND CASUALTY COMPANY
30(b)(6)                30(b)(6) Kevin Chester Dandridge on 10/30/2023        Page 23

 1      A.    I have no problem doing that.

 2      Q.    How much have you been paid for your work in this

 3  claim?

 4      A.    A thousand.

 5      Q.    Is that just a flat rate?

 6      A.    It's a flat rate.

 7      Q.    And I think you said this was a partial plan, or

 8  something along those lines, earlier?

 9      A.    It's a review process.  It's where I take their

10  documentation -- I mean, they, as the person that's hiring

11  me -- review what they have, look at their pictures, their

12  writings, and write up a report from their pictures or --

13  as well as Google Earth and their documentation that

14  they -- like I said, that they provide.

15          I do not walk the jobsite on a review.  I don't

16  travel to the jobsite.

17      Q.    And that's just a flat rate?

18      A.    Correct.

19      Q.    Is there -- in addition, if they wanted you to do

20  more in a particular case, do you have another level up

21  that you prepare a different report or a different type of

22  work?

23      A.    The two main reports that I do are reviews and

24  protocols.

25          A protocol is a -- I walk the jobsite.  I usually

 1  meet with my client that's hiring me and look at the whole

 2  scope of the work, what it's going to take.

 3          For residential, it is usually just a review

 4  process.  They're smaller, actually easier.  They're not

 5  too in-depth.

 6      Q.    How much is a protocol?

 7      A.    5,000 flat fee plus travel.

 8      Q.    And would you agree with me that if you actually

 9  went to the jobsite, you would have a better understanding

10  of what the loss was or what repairs, protocols need to be

11  in place versus relying on someone providing you some

12  pictures?

13      A.    Yes.  I can get an actual visual on all aspects

14  of the job, power lines, sewers.

15      Q.    Were you ever asked to do a protocol in this

16  case?

17      A.    Not a protocol, no.

18      Q.    You were simply asked to review the documents

19  that were given to you and prepare your safety plan; true?

20      A.    Correct.

21      Q.    And were you hired by Mr. Rupert?

22      A.    I was hired by Mr. Rupert.

23      Q.    Have you worked with Mr. Rupert before?

24      A.    Not on this -- not before this job, no, I don't

25  think so.

 1  the work's going to be done more than -- because I don't

 2  want to be -- I don't want to be brought in or claimed

 3  that I'm trying to alter or justify what they've said.

 4          You know, if they say it needs a reroof, then I

 5  write up safety for reroofing.

 6          If they say they have asbestos in it -- now, if I

 7  do get an asbestos documentation, you know, a report, I

 8  read through it to see what the levels are, to see if it's

 9  an acceptable level or not.  I mean, mind you, there's not

10  really an acceptable level.  There is more on lead than

11  there is asbestos, but to see how we want to attack it.

12  And I mean that in the fact of is it one room, is it the

13  whole building, is it -- how are the rooms tied together,

14  how hot are they so we can write up a program for that.

15      Q.   Is it fair to say that what you were provided

16  that's contained in your report was based on information

17  given to you by Mr. Rupert?

18      A.   Yes.

19      Q.   And Mr. Rupert only?

20      A.   Yes.

21      Q.   Do you know -- do you know how big this claim

22  file is?

23      A.   How big it is?  Cost-wise, no, I don't.

24      Q.   No, that's a silly question.

25      A.   Okay.

GEORGE COLLINS, ET AL. vs STATE FARM FIRE AND CASUALTY COMPANY
30(b)(6)                    30(b)(6) Kevin Chester Dandridge on 10/30/2023                    Page 60

1  off and replaced, an R&R, how to safely do that for that

2  building.

3          Say a building across the street would definitely

4  be scaffolding for a single-story residential.  There may

5  be some scaffolding involved, depending on the height of

6  the wall.

7          Those things, in my mind's eye, if they come to

8  an agreement they're not going to replace the siding, both

9  parties do, and they can take that cost out.

10     Q.   Yeah, you're are not making claims decisions?

11     A.   Not at all.

12     Q.   And people do have disputes all the time about

13  what's covered or what may not be covered true?

14     A.   Correct.

15     Q.   Your job is -- has nothing to do with that.

16          Your job is if this is done, this is what I

17  recommend be done to safely do the job?

18     A.   Correct.

19     Q.   And this might be the cost that I assign to that?

20     A.   Correct.

21          Like on my cost sheets, I will put -- the way I

22  have it designed is weeks of work, how many weeks.

23          I have been in depositions where they're like,

24  well, the GC is saying you put 26 weeks.  They're saying

25  they can do it in 24 weeks.  I question -- I work

GEORGE COLLINS, ET AL. vs STATE FARM FIRE AND CASUALTY COMPANY
30(b)(6)                30(b)(6) Kevin Chester Dandridge on 10/30/2023                Page 77

 1  plan; correct?

 2      A.   I do.

 3      Q.   And would you agree with me, sir, that this is

 4  more of a training manual or a checklist on safety

 5  protocols versus an actual estimate?

 6      A.   It is.  It's more of a review of what I saw and

 7  what I was told the work was going to be done.

