

# Berryman

426 N.W. 5TH
Oklahoma City, OK  73102
Off: (405) 235-4646
Fax: (405) 235-3311

June 23, 2023

Drew Brown
Atkinson, Brittingham, Gladd, Fiasco, & Edmonds, P.C.
1500 ParkCentre
525 South Main Street
Tulsa, Oklahoma 74103

**Re:    George Collins and
Alrika Collins,
Plaintiffs,**

**v.**

**State Farm Fire and
Casualty Company,
Defendant.**

**United States District Court for
the Eastern District of Oklahoma
Case #:  22-CV-00318-RAW-JAR**

Dear Mr. Brown:

The following report details to date my pertinent opinions and can be changed only in writing by the undersigned.  The following opinions are based upon my review of the documentation provided to me and the observations made during my inspections of the subject property conducted on September 8, 2021 and May 19, 2023.  In forming my opinions, I utilized my twenty-five (25) years of experience as an evaluator and estimator of property damage as well as my formal education, training, and knowledge previously acquired including but not limited to: building codes, governmental regulations, and construction standards. I reserve the right to supplement this report to address additional information made available to me.
.

EXHIBIT
**6**

1312 West 60ᵗʰ Street North                                                    June 23, 2023
Muskogee, Oklahoma                    COLLINS v. STATE FARM                    Page 2

## DOCUMENTS REVIEWED

- Scheduling Order
- Claim file Bates stamped Collins CL 36-15K5-35N 0001 – 8116
- Petition
- Wagoner County Assessor Website for Account #730015478
- Google Earth
- Xactimate software program and guidelines.
- Xactimate White Paper, "Overhead and Profit," 2/5/2020, pages 1-4.
- "Pricing Research Methodology," published by Xactware Solutions, dated 2/6/18.   https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf

## QUALIFICATIONS

In my time as a general contractor, I have performed numerous restoration projects for owners whose properties have sustained damages including those caused by fire and smoke.  I have routinely examined structures for the extent and cause of damages and submitted construction proposals to the public for the restoration of the owner's property. I have regularly estimated the construction costs and outlined the scope of work that has been an integral part of the firm's offers to contract for needed property restoration. For the last twenty-five (25) years, I have utilized Xactimate, a computerized estimating program, to determine the estimated cost of property damage restoration.[1]

I regularly interact with engineers, architects, and building code officials when determining the extent of damages and developing the proper scope of repairs. In the course of business, I have frequently interfaced with insurance professionals, and I have developed a keen understanding of the customary means, methods, and pricing for the repair of damaged real property.

---

[1] Xactimate is considered to be an industry standard and is utilized by most restoration contractors and the majority of insurance carriers in the United States and Canada to estimate the anticipated cost to restore property damages, including those repairs needed to correct damages caused by storm activity.

## **DESCRIPTION**

The subject property is located at 1312 West 60th Street North in Wagoner County. It is situated on approximately 25 acres north of the city of Muskogee, Oklahoma. The structure was reportedly constructed in 2016.  It is a two-story residence with approximately 3,453 square feet (SF) of living space. The three-car garage provides an additional 937 SF to the structure.[2]

The residence was constructed with dimensional lumber set upon a cast-in-place concrete foundation and slab-on-grade.  The exterior cladding is a combination of brick, stone, and painted hardboard siding.

The style of roof framing is mostly a gable design with two shed style roofs over the front and back porches. The roof is covered with a laminated, composition shingle installed over wood sheet decking with a radiant barrier backing. The pitch of the roof ranges from 5/12 at the sheds and main two-story to 12/12 over the garage end of the house.  The property faces the south.



Front of the subject residence.

---

[2] Wagoner County Assessor. Account #: 730015478

1312 West 60th Street North                                              June 23, 2023
Muskogee, Oklahoma              COLLINS v. STATE FARM                     Page 4



An aerial view of the courtesy of Google Earth

The master bedroom is located on the main level and includes a bathroom, as well as, his and her closets. The main level also includes a kitchen with breakfast, laundry room, living room, formal dining room, office, and a powder bathroom. The main stairs lead to three additional bedrooms and two full bathrooms. A back stairway leads to a separate second-floor area which includes two bonus rooms and another half-bathroom. These rooms are situated above the garage bays. The bonus rooms were reportedly used as an Exercise Room and Theater Room.

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 5



**Main Level**

6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 6 of 58

1312 West 60th Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 6



Level 2

## **BACKGROUND**

According to the Wagoner County Assessor, George L. and Alrika B. Collins (Collins) have been the sole owners of the residence located at 1312 West 60th Street North near Muskogee, Oklahoma. Collins obtained a Farm/Ranch insurance policy through State Farm Fire and Casualty Company (State Farm). The policy was assigned #36-B3-L971-9. On or about January 12, 2021, Collins submitted a claim to State Farm for fire damage at the property. The claim was assigned #36-15K5-35N. The date of loss was reportedly January 11, 2021. Other pertinent information to the matter includes:

1. The claim was assigned to State Farm claim representative, Heather Stanley (Stanley). Stanley inspected the subject property on January 14, 2021.