 8           So this is what we are going to need to do that

 9  work.

10      Q.   And when you say what you saw, that was what

11  Mr. Rupert provided you; true?

12      A.   Correct.

13      Q.   Is this report, sir -- when I read this report,

14  it seems like this is kind of a template that you use over

15  and over; true?

16      A.   There is a template to my report as well as

17  others.  You know, many people use a base that they start

18  off with.

19      Q.   I mean, there's a lot of things in here that are

20  listed for just basics, safety guidelines, things of that

21  nature?

22      A.   There is.

23      Q.   Has nothing to do with Collins particular loss,

24  but just an overall safety general guideline checklist

25  kind of thing --

 1          Do you know if the Collins ever employed a

 2  general contractor?

 3      A.   No.

 4      Q.   Okay.  Page 47, please.

 5           This is where we get into PP equipment?

 6      A.   Yes.

 7      Q.   We discussed the mask situation earlier?

 8      A.   We did.

 9      Q.   You also have on here rubber gloves,

10  approximately $2300 for 25 weeks.

11           And I think your position was that was for debris

12  removal, the carcinogens from the fire?

13      A.   Yeah.  So --

14      Q.   Is that the basis for that?

15      A.   Yeah.

16      Q.   Do you know -- do you think it would take

17  25 weeks to remove that debris?

18      A.   Not just for removal of the debris.  I mean, you

19  should wear rubber gloves when painting because -- keeping

20  your hands clean and keeping out from underneath your

21  nails and then eating it later.

22      Q.   So there are more reasons for rubber gloves

23  besides the carcinogens?

24      A.   Yeah.

25      Q.   Painting is one?

```
 1      A.   Painting can be one, yes.

 2      Q.   Do you know of any painters that wear rubber

 3 gloves when they paint?

 4      A.   I do.

 5      Q.   Do you believe that is...

 6      A.   Common practice?

 7      Q.   Common?

 8      A.   No.

 9      Q.   What other reasons would there be for use of

10 rubber gloves for 25 weeks?

11      A.   Oh, I don't know off the top of my head.

12 Depending on the work that's being done.

13      Q.   You have leather gloves on there, cut-proof

14 gloves?

15      A.   Yeah.

16      Q.   At $9,000, approximately?

17           Well, that's exactly $9,000?

18      A.   It sure is, isn't it?

19      Q.   That's 50 units at $7.30 a pair, and that's for

20 25 weeks as well.

21           Are you in the opinion that these workers and

22 these laborers would need new leather gloves every week?

23      A.   Let me take a look at something real quick.

24      Q.   Sure.

25      A.   Because see, here's the thing, I'm going tell you
```

**GEORGE COLLINS, ET AL. vs STATE FARM FIRE AND CASUALTY COMPANY**

```
 1     A.   Could be.

 2     Q.   And it's your opinion that these laborers would

 3 need a new set of leather gloves every week; true?

 4     A.   Could be.

 5     Q.   Next page, we have face shields?

 6     A.   I'm going to pull this clip off so I can look at

 7 it.

 8     Q.   Okay.  You with me?

 9     A.   Yes.

10     Q.   Page 48?  Face shields with a cost of over

11 $20,000.  These are for 65 weeks.

12          Do you know why you have --

13     A.   I think --

14     Q.   -- 65 weeks?

15     A.   -- to be honest with you, I think I have a

16 mistype in that.

17     Q.   So that should be 25 weeks?

18     A.   If it was going to follow along with the rest of

19 the job at 25 weeks, yes.

20     Q.   Earplugs, 62.40?

21     A.   I've got a 52-week there.  I have a mistype at

22 52 weeks.  It should be 25 weeks.

23     Q.   And then you also have head protection.

24          I assume you're talking about hard hats; is that

25 correct?
```

 1     A.   I am.

 2     Q.   Sir, is it your opinion that gloves and goggles,

 3  hard hats, work clothes, for that matter, aren't standard

 4  equipment for contractors?

 5     A.   They are required equipment for contractors that

 6  are disposable.

 7     Q.   And if they have these materials already, if

 8  they're standard equipment, they already have a hard hat,

 9  they already have goggles and gloves, this estimate would

10  not be appropriate for the Collins; true?

11     A.   Not true.

12     Q.   Why not?

13     A.   Again, because it's all disposable.

14          If -- let's -- I know in the real world, a

15  foreman is a foreman.  He has a hard hat.  He has his

16  gloves.  He has his vest.  He stays with -- he's with the

17  company.  He's a foreman for the company.  He'll probably

18  be there quite a while.

19          The laborer, they float in and out.  I can have a

20  completely different labor crew every week.

21          And if they're being hired on, they have to be

22  issued the equipment.  I cannot take a hard hat from

23  worker 1 and give it to worker 2.  It's against the law.