2. Stanley completed a damage estimate on or about February 17, 2021. The first estimate to repair the damage attributed to the fire totaled $249,269.80.[3]

3. State Farm received a notice of representation by a public adjuster, Ian Rupert (Rupert) of Ian's Enterprise LLC (Ian's) on or about March 29, 2021. The Letter of Representation was signed by Collins and Ian's on February 21, 2021.[4]

4. State Farm revised its estimate on June 28, 2021. The total of the revised estimate was $276,513.57.[5]

5. On or about August 2, 2021, State Farm received from Rupert a package of documents. Contained within the documents included amongst other items:

   • A report by Chad T. Williams, P.E. (Williams) of Valor Forensic Engineering Services.[6] The report, which was dated May 11, 2021, states the scope of work was to "Determine the extent of fire damage to the dwelling as a result of a fire reported on January 11, 2021".
   • A safety review report from Kevin Dandridge (Dandridge) of 1 Life Safety LLC.[7] The report was dated July 26, 2021.
   • A smoke evaluation report from Luke Hibbs (Hibbs) of The Mold Consultant LLC.[8] The report is dated June 11, 2021.
   • An Xactimate estimate prepared on Ian's letterhead and dated July 16, 2021. The estimate total for the Dwelling and Other Structures was $505,376.76.[9]

6. I was retained by State Farm to inspect the subject property and to prepare an estimate to repair the damage sustained by the fire on the date of loss. I inspected the subject property on September 8, 2021. An estimate totaling $317,328.20 was finalized on September 28, 2021.[10]

7. The State Farm subsequently revised its estimate increasing the total to $322,065.42.[11] The print date of this estimate was October 11, 2021.

---

[3] COLLINS CL 36-15K5-35N 2944 - 3029
[4] COLLINS CL 36-15K5-35N 1054
[5] COLLINS CL 36-15K5-35N 3252 - 3352
[6] COLLINS CL 36-15K5-35N 1427 - 1470
[7] COLLINS CL 36-15K5-35N 1573 - 1630
[8] COLLINS CL 36-15K5-35N 1631 - 1685
[9] COLLINS CL 36-15K5-35N 1689 - 1782
[10] COLLINS CL 36-15K5-35N 7374 - 7430
[11] COLLINS CL 36-15K5-35N 3761 - 3857



8. A lawsuit was filed by Collins on January 11, 2022.

*************************************************************************************

## DISCUSSION

Real property is often damaged by a multitude of incidents, e.g., fires, high wind events, hail, etc., and the size and nature of the losses can extend from small, relatively simple damage such as a vandalized door or window, to larger, more complex losses, such as fire and smoke damage. A property repair estimate should be viewed only as a reasonable approximation of the probable costs to accomplish the work and its formulation is not an exact science. The initial reconstruction estimate is a useful tool to advance the process of property restoration.

The initial estimate should be viewed as the starting point for the restoration process because it is common in the reconstruction industry for additional damages or construction needs to be identified and/or considered as the process progresses. For large losses, an exchange of multiple estimates between an insurance carrier and an owner's representative is common. In most cases the owner is represented by their selected contractor. The contractor typically begins restoration project as soon as an agreed scope of work and price is reached. It is typically understood that the agreed scope of work includes items that may change as the repairs are being made, e.g., a bathtub believed cleanable must instead be replaced after the attempt to clean has been made and was unsuccessful. Revised estimates are then created as supplements to the original agreed scope of work and price.[12] As a restoration contractor, I have participated in this process on hundreds of occasions.

*************************************************************************************

## INSPECTION OBSERVATIONS

The following were observations made at the subject property during the initial inspection on September 8, 2021.

## ATTICS:

1. The design of the subject structure resulted in different and separate attic spaces. Those attic spaces can be labeled as Attic 1 and Attic 2.

---

[12] Necessary supplements rarely exceed a small percentage of the initial agreed scope of work and price.



2. The design of each of the bonus rooms and these room's framing resulted in sloped ceilings. Behind the short walls of each room, heat and air equipment, including ductwork, had been installed. Although some areas of these attic spaces were somewhat separated from each other, they can still generally be considered one roof and attic space. The space of Attic 1 is within the red box below but outside the walls of the interior rooms depicted with the dark grey lines. The attic space is limited to the areas above first-floor rooms.

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 10



3. The follow diagram of the roof line identifies the locations within the roof's framing the fire damage was largely contained. The yellow lines represent the locations where stud wall (covered with sheetrock) and roof framing members aided in containing the fire and preventing the fire spreading to other sections of the roof and attic framing.



4. The following photographs demonstrate some of the framing damage in the second-floor bonus rooms and adjacent Attic 1 space.

1312 West 60th Street North                                                    June 23, 2023
Muskogee, Oklahoma                     COLLINS v. STATE FARM                    Page 12



The west wall and sloped ceiling of the exercise room with the attic space just beyond the
vertical stud wall framing members. This is near the reported fire origin.



The south wall of the movie room with the fire being contained behind the sheetrock  and
within the attic cavity.



The walk-in attic to the east of the theater room. This area suffered no fire damage.
Minimal smoke residue was evident.

5.  The traditional two-story construction above the eastern sides of the
    house resulted in an attic space (Attic 2) which is almost entirely
    separated from Attic 1.



Attic 2. Except for a small area at the gable wall, the fire did not reach this space.



The exercise room is located just beyond and partially below the window at the upper part of this photo. The fire burned through the triangular opening at the bottom and up to and around the window. This was the limit to the fire damage in Attic 2.

**ELECTRICAL:**

1. Two electrical breaker panels were situated in the one-car garage at the west end of the residence. The electrical home runs[13] ran up the wall of the garage and were distributed in varying directions in route to their dedicated circuit. Many of these wires were in the general area of the origin of the fire. It would reasonably be anticipated that many of these wires would be replaced due to exposure to the heat. However, it would not be necessary to replace all the wiring on that circuit. The wire could be replaced to a point where the wiring was no longer exposed to the fire and joined together within a junction box. This is a common practice in the fire restoration industry.