24     Q.   Well, you don't know who the contractors are that

25  the Collins utilized; right?

```
 1    A.    I do not.

 2    Q.    So you don't know if those contractors provided

 3 their laborers with those materials; true?

 4    A.    I do not.

 5    Q.    And if they did provide those laborers with those

 6 materials and that was included in their cost, it wouldn't

 7 be appropriate for them to seek additional payment for

 8 those items; correct?

 9    A.    If -- if -- I'm sorry, can you restate that?

10    Q.    I hope.

11          If the contractor provided these materials,

12 gloves, masks, hard hat to their employees and that was

13 included in their cost, then it wouldn't be accurate to

14 then charge more -- or appropriate to charge more for

15 these items if they already had them; correct?

16    A.    It would not be accurate to charge for, say, a

17 hard hat if they already --

18    Q.    It'd be inflated?

19    A.    Excuse me?

20    Q.    It would be inflated; right?

21          If they already had a hard hat and you're

22 charging for a hard hat, that's inflated?

23    A.    That would be inflated.

24    Q.    If they already had gloves, they already had

25 masks, that was included in their cost?
```

 1    A.    I have no clue.

 2    Q.    You also have on here signage and flagmen in over

 3 $30,000.

 4          Do you see that?

 5    A.    Hold on.

 6          $30.

 7    Q.    30,000 towards the bottom, that's just general

 8 labor for a flagman?

 9    A.    Let's see.  We've got $30 an hour.  One person,

10 40 hours.

11    Q.    25 weeks?

12    A.    25 weeks.

13    Q.    And it's your opinion that the Collins need a

14 flagman outside their residence all day, every day for

15 25 weeks at a cost of $30,000?

16          Is that true?

17    A.    If there's moving equipment around -- normally on

18 a residential home, you have traffic driving around, you

19 know, cars coming in and around or kids, that kind of

20 stuff, so you would have somebody that would monitor on

21 that.

22          Now, I do -- because I Google Earthed the address

23 this morning, this is more of a country setting.

24    Q.    Yeah, it's out in the middle of nowhere.

25    A.    It's not in the middle of a neighborhood, so...

1  Q. So that should be --

2  A. I would say we should probably definitely adjust

3  that down.

4  Q. And that would have been helpful if Mr. Rupert

5  would have told you that information when you prepared

6  your report; true?

7  A. That is true.

8  Q. And that's why it would be more beneficial if you

9  actually went and looked at the project before you

10  prepared your report; true?

11  A. I would prefer to walk projects, yes.

12  MR. MCKEEVER:  Object to form.

13  MR. BROWN:  Sorry, Terry?

14  MR. MCKEEVER:  I made an objection.

15  MR. BROWN:  Okay.

16  MR. MCKEEVER:  But he answered anyway, so go

17  ahead.

18  MR. BROWN:  We got it.  We got you down.

19  BY MR. BROWN:

20  Q. And just one other point that I have.

21  Even if this was in the middle of a neighborhood,

22  you don't have the opinion that they'd need a flagman

23  there for the full tenure of the repairs, six months;

24  right?

25  A. No.  It to be honest with you, in reviewing -- in

 1  you need to look at this.

 2          They may look at this and say, I don't need a

 3  telehandler for 25 weeks.  I only need it for ten.  I

 4  don't need --

 5      Q.   Or I don't need it at all?

 6      A.   Or I don't need it at all.  And they can take

 7  that cost out.

 8          Again, this is strictly a guideline.  And I will

 9  say since this report was built and sent over, on the

10  first page of the cost sheet, there's a big side note that

11  says this is strictly for -- I can't say the exact term.

12  I would have to read it.  But this is an estimated, you

13  know, not a final cost.

14      Q.   Are you planning to travel down to Muskogee,

15  Oklahoma and testify in federal court as it relates to

16  this matter?

17      A.   I'm not planning on it unless you ask me to.

18      Q.   The pricing that you utilized when you mentioned

19  that you go through Home Depot and things like that?

20      A.   I do.  Because most people end up shopping there.

21      Q.   Is the pricing that you have in your report that

22  we're talking about today, is that pricing from Oklahoma

23  Home Depots, or is that pricing from Arizona Depots, or do

24  you know?

25      A.   I don't know off the top of my head if I looked

 1      A.   No, I did not.  I'm sorry, I thought you changed

 2  the end of the question.  I apologize.

 3      Q.   **And this report that you prepared, this safety**

 4  **plan you prepared was based on limited documentation you**

 5  **received from Ian; correct?**

 6      A.   Correct.

 7      Q.   **Your report and opinion doesn't provide anyone**

 8  **with information regarding the amount of damage sustained**

 9  **at plaintiffs' residence in January of 2021, does it?**

10      A.   No.

11      Q.   **But your estimate's almost $180,000 for repairs?**

12      A.   I think it was 160.

13      Q.   **Would you agree that your opinion's based on**

14  **limited information?**

15      A.   It is.

16           MR. MCKEEVER:  Object to the form.

17           MR. BROWN:  Other than you providing that

18  information we talked about earlier, I don't have any

19  further questions.  I appreciate your time.

20           THE WITNESS:  No.  Thank you.

21           MR. BROWN:  Terry, I'll pass the witness.

22           MR. MCKEEVER:  Okay.

23           I just have one -- I think it's a follow-up a

24  little bit on what counsel was asking you about on the

25  price list, because I just wanted to have an understanding