**SECOND FLOOR INTERIOR ROOMS:**

1. Both bonus rooms and the adjacent half-bathrooms sustained fire and smoke damage to the extent these rooms required the replacement of all finishes and some of the stud wall framing. The stairway which opened

---

[13] An electrical home run is a line of wiring which leads from the breaker panel to the first fixture on a circuit.

6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 15 of 58

1312 West 60ᵗʰ Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 15

into the exercise room also sustained fire damage to much of the finishes as well as to stud wall framing which was in the immediate area of the fire's origin.

2. The separated bedroom areas of the second-floor sustained far less damage. The three bedrooms, two bathrooms and closets exhibited minimal signs of smoke on the surface of the finishes. Carpeted areas likely needed replacement while the painted surfaces could be remediated with cleaning and painting. Other surfaces, e.g., fixtures, countertops, etc., could be cleaned. The west wall of Bedroom 2 was the closet to the fire damage in Bonus Room 1. Some smoke was present at the base of the wall and the fire department appeared to have inadvertently punctured a hole in the wall.



Upstairs Bedroom 1 had minimal soot settlement on the walls, doors, trim, lights, etc.



Bedroom 1 Closet with minimal soot present. A piece of the carpet and pad was removed to send to a third-party to determine the reasonable cost to replace the items.



The west wall of Bedroom 2. The hole in the wall appears to have been caused by the fire department when engaging the fire in Bonus Room 1 nearly on the other side of the wall.



The vanity of Bathroom 2 with minimal soot accumulation on the countertop and fixture.
This condition was similar in the other upstairs bathroom.

**MAIN LEVEL INTERIOR:**

1.  The fire had burned downward from the origin at the top of the stairs in the Bonus Room area. The fire damaged the finishes of the Garage Hallway and Laundry Room. Each of these rooms required the full replacement of the finishes including but not limited to: drywall, trim, cabinetry, floor tile, and light fixtures.



The approximate origin of the fire in the attic space above these rooms.

The fire burned through the wall of the stairs causing fire damage in these rooms.

2.  The ceiling of the two-car garage had been pulled down, likely by the fire department, which provided viewable access to the framing. It was found that the floor/ceiling I-beams above the garage and below Bonus Room 1 had begun to sag.



An overview of the garage looking from the entry door into the garage hall.



The joists which are sagging in the vicinity of the understood location of the fire's origin.

3.  The finishes of the single-car garage suffered no visible fire damage. Smoke from the fire was present. However, framing above the south end of this room, in the attic space, was damaged by the fire.



4.  The fire just breached the cased opening leading from the Garage Hallway into the Kitchen. Fire damage was observed to the sheetrock and trim around this opening. Fire did char a portion of the refrigerator bulkhead and the crown molding attached at the top. No other fire damage was observed in this room. Smoke was present on the finishes including but not limited to: appliances, countertops, cabinets, drywall, trim, and windows.



Fire damage to the wall and the top of the refrigerator bulkhead.



The top of the cabinet above the refrigerator with no damage. The other cabinets within the kitchen were in this same undamaged (by fire) condition.

5.  Holes had been punched in the Dining Room drywall at the ceiling and within a furr down used to run ductwork. The insides of the cavities were inspected. No smoke or soot was found to be present.



Holes in the ceiling and wall of the Dining Room.



The inside of one of the cavities showing it to be clean of smoke damage.

6.  The remaining rooms including the Master Bedroom, Master Bathroom, Master Closets, Living Room, Powder Bath, Entry Closets, and Office all sustained soot/smoke damage. No fire damage was present. All finishes of these rooms can be remediated by cleaning and painting. The exception being the carpet and pad of the Master Bedroom and Closets. The tile floor covering ran continuously from the Garage Hallway and therefore replacement of this flooring was included in the proposed scope of work. The floor tile of the Master Bathroom and Guest Bath, as well as the white, cultured marble countertop of the Master Bathroom, were test cleaned. It was found these building components were cleanable and did not require replacement.

6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 24 of 58

1312 West 60ᵗʰ Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 24



Master Bedroom



Master Closet



Master Bathroom



The Living Room looking towards the Kitchen and Entry

6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 26 of 58
1312 West 60th Street North
Muskogee, Oklahoma
COLLINS v. STATE FARM
June 23, 2023
Page 26



The upper sections of the Living Room.



A sconce light installed at the stairwell to the second-floor bedrooms. Cleaning of this
light fixture will address the minimal soot accumulation.



Location of the Guest Bath test clean before cleaning. A floor mat had protected the tile
from smoke and soot.



The same area after the test clean. The soot has been fully removed from the tested area.

**EXTERIOR:**

1.  A tarp had been placed over the west facing elevation of the two-car garage.

2.  Three upper-level windows had been covered with particle board sheathing. The window locations included: window in the south wall of Bonus Room 1 (Exercise Room); west wall of Bonus Room 2 (Theater Room); and a decorative (faux) window in the west gable of the attic space above the second-floor bedrooms. A fourth window, located in the garage, showed evidence of condensation. Other causes possibly caused the condensation build-up, but the window was in the general area of the fire.



The tarp installed over the double garage with the partially boarded window of the Theater Room.

3.  Exterior light fixtures were undamaged by the fire and had no soot collection.

6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 29 of 58

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 29



4. The brick, hardboard, and stone cladding at the front elevation were undamaged. However, the fire appeared to have damaged the gable wall framing which caused the need to remove and replace/reset some of this cladding as it is attached to the framing.



The framing behind these gables were fire damaged. Otherwise, the cladding was undamaged.

5. The gutter across the front of the porch appeared to have been damaged by the fire fighters accessing the roof. Otherwise, the remainder of the front elevation was undamaged.



6.  The east elevation of the residence was undamaged.



7.  The back elevation was also undamaged.





8.  The entry doors, storm doors, and windows were all inspected for fire/smoke damage. Other than the windows previously discussed, all were free of damage and could be restored with cleaning and/or painting.

### Roof:

1.  The shingles of the roof were found to be a 30-year laminated, composition shingle. Due to the fire damage to the framing in the Attic 1/Bonus Rooms area, much of the roof required replacement.

2.  The west facing gable of the Attic 2 area exhibited smoke damage where the fire had burned through the previously discussed window.



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The following were observations made at the subject property during the second inspection on May 19, 2023. At that inspection, it was observed that the Plaintiffs in this matter and moved back into the subject residence.

1312 West 60th Street North         June 23, 2023
Muskogee, Oklahoma      COLLINS v. STATE FARM      Page 33

## ATTICS:

1. Much of the debris in the bonus room had been removed. The sagging floor I-beams had been cut back with a temporary wall placed below the remaining I-beams. The roof decking and some of the rafters had been replaced.



This photo is nearly the same perspective of that include at the top of page 11 of this report.



1312 West 60th Street North                                                                                        June 23, 2023
Muskogee, Oklahoma                                    COLLINS v. STATE FARM                                            Page 34

The roofs decking has been replaced but partially charred rafters remain.



This area, above the origin of the fire, shows new decking and new rafters attached against the fire damaged rafters. An odor sealer has been applied to the old framing members.



6:22-cv-00318-JAR   Document 68-6   Filed in ED/OK on 02/16/24   Page 35 of 58

1312 West 60th Street North
Muskogee, Oklahoma

COLLINS v. STATE FARM

June 23, 2023
Page 35

A fire damaged rafter with a new sister rafter. Both have been sealed.



The south wall of the Theater Room. The finishes have been removed but the framing was not replaced despite a new roof being installed above this section of the house.

2.  All three of the previously discussed fire damaged windows in the second floor had been replaced. No other windows were new. The window in the Attic 2 gable had been partially reframed. However, other fire damaged framing had been left in place.



Some new framing below the Attic 2 window. Other fire damaged framing was left in place.



The exterior side of the new window in the Attic 2 gable. The siding was not replaced.

## ELECTRICAL:

1. There was not any evidence that any electrical wiring had been replaced including the wiring running through and/or near the fire damaged areas of the home.

2. Nearly all lighting was tested for operation and all were found to be working at the time.

## SECOND FLOOR INTERIOR:

1. The Bonus Rooms and Bathroom had been demolished of their finishes. The framing repairs had been partially completed.

2. The Bedrooms and adjacent rooms appeared to be largely unchanged since the previous inspection except the rooms were now occupied. It appeared the rooms had been cleaned. If the walls, doors, and trim had been painted, they were painted the same colors. The carpeting appeared to have not been replaced. There was no evidence of visible smoke nor a detectable smoke odor.



The carpeting in the closet of Bedroom 1 with the same home hole from the carpet sample extraction as seen on page 15 of this report.

## MAIN LEVEL INTERIOR:

1. The fire damaged garage hallway had been partially repaired. New sheetrock, a new door to the Bonus Room Stairs, and a new door from the Garage had been installed. The room had not been painted and trim had not been installed. The flooring appeared to be the same and was not new.





2. The Laundry Room was entirely finished indicating the finishes had not been replaced in this room. What appeared to be the original drywall, cabinets, baseboard, floor tile, and hot water heater were all still in place.







The original hot water heater located in the laundry room. The installation and inspection
stickers are dated January 2016.

3.  The stairs to the Bonus Room have largely been unrepaired except for the application of an odor control sealer.



4.  The fire damage to the Kitchen door casing, drywall, and cabinet bulkhead had been repaired/replaced and repainted. Kitchen fixtures had been cleaned but appeared to be the same units, including the appliances.



The kitchen from nearly the same perspective as that provided on page 20 of this report.

1312 West 60ᵗʰ Street North                                          June 23, 2023
Muskogee, Oklahoma                    COLLINS v. STATE FARM                Page 42

5. Drywall repairs of the holes had been made in the Dining Room and the room had been painted.



6. The remaining rooms of the Main Level had been cleaned and perhaps re-painted. All the flooring appeared to be the original flooring.



The Master Bathroom from nearly the same perspective as the photo on page 24 above.

**EXTERIOR:**

1. No repairs to the exterior elevations had been completed except for the above-mentioned replacement of three windows.

**ROOF:**

1. The roof over the two-car garage and part of the single-car garage had been replaced. The rest appeared to be original.



The section of the roof which had been re-roofed.



The interior of the box is the approximate area of the roof which was re-shingled.

*********************************************************************************************

***Opinion #1:*** *Chad Williams (Williams) of Valor Forensic Engineering Services provided a report dated May 11, 2021. The report offers a conceptual scope of repairs based on the inspection made by Williams on May 4, 2021. The scope of repairs offered and damages discussed by Williams are mostly the same as those I observed and were included in the final State Farm estimate. A few recommendations were not consistent with my observations. I believe this went beyond the work necessary to remediate and repair the damages.*

1. Williams recommends to replace all the reflective (radiant barrier) sheathing including that installed over Attic 2. Based on information and belief, this recommendation was based on a tear in the radiant barrier in one location. My observations found that the nearest tear in the radiant barrier was approximately 30' from the nearest fire damage. It is not reasonable to conclude the fire caused the tear in the reflective sheet. It is more likely this tear occurred as the sheathing was being installed. Any smoke that collected on the sheathing and framing can be remediated without replacement.



2.  Williams noted the fire damage around the Attic 2 gable window. However, he recommended that the entire wall be re-framed. As the damage was limited to the immediate window area, it would not be necessary to re-frame the entire wall. It is a common practice to repair fire damage within a framed section without replacing the entire section.



The fire damage is limited to the window framing and the portions of the studwall just below the window. It would not be necessary to replace the entire wall, measuring approximately 32' wide, to repair this damage.

3. He recommends "removal and reconstruction of the kitchen cabinets due to the fire damaged at the refrigerator cabinet". He also discusses the possibility of replacing all the cabinets due to matching concerns. As previously discussed, the kitchen cabinet damage was limited to the bulkhead and crown molding used to trim the top of the cabinet. The bulkhead is made of plywood which can easily be matched as it has no detail. The crown molding can likely be matched. However, State Farm estimated to replace all the crown molding across the top of the cabinets anyway. State Farm also painted all the cabinets, inside and outside, to match the paint and address any smoke that could not be cleaned.

4. Williams seems to recommend that all roof and second floor framing around the Bonus Rooms be replaced due to fire damage. At the time of his and my 2021 inspections, it was evident that this recommendation was too broad and unnecessary. The photo on page 12 of this report documents the lack of damage is the north section of the second-floor framing and roof. Williams seems to recommend replacing this area of framing. My 2023 inspection, which occurred after the finishes had been removed from the Theater Room, shows the fire did not burn over this room.



The south sloped ceiling of the Theater Room is on the left. The fire spread from the area of the attic farther to the left of this photo. This photo shows the fire was blocked at the short wall of the Theater Room and contained within the attic space. It would not be necessary to replace all this framing and additional framing to the right of the photo as Williams seems to recommend.

5. In addition to the four (4) windows discussed earlier in this report, Williams recommended to replace a window located in Bedroom 2 of the second floor. Since this area sustained no fire damage, it is not reasonable to conclude that condensation in the window is a result of the fire loss. It is more likely the seals of the thermal window failed for other reasons, e.g., manufacturing issue.

6. Other recommendations offered by Williams appear to have been included in the final State Farm estimate dated October 11, 2021.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**_Opinion #2:_**  *Luke Hibbs (Hibbs) of The Mold Consultant offered a report with recommendations as to repairs due to fire and smoke. The recommendations offered by Hibbs appears to have been almost entirely addressed within the State Farm estimate dated October 11, 2021.*

1. Hibbs recommended fully replacing the drywall finishes in the "areas directly affected by the fire". His directly affected rooms include: Laundry Room, Garage, Kitchen, Hallway from Garage, and Upstairs Bonus Rooms. All these rooms are included in the State Farm estimate except for the Kitchen which was only directly affected just inside the cased opening from the Garage Hallway. It is not necessary to demolish an entire room when only a small portion of the room was directly affected. To demolish all the finishes of the kitchen to repair the limited damage, as seen on page 20 of this report, would be unnecessary causing delays in the period of restoration and greatly inflating the cost of the repairs.

2. Hibbs recommended "cleaning, resealing, repainting, and deodorization" of the rooms. The State Farm estimate includes these recommended repairs.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**_Opinion #3:_**  *A report, dated July 26, 2021, was submitted as prepared by Kevin Dandridge (Dandridge) of 1 Life Safety LLC. The report and attached estimate are unreliable as they include proposed work and charges that do not apply to the repairs necessary at the subject property. Proposed unit quantities and unit costs are inflated and do not reflect realistic charges if the charges were necessary. The $186,236.00 estimate grossly overstates the true cost to completed the exaggerated scope of work proposed by Dandridge. The report and estimate should be disregarded.*

1. Dandridge acknowledges having not visited the subject property. Instead, he relied on documents provided to him including photographs.

2. Much of the written portions of the report appear to be general language as much of the discussion involves details that are not part of the subject residence's design or construction. Therefore, these sections are not applicable.

3. Dandridge states "all safety protocols set by the CDC will be enforced until the restrictions are released". It is unclear what CDC protocols Dandridge is referring to as he does not cite them. By July 2021, requirements to wear masks indoors had been lifted. Even recommendations or advise by the CDC had been reduced regarding masks. Hand washing stations were not required nor expected. Breathing masks were not required to be always worn as stated by Dandridge.

4. He states "All work that will have to be done in the fire affected areas will need to be done with gloves and masks to make sure that the employees are not coming into contact with dangerous carcinogens". Gloves and masks, during debris removal, are standard equipment used by contractors in the same way that framing contractors use hammers and saws to complete the framer's tasks. It should be noted, the debris removal of debris which may have carcinogens from the fire would anticipate to be completed in 1-2 weeks.

5. Dandridge seems to not understand the subject residence is located on an acreage in the rural area of the county, as he states several charges are necessary to include: flagmen to prevent people from walking into constructions zones; fencing because of public access to the property; and ground-level scaffolding to cover walkways. These precautions may occasionally be needed on large projects in areas where the public does have access. They do not apply to this matter.

6. He states "A daily FOD, Foreign Object Debris, walk will have to be done at the end of each day to make sure that there is no material trash or debris left in walkways or access points of the building". This is a common practice that is expected of every contractor working on a project. Each Xactimate line item includes labor assumptions which include the cost to travel to the job site, set up for the day's work, keep the job site clean, etc. In other words, each of the line items in any of the Xactimate estimates already includes a factor contributing to the charge of maintaining a clean and safe jobsite. Inclusion of any additional charges only serves to inflate the estimate.

7. Dandridge includes 500-hours of "safety monitoring systems". Even based on the overstated scope of work, supervising the work is not necessary. Safety is a priority on every project, no matter the size. Each contractor has an awareness as to their safety needs and requirements and is expected to follow them. The General Contractor also has a role in

assuring the contractors executing the work are doing so with the appropriate safety requirements in mind. Charging the customer of a fire reconstruction project an additional $47,500 to oversee work which others are expected to execute safely only serves to inflate the estimate.

8.  Dandridge includes a charge for three (3) portable toilets/handwash stations for 25-weeks. One temporary toilet, which typically includes hand sanitization, would be expected during the duration of the anticipated 6-month project. The rate of a temporary toilet is approximately $150/month. By charging for 3-units at $200/week (approximately $800/month), Dandridge has inflated the estimate over $14,000 or 1,500%.

9.  The estimate includes a charge for N-95 Masks. As previously discussed, masks are part of contractors' equipment. Trim carpenters oftentimes where them daily in the same way they use their saw daily. The mask charge is not necessary. Still, Dandridge charges a unit cost of $42.50 per mask. N-95 masks can be purchased in bulk for $0.60/each. Research found that they could be purchased for about $1.00/each in November of 2021.[14] Even if it were necessary to charge a customer for a contractor to use expected equipment, the mark-up of 4,250% or nearly $6,000 offered by Dandridge is unreasonable. If Dandridge's estimate represents a cost of $42.50 per box of masks, then the calculation can be broken down to each of his proposed 20 workers will use 40 masks per week. Both quantities are significantly inflated and out of line.

10. Dandridge estimates that the job will require the use of 1,250 pairs of leather/cut proof gloves. It appears he anticipates each worker utilizing 2.5 pairs of leather gloves per day. Leather gloves are reusable and when maintained each pair last for months or longer. Further, leather gloves are standard equipment used by contractors. The entire $9,000 charge entered by Dandridge is unreasonable.

11. Goggles are also standard equipment and taken from job-to-job by contractors. However, Dandridge estimates that the workers will require 25-pair of goggles for a duration of 65-weeks. The period-of-restoration is reasonably expected to be six-months. Dandridge seems to agree with this in other areas of the estimate where he estimates a 25-week duration, e.g., line item for safety monitory system. In this case, the unnecessary charge for goggles is inflated in price, number of units, and duration. The entire $20,312.56 charge for goggles is unreasonable and unnecessary.

12. A similar overstatement occurs with the cost for earplugs. They are standard equipment and Dandridge estimates the charge for this

---

[14] N95, KN95, or Cloth Masks? Prices Surge As CDC Weighs New Recommendations - Bloomberg (bingj.com)

equipment should last for 52-weeks. The $6,240 charge for earplugs is unreasonable.

13. Head protection is also standard equipment. Contractors own their own hardhats and take them from job-to-job.

14. Dandridge includes a charge for a portable fire extinguisher because it is required "within 75 feet of each pump, dispenser, underground pipe opening, and lubrication or refueling service area". None of these exist in this residential fire reconstruction.

15. He estimates a charge of $30,000 for a flagman to be onsite 40-hours a week for 25-weeks. Again, it seems Dandridge seems to be unclear as to the job surroundings and the reasonable scope of work necessary to remediate and repair the subject residence.

16. A charge of $60,000 is entered for what appears to be the preparation and maintenance of the electrical system during the repairs. Again, it appears Dandridge does not understand the existing electrical system, the damage it sustained, or the electrical requirements which will be needed or allowed during the period-of-restoration. As is customary in the restoration industry, the existing electrical system would be disconnected and a temporary power system put in place with limited power usage. All of which would be done with the oversite of the local building inspection department. The costs associated with these charges are properly accounted for in the final State Farm estimate.

17. Dandridge charges $3,925 for a debris chute or hopper and hardware. It is unclear where this chute would be assembled and utilized. It is not necessary for this project.

18. A 40-hour/week charge is included for a laborer to manage the storage of materials. Materials will be delivered on an as-needed-basis and will not require a full-time employee to assure the materials are "stored in tiers and meet safe load limits of floors".

19. Fall protection, such as harnesses, are standard equipment for roofers and framers. An additional charge is not necessary.

20. For this project, a telehandler would not be utilized. The framing is constructed with stick framed, nominal lumber. Lifting of trusses is not necessary. Roofing items would be loaded when delivered. The 25-week duration offered by Dandridge is unreasonable. Even if a forklift were necessary, it would only be on site in the early stages of the project. The entire $11,250.00 charge is unnecessary.

21. The Dandridge estimate is so unreliable that the public adjuster who solicited the estimate, Ian Rupert, seems to have largely disregarded it.

*********************************************************************************************

**_Opinion #4:_**  *The Plaintiffs' Public Adjuster, Ian Rupert, submitted an estimate dated July 16, 2021. The total for the Dwelling and Other Structures sections of the estimate was $505,376.76. The estimate contains many inaccuracies. It cannot be relied upon to determine the true cost to repair the damage sustained by the fire loss on January 11, 2021.*

1. The paragraphs below include some of the more significant overestimations included in the Rupert estimate. To provide an exhaustive list of the items found in the 81-page estimate is beyond the scope of this report.

2. The estimate was provided to State Farm in August of 2021 approximately six-months after Rupert was retained by Collins.

3. Many of the safety items included in the Rupert estimate are unreasonable and unnecessary charges. Some of these items have been previously discussed.

   • Roof anchors and safety harnesses are standard equipment and are not typically charged as an add-on by contractors.
   • It would not be necessary to construct a fence around the residence in this setting. Construction materials can be maintained within the secured facility. The public does not have access to the property.
   • For the same reason, warning signs and additional barricade system set-up is not necessary. Even if it were, a charge for 10 signs at a daily rate for 180 days (calculated to 1,800 days) for a total of $6,829.20 is unreasonable.
   • For this job, the line-item for personal equipment is not necessary. The necessary equipment are standard items and expected to be taken from job-to-job. The quantity entered by Rupert is unreasonable. For the scope of work necessary, it is not expected that there will be 20-workers on the job site in any one day. To estimate that 20-workers will be on the job site everyday of work for 6-months is unreasonable.
   • For reasons previously discussed, safety monitoring is not necessary.

4. Rupert used several line items to account for the demolition or debris removal of the fire damaged property. On line 22 of the estimate, he adds a rounded 120 hours of debris removal to account for debris to include "All except Roofing, Framing, and Above Lines". As Xactimate provides several ways to estimate debris removal more accurately, like the methods utilized by Rupert for "Roofing Framing and Above Lines", it is

unclear why Rupert found it necessary to add these undocumented hours. It is likely the line-item entry has inflated the estimate.

5. Rupert manually manipulated the pricing of many of the line items in the estimate. One example is found at Line #36 on Page 7 of the estimate. The standard Xactimate unit price to *Remove Laminated – comp. shingle rfg. – w/felt* (as provided by the June 2021 Xactimate pricing database used by Rupert) is $47.32/Square[15](SQ). Rupert manipulated this price to $103.28/SQ. This type of manipulation appears to have been repeated on the demolition of all roof and roof related items in the estimate. This is contrary to roofing industry standards and served to inflate the estimate. Rupert's opinion seems to be that the removal of the shingles and other roofing items should be estimated using the roofing labor rates of the most skilled workers instead of Xactimate's researched labor rate. This is incorrect for the following reasons:

   a. It is contrary to how Xactimate develops and characterizes its unit prices. Xactimate queries the marketplace, e.g., vendors, materialmen, supply houses, etc. for its pricing data points; hence, the $47.32/SQ price is the data driven, researched price rather than the $103.28/SQ which Rupert utilized. If roofing contractors, providing competitive bids, reported their pricing in the amount Rupert suggests, those reported unit prices would be the data analyzed and reported by Xactimate as the current market unit price. Instead, the $47.32/SQ price serves as the market driven price.

   b. It is contrary to common practices. Every roofing crew has members with varying skills, responsibilities, and pay rates. His assertion that the applicable labor rate for all tasks needed to remove/replace a roof should always be the highest Xactimate roofing rate. This suggests that only the most skilled roofers on the crew will complete all the tasks associated with replacing a roof, including the roof shingle tear-off. This is not the case in the roofing marketplace. In reality, a roofing crew splits the responsibilities with: the lesser skilled workers tearing-off the shingles, hauling the shingles to the onsite trash container, and cleaning up around the job site, etc.; and the more skilled workers installing the shingles and other roofing components that require greater knowledge, skill, and experience. This is further supported by Xactimate's differentiation of roofing tasks/skills and commensurate rates: skilled roofer, $92.34/hour; roofing general labor, $32.41/hour.[16]

---

[15] Xactimate estimating software pricing database for Muskogee, OK, OKMU8X_JUN21
[16] Xactimate estimating software pricing database for Muskogee, OK, OKMU8X_JUN21.

6.  The manipulation of unit pricing in Rupert's estimate runs counter to the highly researched unit pricing found within the Xactimate software system. When assembling the price databases, Xactimate obtains routine feedback from a wide variety of data sources and uses a proprietary cluster analysis algorithm to develop a "range of cost" for a particular item.[17]   The unit price is the best representation of an identified "range of cost". Xactimate acknowledges some of its collected market pricing data may be higher or lower than its published unit price; however, this in and of itself is not justification for arbitrarily increasing the unit pricing. The Xactimate published price is the *most representative price*. Rupert arbitrarily changed the most representative price without the basis outlined by Xactimate.

7.  Rupert replaced all the structure's roof decking when the decking attached to the roof above Attic 2 was undamaged.

8.  The estimate includes the replacement of ten windows which is greater than the four documented to be damaged. Rupert ignores the recommendation of the engineer he solicited, Williams, who recommended the replacement of five windows.

9.  When the addition of General Contractor Overhead and Profit (GCOP) is expected, as it is in this case, the common markup rate is 10% for overhead and 10% for profit which is applied to the Xactimate estimate's subtotal. This is the industry standard. Rupert chose to excessively markup each at a rate of 20%. Rupert's cumulative markup of 40% is not a common practice. His assigned markup only serves to inflate the estimate as it would cause the estimate to be uncompetitive in the reconstruction marketplace.

*************************************************************************************

**<u>Opinion #5</u>:** *The estimates prepared by State Farm reasonably addressed the documented fire-caused damages to the subject property. The State Farm representative appears to have followed industry standard methods, common in the damage evaluation industries, when inspecting the property for damages. The estimates prepared by State Farm was prepared in ways common to what is typical when estimating fire damages. The final State Farm estimate reasonably includes the necessary costs to return the subject property to a pre-loss condition.*

---

[17] "Pricing Research Methodology," published by Xactware Solutions, dated 2/6/18, available at https://www.xactware.com/globalassets/us/pdf/brochures/pricing-research-methodology.pdf.

1312 West 60ᵗʰ Street North                                                    June 23, 2023
Muskogee, Oklahoma                    COLLINS v. STATE FARM                     Page 54

1. State Farm utilized the Xactimate estimating software to prepare the estimate to repair fire-related damages.

2. The final pricing database selected by State Farm, OKMU28_OCT21, accurately matches the month the estimate was prepared and the geographic locale of the subject residence.

3. The estimated scope of work and quantities itemized within the estimate appears to match the repairs needed to return the property to its pre-loss condition. The final estimate total reasonably represents the true cost to repair the fire-related damages.

4. Even within the initial estimate, which served as the starting point, the quantities and dimension used to prepare the estimate closely matched those which I observed.

5. The initial State Farm estimate was prepared within weeks of initially visiting the property. This is common when estimating for large losses.

6. State Farm did not receive another estimate from the owners' representative until Rupert submitted his report approximately six-months after being retained. State Farm promptly reached out to Berryman Enterprises to inspect the property and prepare another bid for comparison.

7. Upon receiving the Berryman bid, State Farm promptly revised its estimate by largely adopting Berryman's bid.

8. The initial estimate served as a reasonable starting point to work toward an agreed scope and price. The final State Farm estimate reasonably addresses the necessary costs to return the property to its pre-loss condition.

I understand that discovery is in progress and I reserve the right to supplement this report to address additional information made available to me. Any document contained or referred to in this report may be used as an exhibit to illustrate my testimony.  Please find attached as a part of this report my current Curriculum Vitae which list all cases in which I have given testimony, both at deposition and trial over the last four (4) years.  It establishes my qualifications and my compensation.

Sincerely,

Derek VanDorn
BERRYMAN ENTERPRISES, INC.

**CURRICULUM VITAE**

**Name:**     Derek VanDorn
**Born:**     April 15, 1974
           Shattuck, Oklahoma

**Occupation:**  Construction Consultant
           Berryman Enterprises, Inc.
           General Contractor / Consultant
           426 N.W. 5th Street
           Oklahoma City, Oklahoma 73102

**Education:**  M.B.A., Cameron University, 2004
           Business Administration

           B.S., Oklahoma State University, 1998
           Finance

**Experience:**  General Contractor/Consultant, Berryman Enterprises 2017-Present

           General Contractor, Phoenix Construction, 2015-2017

           General Manager, Steve Breed Construction, 2007-2015

           Claim Specialist, State Farm Insurance, 1998-2007

**Certifications:** Oklahoma Commercial Roofing Endorsement

**Compensation Structure:**

Expert services and review, study, estimation, and written opinions shall be billed at a rate of $345/hour.

Expert services at deposition and trial shall be billed at $525.00/hour.

**Previous Depositions and Court Appearances (Four Years):**

1) Lisa West and Stormy Hopson, individually
   and as class representatives, v.
   ABC Oil Company, Inc., et. al.
   In the United States District Court
   For the Western District of Oklahoma
   Case # CIV-16-264-F
   Deposition Date: June 5, 2020

2) William and Rachel Marchant,
   v. Magnum Contemporary Housing,
   Inc., and Palm Harbor Homes, Inc.
   And Palm Harbor Village, Inc.
   In Private Arbitration
   Arbitration Date: July 28, 2020

3) Jody and Jerry Bryant,
   v. North Star Mutual Insurance
   Company and Dome Insurance
   Agency, LLC,
   District Court of Oklahoma County, Oklahoma
   Case # CJ-2020-70
   Deposition Date: October 28, 2021

4) L. Duane Wilson and Helen L. Wilson
   v. State Farm Fire & Casualty Company
   For the Northern District
   Of Oklahoma
   Case #: 21-CV-00062
   Deposition Date: December 15, 2021

5) Eric and Micah Proe,
   v. Glenn Dennis Emery, Mike
   Emery, dba Diamond Homes
   District Court of Hughes County, Oklahoma
   Case # CJ-2019-63
   Deposition Date: May 31, 2022

6) Johnnie L. Greer
   v. State Farm Fire and Casualty
   Company, and Robert W. Kawero
   District Court of Canadian County, Oklahoma
   Case # CJ-2019-151
   Deposition Date: June 7, 2022

7) Thomas H. Bates
   v. State Farm Fire and Casualty
   Company
   For the Western District
   Of Oklahoma
   Case # CIV-21-705-JD
   Deposition Date: June 28, 2022

8) First Presbyterian Church of
   Arkansas City
   v. Brotherhood Mutual Insurance
   For the District of Kansas
   Case # 21-CV-01201-KHV-JPO
   Deposition Date: August 31, 2022

9) Kevin W. and Rebecca Hoog
   v. Dometic Corporation
   For the Western District
   Of Oklahoma
   Case # CIV-20-00272-JD
   Deposition Date: September 30, 2022

10) Eric and Micah Proe,
    v. Glenn Dennis Emery, Mike
    Emery, dba Diamond Homes
    District Court of Hughes County, Oklahoma
    Case # CJ-2019-63
    Trial Testimony: October 28, 2022

11) Thomas H. Bates
    v. State Farm Fire and Casualty
    Company
    For the Western District
    Of Oklahoma
    Case # CIV-21-705-JD
    Trial Testimony: November 7, 2022

12) Garrett and Ashley Foster
    v. United Built Homes
    In Private Arbitration
    Deposition Date: November 16, 2022

13) AC Owen Construction, LLC,
v. Jeremy W. Cramer, D.V.M.,
P.L.L.C. d/b/a Lakeview
Pet Hospital,
In Private Arbitration
Deposition Date: January 11, 2023

14) Jonathan and Jessica Plasencia
v. Asher Homes, LLC
In Private Arbitration
Case # 01-22-0003-2957
Hearing Date: January 23, 2023

15) AC Owen Construction, LLC,
v. Jeremy W. Cramer, D.V.M.,
P.L.L.C. d/b/a Lakeview
Pet Hospital,
In Private Arbitration
Hearing Date: February 3, 2023

16) Mike Hazlip, et al., v White Star
Petroleum, LLC. et al.,
District Court of Payne County,
Oklahoma
Case # CJ-2018-87
Deposition Date: February 16, 2023